UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MAURA O'NEILL, as administrator of the Estate of Madelyn E. Linsenmeir, <br><br> Plaintiff, <br><br> v. <br><br> CITY OF SPRINGFIELD, MOISES ZANAZANIAN, REMINGTON MCNABB, SHEILA RODRIGUEZ, HAMPDEN COUNTY SHERIFF'S DEPARTMENT, and JOHN/JANE DOES NOS. 1-5, <br><br> Defendants. | Civil Action No. _____ |

**COMPLAINT**

## INTRODUCTION

1.   This is a complaint against the City of Springfield and the Hampden County Sheriff's Department, as well as several of their respective law enforcement officers, for the wrongful death of Madelyn Linsenmeir.  Madelyn died in custody on October 7, 2018, from illness arising from an infected heart valve.  She was 30 years old.  She left behind a young son and grieving family.

2.   Madelyn's illness was treatable.  Her life could have been saved; her suffering could have been spared.  She was in the defendants' custody.  She begged them for help.  Other prisoners sought help on her behalf.  But the defendants refused and caused her death.

3.   As shown below, Madelyn lived a difficult life. She survived for years while suffering with substance use disorder. She survived being subjected to human trafficking. What she could not survive, however, was the wrongdoing perpetrated against her by the defendants.

## PARTIES

4.   Plaintiff Maura O'Neill is the administrator of the estate of Madelyn E. Linsenmeir (the "Estate"). The Estate was formed under the laws of Vermont, by order of the Vermont Probate Court, to represent the interests of Madelyn E. Linsenmeir, who is deceased.  Madelyn E. Linsenmeir's minor son is the sole beneficiary of the Estate.

5.   Defendant Moises Zanazanian was at all relevant times a sergeant in the Springfield Police Department (the "SPD"). His actions alleged in this complaint were taken under color of the laws of the Commonwealth of Massachusetts and the City of Springfield. He is sued in his individual capacity.

6.   Defendant Remington McNabb was at all relevant times an officer in the SPD. His actions alleged in this complaint were taken under color of the laws of the Commonwealth of Massachusetts and the City of Springfield. He is sued in his individual capacity.

7.   Defendant Sheila Rodriguez was at all relevant times an employee of the SPD. Her actions alleged in this complaint were taken under color of the laws of the Commonwealth of Massachusetts and the City of Springfield. She is sued in her individual capacity.

8.   Defendant City of Springfield (the "City") is a Massachusetts municipality.  The SPD is a component of the City.  The SPD's headquarters is at 130 Pearl Street in Springfield, Massachusetts.

9.   Defendant Hampden County Sheriff's Department (the "HCSD") is a component of the Massachusetts state government.  The HCSD operates the Western Massachusetts Regional Women's Correctional Center (the "WCC"), which is in Chicopee, Massachusetts.

10. John/Jane Does Nos. 1-5 are employees of the WCC who are not yet identified.

**JURISDICTION AND VENUE**

11. Jurisdiction is proper under 28 U.S.C. §§ 1331, 1343, and 1367. Venue is proper under 28 U.S.C. § 1391.

### ALLEGATIONS

### Madelyn's Life, Family, and Struggle with Opioid Use



*Fig. 1: Madelyn Linsenmeir and her son.*

12. Madelyn Linsenmeir was born in Burlington, Vermont.  Her family remembers her as a "born performer," who "had a singing voice so beautiful it would stop people on the street." She was "hilarious, and warm, and fearless, and resilient."  She is remembered as a loving mother to her young son.

13. Madelyn was also a victim of the opioid crisis, having developed substance use disorder after using prescription opioids in high school. During her young adult life, Madelyn repeatedly sought treatment for opioid use, and as often happens with this disease, repeatedly relapsed into active addiction.  By 2018, Madelyn's son, then three years old, was living with her sister Maura O'Neill while Madelyn struggled to overcome her addiction to opioids.

14. In April 2018, Madelyn was sentenced to probation in New Hampshire for a drug-related offense.

15. Shortly thereafter, Madelyn was subjected to human trafficking. She was kidnapped and then trafficked in Rhode Island. While held captive, she was drugged with fentanyl, burned, stabbed, and raped multiple times.

16. The traffickers were later arrested, and Madelyn was returned to New Hampshire due to her outstanding probation obligations there.

17. In August 2018, the New Hampshire court authorized Madelyn to continue her probation in Vermont, where she could receive medical, psychiatric, and substance use treatment near her family. Madelyn was treated at the Brattleboro Memorial Hospital and the Brattleboro Retreat. Madelyn was diagnosed with post-traumatic stress disorder, and she reported severe anxiety, flashbacks, and nightmares, among other symptoms.

18. On or about August 20, 2018, Madelyn stopped going to the treatment facility in Vermont. Her family did not know where she was. She ultimately made her way to Massachusetts.

19. Madelyn's departure from Vermont triggered the issuance of a probation-related arrest warrant from New Hampshire.

**Madelyn Develops a Life-Threatening, but Treatable, Heart Condition**

20. By late September 2018, Madelyn was suffering from infective endocarditis. Infective endocarditis is a life-threatening, but treatable, infection of the heart, usually involving one of the valves. The infection results in the growth of a "vegetation" of infected material on the surface of the valve. Pieces of the vegetation can break off and lodge in the tissues of the lungs, creating septic emboli and cavitary lesions of the lungs. Symptoms of infective endocarditis consequently can include chest pain and difficulty breathing. Infected material can also migrate to other areas of the body, ultimately causing infections in the organs and joints, as

well as sepsis.  People with a history of intravenous substance use, such as opioid injection, are at elevated risk of infective endocarditis.

21. On September 28, 2018, Madelyn sent her mother, Maureen Linsenmeir, a text message stating, "*I need to go to the hospital I am dying i weigh 90 pounds mom I need you.*"



*Fig. 2: September 28, 2018 text message from Madelyn to her mother.*

22. Later that day, Madelyn sent her sister Kate O'Neill a series of text messages stating, among other things:

- "*I am really sick*"

- "*I just need to get help go to the hospital*"

- "*I am just in a lot of pain 90 pounds can't eat sleep my chest Hurst my knee is so swollen i can't even walk*"

Madelyn also stated, however, that she was scared to seek help at a hospital because she believed "*the hospital checks for warrants,*" and she "*[didn't] want to go to jail [like] this.*"



*Fig. 3: September 28, 2018 text message from Madelyn to her sister.*

6

23. Madelyn's family did not know where she was or how to help her.

24. Ultimately, the decision whether Madelyn would go to the hospital did not belong to her.

25. The SPD arrested her the next day, September 29, 2018, and charged her with being a fugitive from the New Hampshire warrant and with giving a false name.  For the remainder of her life, Madelyn was in custody, at the mercy of her jailors' decisions to provide or withhold medical care.



**The SPD Refused to Provide Madelyn with Medical Treatment**



*Fig. 4: Madelyn in her initial booking interview.*

26. The SPD headquarters contains a booking area and lockup for processing and detaining arrestees.

27. The SPD's booking area is subject to video surveillance and recording.  The video surveillance system can record audio.  SPD officers activate that audio recording system by pushing a button behind the booking desk.  On information and belief, SPD officers routinely activate that audio recording system when interacting with arrestees.

28. On September 29, 2018, Sergeant Zanazanian worked two consecutive shifts as a booking supervisor at the SPD headquarters, starting at 4 p.m. on September 29 and ending at 8 a.m. the following day.  During those shifts, Sergeant Zanazanian was responsible for the safety and welfare of prisoners booked and held at the SPD headquarters.

29. On September 29, 2018, Officer McNabb worked a shift as a booking officer at the SPD headquarters from 4 p.m. until midnight.  During that shift, Officer McNabb was responsible for the safety and welfare of prisoners booked and held at the SPD headquarters.

30. On September 29, 2018, Ms. Rodriguez worked a shift at SPD headquarters as a "matron"—that is the SPD's term—from 4 p.m. until midnight.  During that shift, Ms. Rodriguez was responsible for the safety and welfare of female prisoners booked and held at the SPD's headquarters.

31. Shortly after her arrest, Madelyn was transported by the SPD to the SPD headquarters for booking.

32. Both before and during the booking process, the SPD was aware that Madelyn had a history of intravenous drug use.

33. Madelyn was brought into the booking area at approximately 5:34 p.m.  She was visibly limping.

34. As Madelyn entered the booking area, Officer McNabb activated the audio recording feature of the surveillance system.  Sergeant Zanazanian and Officer McNabb were stationed behind the booking desk.  Ms. Rodriguez was stationed in front of the booking desk, where she could physically interact with Madelyn.

35. When Madelyn arrived at the booking desk, Sergeant Zanazanian asked her questions and entered her responses in a computer terminal.  Officer McNabb and Ms. Rodriguez remained present throughout the questioning and helped remove Madelyn's shoes and personal property.

36. Madelyn was tearful and cried out in pain when her right shoe was removed.



*Fig. 5: Madelyn being questioned by the SPD during booking*

37. Sergeant Zanazanian asked Madelyn, "Are you ill?"  Madelyn responded, "*Yeah, I'm very ill right now.  I can't even think straight.  I'm gonna like literally pass out from pain.*"

38. Sergeant Zanazanian asked Madelyn, "Are you seeking psychiatric care?"  Madelyn responded, "*No, but I might need to go to the hospital.*"

39. Sergeant Zanazanian asked Madelyn, "Why do you think you're gonna need to go to a hospital?"  Madelyn responded, "*I have a really really really bad chest, like I don't know what happened to it, it feels like it's caving in, I can't even breathe.  And my knees and my feet.*"

40. Sergeant Zanazanian asked Madelyn, "What's wrong with your knees and feet?"  Madelyn showed her swollen right knee and said, among other things, "*It's really bad.*"  She then broke down in tears.

41. Sergeant Zanazanian asked Madelyn, "Your left knee; what else?"  Madelyn responded, "*No, my right knee, and I can't breathe, my chest really hurts, and I'm gonna pass out because I need water.*"

42. Although Madelyn had clearly and repeatedly mentioned that she was having pain in her chest, Sergeant Zanazanian did not follow up about that. He instead asked Madelyn, "What's wrong with your feet?"  Madelyn responded, "*A lot.  I can't walk on them.  They're too swollen.  They're swollen.*"

43. Madelyn stated, "*I'm in so much pain right now.*"

44. Madelyn stated, "*I really need some water, I really feel like I'm gonna pass out.*"

45. Defendant Zanazanian asked Madelyn, "Are you gonna use the phone?"  Madelyn tearfully responded, "*Not this second because I really need to drink some water, please?*"

46. Ms. Rodriguez escorted Madelyn out of the booking area to the lockup.  SPD personnel also took photographs of her, including of her swollen right knee and leg area.

47. While Madelyn was in her cell, Ms. Rodriguez observed that she was in too much pain to lie down on the bed.

48. At approximately 7:38 p.m., Ms. Rodriguez escorted Madelyn back to the booking area, where Sergeant Zanazanian and Officer McNabb remained stationed behind the desk.

49. As Madelyn entered the booking area, Officer McNabb reached down to press the button that activates the audio recording system.  Sergeant Zanazanian made a hand motion instructing him not to do so.

50. Officer McNabb then withdrew his hand and did not activate the audio recording system.

51. Upon arriving in the booking area, Madelyn and Sergeant Zanazanian conversed for approximately two minutes.  When they were done talking, Madelyn was permitted to call her mother, Maureen, who was in Vermont.  Sergeant Zanazanian, Officer McNabb, and Ms. Rodriguez were nearby for the entire call. On information and belief, they overheard the call.

52. During the call, Sergeant Zanazanian, Officer McNabb, and Ms. Rodriguez heard Madelyn tell Maureen that she had been arrested, that she was really sick, that she was in pain, and that she needed help.  They also heard Madelyn tell Maureen that she had asked for, and been denied, medical attention.

53. During the call, Defendant Zanazanian made statements to Madelyn and her mother. Among other things, he said he would not provide Madelyn with medical attention.

54. Defendant Zanazanian directed Madelyn to end the phone call.

55. On information and belief, after Madelyn hung up the phone, she begged Sergeant Zanazanian, Officer McNabb, and Ms. Rodriguez for medical attention.

56. Madelyn was crying.  She again showed the defendants her swollen knee.  She then made repeated gestures pointing towards her chest and ribcage area.  It is clear that she was desperate, trying to convince an indifferent audience of her urgent need for medical care.



*Fig. 6: Madelyn in the booking area after her phone call*

57. But Sergeant Zanazanian, Officer McNabb, and Ms. Rodriguez did not call for medical assistance. Instead, Sergeant Zanazanian instructed Madelyn to leave the booking area. On information and belief, Ms. Rodriguez took Madelyn back to her cell.  Video shows Madelyn struggling to walk down the hall on her swollen foot and knee. She continued to tell Ms. Rodriguez that she was in pain.

58. Madelyn remained in SPD custody until she was transported to the WCC on September 30, 2018. The SPD held Madelyn in custody as a pretrial detainee. She was not being held under a criminal conviction and was not serving a criminal sentence.

59. While Madelyn was in SPD custody, it was obvious that she had serious medical needs. Madelyn's appearance and demeanor, and her repeated statements that she was having chest pain and difficulty breathing, made clear that she required medical attention.

60. Defendants Zanazanian, McNabb, and Rodriguez knew or should have known of, and were deliberately indifferent to, the serious risk to Madelyn's health and safety. Among other things, they heard her say repeatedly that she could not breathe and that her chest was "caving in." But the defendants did not call an ambulance for Madelyn, or otherwise transport Madelyn to a hospital, while she was in the custody of the SPD on September 29 and 30, 2018. The defendants consciously and unreasonably refused to provide Madelyn with medical treatment of any kind while she was in their custody.

### The WCC Refused to Provide Madelyn with Medical Treatment

61. On September 30, 2018, Madelyn was transferred to the WCC, a component of the HCSD. Madelyn was being held at the WCC as a pretrial detainee. She was not committed under a criminal conviction.

62. On information and belief, at all relevant times, it was the policy and practice of the WCC to house recently arrived detainees together in an orientation unit. In the orientation unit, detainees are generally locked in their cells. WCC staff make periodic rounds to observe and converse with the detainees. Detainees are allowed to leave their cells at certain times, such as for meals and recreation periods, and when medications are brought to the unit.

63. On information and belief, at all relevant times, the WCC had the capacity to "detox" opioid users in a controlled manner using opioid replacement therapy, such as methadone. Indeed, the WCC's detoxification protocol for pregnant detainees was to begin a methadone treatment program. However, for detainees who were not pregnant (and not already receiving methadone or buprenorphine), the WCC's standard practice and procedure was to force them

into withdrawal.  Opioid withdrawal (sometimes referred to as being "dope sick") is an excruciating experience that lasts for several days and often includes symptoms that can lead to serious complications: insomnia, abdominal cramps, severe diarrhea and vomiting, and dehydration.

64. On information and belief, as a result of the practices described in paragraph 63, above, the WCC's orientation unit contained a large number of opioid users experiencing withdrawal at any given time.  At least in part because the WCC's policy was to deny medically appropriate care to people suffering from withdrawal, its staff were acclimated to be deliberately indifferent to the medical complaints made by or on behalf of incarcerated opioid users, and to intentionally discriminate against such detainees because of their history of opioid use.

65. On September 30, 2018, during the medical intake process, WCC staff determined that Madelyn had a diagnosis of, among other things, "Alcohol abuse" and "Opioid abuse."

66. WCC staff placed Madelyn into a detoxification protocol on or about September 30, 2018.  Madelyn was ordered to receive chlordiazepoxide (Librium), a drug commonly used to treat symptoms of alcohol withdrawal.  She was also ordered to receive ibuprofen, ice, and vitamin B complex.

67. Madelyn was housed in the WCC's orientation unit.  On or about September 30 and October 1, 2018, Madelyn repeatedly asked WCC staff, including defendants John/Jane Doe Nos. 1-5, for medical attention as they made their rounds.  Madelyn told them repeatedly she was sick and not "dope sick," and that her chest was tight and that her heart hurt.  Madelyn repeatedly asked them to take her to get medical help.  WCC staff members told Madelyn that the situation was her own fault for using drugs.

68. Over the next several days, Madelyn's condition visibly deteriorated. She became increasingly lethargic and unresponsive; one of her fellow detainees, concerned about Madelyn's condition, gave Madelyn a bedsheet and helped her cover up.

69. Between October 2 and the morning of October 4, 2018, other detainees told WCC staff on multiple occasions that Madelyn was ill and needed medical attention.

70. From October 1 until the morning of October 4, 2018, the WCC did not provide Madelyn with any medical care except for the medications described above and a tuberculosis and STD screening. Other medical records for this time period are captioned "Daily Medical Rounds," followed by a blank page.  Medical staff did not treat Madelyn's complaints of chest pain or difficulty breathing. They did not provide her with any treatment for her swollen knee and foot, despite her visible pain and difficulty while walking.  Nor did they monitor her for the complications known to arise from opioid use. They did not even take her vital signs.

71. On the morning of October 4, 2018, WCC medical staff visited Madelyn's cell, purportedly to evaluate a different prisoner.  They observed that Madelyn was "in severe distress" constituting a "Medical Emergency."  Among other symptoms, Madelyn was "initially unresponsive" and later provided only "incoherent" responses to verbal stimuli. Medical staff called an ambulance.

72.  The ambulance transported Madelyn to the Baystate Medical Center in Springfield, where she remained in HCSD custody.  Within hours of her arrival, the hospital's medical staff diagnosed Madelyn with tricuspid valve endocarditis, "innumerable" pulmonary emboli and cavitary lesions of the lungs, and acute hypoxemic respiratory failure, among other things. Madelyn began receiving antibiotics and other treatment.

15

73. By October 5, 2018, Madelyn had been sedated so that she could be connected to a ventilator.  A tube was inserted into her airway to help her breathe.

74. By that time, it was too late for Madelyn's infections to be successfully treated; she continued to grow worse while at the hospital.  She died on October 7, 2018, still at the hospital and in the custody of the HCSD.

75. The state Office of the Chief Medical Examiner performed Madelyn's autopsy. Madelyn's cause of death was her heart infection, or "Complications of Methicillin-Resistant *Staphylococcus Aureus* Septicemia [often referred to as MRSA] in the Setting of the Tricuspid Valve Endocarditis."  The medical examiner also determined that Madelyn suffered from "Septic Emboli and Cavitary Lesions of the Lungs" and "Septic Emboli and Infarctions of the Kidneys." And the examiner noted Madelyn's swollen right knee, determining that it had "Septic Arthritis."

**The Defendants' Refusal to Provide Medical Treatment Caused Madelyn's Death**

76. If Madelyn had received appropriate medical treatment on or after September 29, 2018, she would have been diagnosed with infective endocarditis of the tricuspid valve, also known as "right sided" endocarditis.

77. If diagnosed at an appropriate time, infective endocarditis is generally treatable through medications and/or surgery.

78. Had Madelyn received appropriate medical treatment while in the defendants' custody, she would have survived and been spared conscious pain and suffering.  Madelyn's pain, suffering, and death were caused by the defendants' conduct described above, including their deliberate, intentional, and unreasonable refusal to provide such treatment.

**The SPD's Policy of Tolerating Civil Rights Violations Caused the SPD Defendants to Deny Madelyn's Constitutional Right to Medical Care**

79. The City of Springfield had policies, practices, and/or customs of failing to monitor, train, supervise, control, and discipline SPD officers who violated civil rights, including the right to receive reasonable and adequate medical care while in custody. The City tolerated and was deliberately indifferent to constitutional violations committed by SPD officers.  The City's policies, practices, and customs were the moving force behind the violations of Madelyn's constitutional rights by Zanazanian, McNabb, and Rodriguez, including their deliberate refusal, in the face of Madelyn's desperate pleas to be taken to a hospital, to provide her with any treatment and monitoring for her serious and obvious medical needs.

80. Among other things, the SPD had a practice or custom of failing to adequately investigate and discipline SPD officers who committed civil rights violations. The SPD did not have a properly functioning internal affairs system, and its investigations were inadequate.  The SPD also failed to establish mechanisms to properly resolve complaints alleging civil rights violations, including the mistreatment of prisoners, by SPD officers.

81. These failures sent a message to SPD officers and employees, including Defendants Zanazanian, McNabb, and Rodriguez, that they could violate the rights of others with impunity. In turn, this resulted in the defendants' deliberate indifference to Madelyn's pain and suffering, and their conscious denial of her repeated requests for treatment of her serious medical needs.

82. The City's policy and practice of condoning civil rights violations by SPD employees is shown by its efforts to shield the violations in this case.  The City sought to protect the SPD employees from accountability for Madelyn's death and from exposure to Madelyn's family and the public.  Among other things, in response to a public records request by Madelyn's family seeking "[a]ll reports, notes, interview summaries, and other documents relating to any

17

investigation of Madelyn Linsenmeir's death, or obtained or reviewed as part of any such investigation," the City affirmatively stated on December 13, 2018, that "[t]he City does not have any records that are responsive to your request." This was false. An investigation had occurred and had in fact already been concluded by December 13. During that investigation, Internal Investigation Unit personnel had coached the SPD officers by showing them videos of their own interactions with Madelyn while they prepared their written statements—a practice that placed the officers in a position to know which assertions could be contradicted by video evidence and which could not. Certain officers then produced written statements that are inconsistent with, or contradicted by, the information those same officers provided in their initial oral interviews.

## Damages

83. As a result of the defendants' actions, Madelyn experienced conscious pain and suffering. Her son and/or other next of kin lost her reasonably expected income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice.

84. The failure of Sergeant Zanazanian, Officer McNabb, and Ms. Rodriguez to provide Madelyn with medical care while she was in custody caused her to suffer chest pain, difficulty breathing, faintness, anxiety, and severe emotional distress, among other things.

85. The failure of the WCC and of the John/Jane Doe defendants to provide Madelyn with appropriate medical care while she was in their custody caused her to suffer severe illness, chest pain, difficulty breathing, faintness, anxiety, and severe emotional distress, among other things.

86. Madelyn died as a result of the defendants' actions. As a result, her son lost his mother and her other family members lost their sister and daughter.

## CLAIMS FOR RELIEF

### Count I – Unconstitutional Failure to Provide Medical Care
### in violation of 42 U.S.C. § 1983
(against defendants Zanazanian, McNabb, Rodriguez, and the City of Springfield)

87.  Plaintiff incorporates by reference the foregoing paragraphs as if set forth here in their entirety.

88. Defendants Zanazanian, McNabb, Rodriguez, and the City of Springfield are persons within the meaning of 42 U.S.C. § 1983.

89. On September 29 and 30, 2018, Madelyn Linsenmeir was held in custody by Springfield Police Department, specifically subject to the custody and control of defendants Zanazanian, McNabb, and Rodriguez.

90. On September 29 and 30, 2018, defendants Zanazanian, McNabb, and Rodriguez were aware of Madelyn Linsenmeir's serious medical needs and deliberately and unreasonably refused to provide her with any medical treatment.  This failure was pursuant to policies, practices, and customs of the SPD as described above.

91. These defendants' refusal to obtain prompt and appropriate medical treatment caused Madelyn Linsenmeir to experience pain, suffering, and death.

92. These defendants' actions deprived Madelyn Linsenmeir of her rights, privileges, or immunities secured by the Constitution and laws, including her clearly established rights under the Fourteenth Amendment to the U.S. Constitution in violation of 42 U.S.C. § 1983.

93. The defendants' actions were taken with reckless disregard for Madelyn's constitutional rights.

94. As a result of the defendants' actions, Madelyn and her next of kin suffered the damages described above.

**Count II – Violation of Title II of the Americans with Disabilities Act (ADA)**
(against defendant Hampden County Sheriff's Department)

95.  Plaintiff incorporates by reference the foregoing paragraphs as if set forth here in their entirety.

96. The Hampden County Sheriff's Department is a public entity subject to the Americans with Disabilities Act.

97. Drug and alcohol addiction is a "disability" under the ADA.  See 42 U.S.C. §§ 12102 and 12131(2); 28 C.F.R. § 35.108 (The phrase "physical or mental impairment includes, but is not limited to . . . drug addiction, and alcoholism.").

98. Madelyn Linsenmeir was subject to the custody and control of the Hampden County Sheriff's Department from September 30, 2018, until her death on October 7, 2018.

99. Throughout her time in HCSD custody, Madelyn Linsenmeir was a qualified person with a disability, including because she had a physical or mental impairment that substantially limited one or more major life activities, and because the Hampden County Sheriff's Department regarded her as having a mental or physical impairment within the meaning of the ADA.

100.    Because of Madelyn Linsenmeir's disability, the Hampden County Sheriff's Department personnel intentionally discriminated against her, failed to provide her with adequate treatment for her medical conditions, deprived her of the benefits of its medical programs, and were deliberately indifferent to her serious medical needs.

101.    The Hampden County Sheriff's Department refused to make reasonable accommodations for Madelyn Linsenmeir, including by failing to provide her with a medically adequate detoxification program.

102.    The unlawful discrimination of the Hampden County Sheriff's Department caused Madelyn Linsenmeir to experience pain, suffering, and death.

103.     As a result of the defendant's actions, Madelyn and her next of kin suffered the damages described above.

### Count III – Unconstitutional Failure to Provide Medical Care
### in violation of 42 U.S.C. § 1983
(against defendants John/Jane Does Nos. 1-5)

104.     Plaintiff incorporates by reference the foregoing paragraphs as if set forth here in their entirety.

105.     Defendants John/Jane Does Nos. 1-5 are persons within the meaning of 42 U.S.C. §1983.

106.     Between September 30, 2018, and October 4, 2018, Madelyn Linsenmeir was held in custody by HCSD at the WCC.

107.     At various times between September 30, 2018, and October 4, 2018, defendants John/Jane Doe Nos. 1-5 were aware of Madelyn Linsenmeir's serious medical need and deliberately and unreasonably refused to provide her with prompt and appropriate medical treatment.

108.     These defendants' refusal to provide prompt and appropriate medical treatment caused Madelyn Linsenmeir to experience pain, suffering, and death.

109.     These defendants' actions deprived Madelyn Linsenmeir of her rights, privileges, or immunities secured by the Constitution and laws, including her clearly established rights under the Fourteenth Amendment to the U.S. Constitution in violation of 42 U.S.C. § 1983.

110.     The defendants' actions were taken with reckless disregard for Madelyn's constitutional rights.

111.     As a result of the defendants' actions, Madelyn and her next of kin suffered the damages described above.

**COUNT IV – Wrongful Death, M.G.L. ch. 229 § 2**
(against defendants Zanazanian, McNabb, Rodriguez, and John/Jane Doe Nos. 1-5)

112.    The above paragraphs are incorporated by reference.

113.    The defendants caused Madelyn Linsenmeir's death by intentional acts.

114.    Madelyn Linsenmeir's Estate is entitled to damages for her conscious pain and suffering.

115.    Madelyn Linsenmeir's next of kin, by and through the Estate, is entitled to compensation for the loss of Madelyn's reasonably expected income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice.

## JURY DEMAND

Plaintiff requests a trial by jury for all claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court:

1.    Award Plaintiff compensatory damages and statutory interest;

2.    Award Plaintiff punitive damages against Defendants Zanazanian, McNabb, Rodriguez, and John/Jane Does Nos. 1-5;

2.    Award Plaintiff attorneys' fees and costs; and

3.    Grant such other and further relief as the Court deems just and proper.

March 5, 2020                                    Respectfully submitted,

*/s/ Richard J. Rosensweig*
Matthew R. Segal (BBO # 654489)
Jessie J. Rossman (BBO # 670685)
Daniel L. McFadden (BBO #676612)
American Civil Liberties Union
Foundation of Massachusetts, Inc.
211 Congress Street
Boston, MA 02110
(617) 482-3170

Elizabeth Matos (BBO # 671505)
David Milton (BBO # 668908)
Prisoners' Legal Services of Massachusetts
50 Federal St.
Boston, MA 02110
(617) 482-2773

Martin M. Fantozzi (BBO # 554651)
Richard J. Rosensweig (BBO # 639547)
Goulston & Storrs PC
400 Atlantic Avenue
Boston, MA 02110
(617) 482-1776

*Attorneys for Plaintiff*