UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MAURA O'NEILL, as administrator of the Estate of Madelyn E. Linsenmeir, <br><br> Plaintiff, <br><br> v. <br><br> CITY OF SPRINGFIELD, MOISES ZANAZANIAN, REMINGTON MCNABB, SHEILA RODRIGUEZ, HAMPDEN COUNTY SHERIFF'S DEPARTMENT, and JOHN/JANE DOES NOS. 1-5, <br><br> Defendants. | C.A. No. 20-30036-MGM <br><br> Leave to File Excess Pages <br> Granted on June 1, 2020 |

## CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

I.  SUMMARY OF FACTUAL ALLEGATIONS. ........................................................... 2

 A.  Madelyn Linsenmeir's Life and Struggle with Opioid Use Disorder .................... 2

 B.  Madelyn Develops Endocarditis, and Is Arrested Before Going to the
  Hospital ................................................................................................................. 3

 C.  The SPD Refuses to Provide Madelyn with Medical Treatment ............................ 4

 D.  The HCSD Refuses to Provide Madelyn with Medical Treatment ........................ 7

 E.  Madelyn Continues to be Unresponsive and Dies ................................................. 8

II.  THE HCSD'S DISCLOSURE OF NEW MEDICAL RECORDS AFTER THE
 COMPLAINT WAS FILED ....................................................................................... 9

III.  ARGUMENT ............................................................................................................ 10

 A.  Count I Should Not Be Dismissed. ...................................................................... 10

 B.  Count II Should Not Be Dismissed ...................................................................... 13

  1.  Count II adequately alleges the HCSD violated the ADA by
   denying Madelyn medical services because of her opioid use
   disorder .................................................................................................... 13

  2.  Count II also adequately alleges that the HCSD violated Madelyn's
   constitutional right to medical care .......................................................... 15

  3.  Count II does not merely allege medical malpractice .............................. 17

 C.  Counts III and IV Should Not be Dismissed for Naming "Doe"
  Defendants. ......................................................................................................... 19

 D.  The Doe Defendants Are Named in Their Individual Capacities in Counts
  III and IV ............................................................................................................ 22

 E.  Count IV Should Not Be Dismissed Based on Determinations about the
  Defendants' Mental State, which is Quintessentially a Jury Question ................. 23

CONCLUSION ................................................................................................................ 25

## TABLE OF AUTHORITIES

**Cases**

*A Helping Hand, LLC v. Baltimore Cty., MD,*
   515 F.3d 356 (4th Cir. 2008) ............................................................................. 14

*Battista v. Clarke,*
   645 F.3d 449 (1st Cir. 2014) ............................................................................. 16

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,*
   403 U.S. 388 (1971) ......................................................................................... 19

*Buchanan v. Maine,*
   469 F.3d 158 (1st Cir. 2006) ............................................................................. 13

*Carmona v. Toledo,*
   215 F.3d 124 (1st Cir. 2000) ............................................................................. 20

*Castro v. Cnty. of L.A.,*
   833 F.3d 1060 (9th Cir. 2016) ........................................................................... 16

*Colbruno v. Kessler,*
   928 F.3d 1155 (10th Cir. 2019) ......................................................................... 16

*Consolo v. George,*
   58 F.3d 791 (1st Cir. 1994) ............................................................................... 17

*Coscia v. Town of Pembroke,*
   659 F.3d 37 (1st Cir. 2011) ............................................................... 1, 10, 11, 12

*Darnell v. Pineiro,*
   849 F.3d 17 (2d Cir. 2017) ............................................................................... 16

*De Prins v. Michaeles,*
   236 F. Supp. 3d 482 (D. Mass. 2017) ................................................................ 23

*Deshaney v. Winnebago Cty. Dep't of Soc. Svcs.,*
   489 U.S. 189 (1989) ......................................................................................... 11

*Drumgold v. Callahan,*
   707 F.3d 28 (1st Cir. 2013) ............................................................................... 11

*Edsall v. Assumption College,*
   367 F. Supp. 2d 72 (D. Mass. 2005) .................................................................. 23

*Estate of Perry v. Wenzel,*
   872 F.3d 439 (7th Cir. 2017) ............................................................................. 12

*Estelle v. Gamble,*
   429 U.S. 97 (1976) ........................................................................................... 11

*Farrah v. Gondella,*
   725 F. Supp. 2d 238 (D. Mass. 2010) ................................................................ 24

*Foster v. McGrail,*
   844 F. Supp. 16 (D. Mass. 1994) ................................................................ 24

*Gaudreault v. Salem,*
   923 F.2d 203 (1st Cir. 1990) .................................................................... 15

*Gladu v. Correct Care Solutions,*
   No. 17-504, 2019 WL 5423019 (D. Me. 2019) ...................................... 17

*Gordon v. Cty. Of Orange,*
   888 F.3d 1118 (9th Cir. 2018) ............................................................... 16

*Groden v. N&D Transportation Co., Inc.,*
   866 F.3d 22 (1st Cir. 2017) ....................................................................... 9

*Hafer v. Melo,*
   502 U.S. 21 (1991) ................................................................................ 22

*Hardeman v. Curran,*
   933 F.3d 816 (7th Cir. 2019) ................................................................. 16

*Isles v. Doe 1,*
   No. 3:18-CV-632-J-32JRK, 2018 WL 2317969 (M.D. Fla. May 22, 2018) ........................... 21

*Jones v. City of Boston,*
   752 F.3d 38 (1st Cir. 2014) ..................................................................... 14

*Justiniano v. Walker*
   C.A. 15-11587, 2016 WL 5339722 (D. Mass. Aug. 24, 2016) ......................... 23, 24

*Kentucky v. Graham,*
   473 U.S. 159, 165 (1985) ....................................................................... 22

*Kiman v. New Hampshire Dep't of Corr.,*
   451 F.3d 274 (1st Cir. 2006) ........................................................ 14, 15, 18

*Kingsley v. Hendrickson,*
   135 S. Ct. 2466 (2015) .......................................................................... 16

*Kowalski v. Gagne,*
   914 F.2d 299 (1st Cir. 1990) .................................................................. 26

*Leavitt v. Corr. Med. Servs., Inc.,*
   645 F.3d 484 (1st Cir. 2011) ......................................................... *passim*

*Martinez-Rivera v. Sanchez Ramos,*
   498 F.3d 3 (1st Cir. 2007) .................................................................. 19, 20

*Messere v. Clarke,*
   No. 11-12166, 2015 WL 5609959 (D. Mass. Sept. 22, 2015) ...................... 15

*Miranda v. Cty. of Lake,*
   900 F.3d 335 (7th Cir. 2018) ................................................................. 16

*Njoku v. Unknown Special Unit Staff,*
   No. 3:20-CV-20036, 2000 U.S. App. LEXIS 15695 (4th Cir. July 7, 2000) .............. 20, 21

*Pa. Dep't of Corrections v. Yeskey*,
   524 U.S. 206, 210 (1998) ................................................................................ 13, 14

*Parker v. Universidad de Puerto Rico*,
   225 F.3d 1 (1st Cir. 2000) ...................................................................................... 14

*Parker v. Chief Justice for Admin. & Mgmt. of Trial Court*,
   67 Mass. App. Ct. 174 (2006) ................................................................................ 22

*Perry v. Roy*,
   782 F.3d 73 (1st Cir. 2015) ............................................................................... 17, 18

*Pesce v. Coppinger*,
   355 F. Supp. 3d 35 (D. Mass. 2018) ...................................................................... 14

*Price v. Marsh*,
   No. 2:12-CV-05442, 2013 WL 5409811 (S.D.W. Va. Sept. 25, 2013) ...................... 20, 21, 22

*Richardson v. Johnson*,
   598 F.3d 734 (11th Cir. 2010) ............................................................................... 21

*Ruiz-Rosa v. Rullan*,
   485 F.3d 150 (1st Cir. 2007) .................................................................................. 15

*Smith v. Aroostook*,
   376 F. Supp. 3d 146 (D. Me. 2019) ................................................................... 14, 15

*Springer v. Seaman*,
   821 F.2d 871 (1st Cir. 1987) .................................................................................. 12

*Stamps v. Framingham*,
   813 F.3d 27 (1st Cir. 2017) ............................................................................... 10, 24

*United States ex rel. Hutcheson v. Blackstone Medical, Inc.*,
   647 F.3d 377 (1st Cir. 2011) .................................................................................. 10

*United States v. Georgia*,
   546 U.S. 151, 159 (2006) ....................................................................................... 13

*Wagenmann v. Adams*,
   829 F.2d 196 (1st Cir. 1987) .................................................................................. 12

*Williams v. DeKalb Cty. Jail*,
   638 F. App'x 976 (11th Cir. 2016) ......................................................................... 21

*Wilson v. Town of Mendon*,
   294 F.3d 1 (1st Cir. 2002) ................................................................................. 19, 21

## Statutes

42 U.S.C. § 1983 .................................................................................................... 10

42 U.S.C. § 12131 *et seq.* ........................................................................................ 1

42 U.S.C. § 12132 .................................................................................................. 15

M.G.L. c. 229 § 2 ................................................................................................... 22

**Rules**

28 C.F.R. § 35.108 ........................................................................................................................ 14

Fed. R. Civ. P. 12 ............................................................................................................................ 9

Fed. R. Civ. P. 15 .......................................................................................................................... 19

## PRELIMINARY STATEMENT

*"My chest really hurts."  "I can't breathe."  "I'm in so much pain right now."*

This case presents a textbook example of deliberate indifference by police and correctional officials to an obvious medical emergency.  In late September and early October of 2018, Madelyn Linsenmeir was in the custody of the City of Springfield (the "City") and then the Hampden County Sheriff's Department (the "HCSD").  Madelyn begged the defendants to treat her chest pain, difficulty breathing, and other painful symptoms.  The defendants did *nothing* to address Madelyn's serious medical need.  Ultimately, after roughly six days of agony in custody, Madelyn became unresponsive, and HCSD staff finally took her to the hospital.  It was too late.  Madelyn died, still in custody, of a heart infection that, because of the defendants' complete and deliberate inaction, had spread irreversibly throughout her body.  Madelyn was 30 years old.  This case should not be dismissed.

In particular, the motions to dismiss should be denied because they ignore and misconstrue the key allegations of the Complaint, which must, at this stage, be taken as true and construed in the light most favorable to the Estate.  The City and its employees principally rely on the narrow exception to ordinary causation principles articulated in *Coscia v. Town of Pembroke*, 659 F.3d 37 (1st Cir. 2011), but that exception applies when people are released to seek their own care as a free person, not when (like Madelyn) they die in custody.  Similarly, the HCSD principally seeks to cast the Estate's claims as a disagreement with the HCSD's treatment strategy, but that argument ignores the Complaint's allegations that the HCSD took *no* action to respond to Madelyn's chest pain, difficulty breathing, and deteriorating condition.  The motions to dismiss should be denied, and this case should move forward promptly to discovery and trial.

I.      **SUMMARY OF FACTUAL ALLEGATIONS**.

Madelyn Linsenmeir was arrested in September 2018, at the age of 30, and was never free again.  *See* Compl. ¶¶ 25–75.  Over the course of several days, Madelyn repeatedly informed her custodians of her serious medical needs, including chest pain and difficulty breathing.  *See id.* ¶¶ 37–60, 67.  She begged them for medical treatment, but they refused.  *See id.*  As a result, Madelyn's condition deteriorated until she was found unresponsive in her cell in severe distress.  *See id.* ¶ 71.  At that point, she was finally transported to the hospital, but it was too late.  *See id.* ¶ 72.  Madelyn died in custody from an otherwise treatable heart infection that had spread throughout her body.  *See id.* ¶¶ 72–75.  The defendants are being sued because, as more fully described below, their unlawful actions caused Madelyn's death.  *See id.* ¶ 2.

A.      *Madelyn Linsenmeir's Life and Struggle with Opioid Use Disorder.*

Madelyn Linsenmeir was a victim of the opioid crisis, having developed opioid use disorder after using prescription opioids in high school.  *See id.* ¶ 13.  She repeatedly sought treatment for opioid use, and as often happens with this disease, repeatedly relapsed into active addiction.  *See id.*

In April 2018, Madelyn was sentenced to probation in New Hampshire for a drug-related offense.  *See id.* ¶ 14.  Shortly thereafter, she was kidnapped and became a victim of human trafficking.  *See id.* ¶ 15.  While held captive in Rhode Island, she was drugged with fentanyl, burned, stabbed, and raped multiple times.  *See id.*  The traffickers were later arrested, and the New Hampshire court authorized Madelyn to continue her probation in Vermont, where she could receive medical, psychiatric, and substance use treatment near her family.  *See id.* ¶¶ 16–17.

While in Vermont, Madelyn was diagnosed with post-traumatic stress disorder, and she reported severe anxiety, flashbacks, and nightmares, among other symptoms.  *See id.* ¶ 17.

Madelyn stopped going to the treatment facility in Vermont in late August 2018, and ultimately made her way to Massachusetts. *See id.* ¶ 18. Her family did not know her location. *See id.*

B. *Madelyn Develops Endocarditis, and Is Arrested Before Going to the Hospital.*

By late September 2018, Madelyn had developed infective endocarditis. *See* Compl. ¶ 20. Infective endocarditis is a life-threatening, but treatable, infection of the heart, usually involving one of the valves. *See id.* The infection results in the growth of a "vegetation" of infected material on the surface of the valve. *See id.* Pieces of the vegetation can break off and lodge in the tissues of the lungs, creating septic emboli and cavitary lesions of the lungs. *See id.* Symptoms of infective endocarditis consequently can include chest pain and difficulty breathing. *See id.* Infected material can also migrate to other areas of the body, ultimately causing infections in the organs and joints, as well as sepsis. *See id.* People with a history of intravenous substance use, such as opioid injection, are at elevated risk of infective endocarditis. *See id.*

On September 28, 2018, Madelyn sent her mother, Maureen Linsenmeir, a text message stating, "*I need to go to the hospital I am dying i weigh 90 pounds mom I need you.*" *See id.* ¶ 21. Later that day, Madelyn sent her sister, Kate O'Neill, a series of text messages stating, among other things: "*I am really sick*," "*I just need to get help go to the hospital,*" and "*I am just in a lot of pain 90 pounds can't eat sleep my chest Hurst [sic] my knee is so swollen i can't even walk.*" *See id.* ¶ 22. But Madelyn's family did not know where she was or how to help her. *See id.* ¶ 23.

In these messages, Madelyn expressed that she was fearful of going to the hospital to seek help because she believed "*the hospital checks for warrants,*" and she "*[didn't] want to go to jail [like] this.*" *See id.* ¶ 22. Ultimately, however, "the decision whether Madelyn would go to the hospital did not belong to her." *See id.* ¶ 24. Madelyn was arrested by the Springfield Police Department ("SPD") on September 29, 2018, and was charged with being a fugitive from

3

her New Hampshire probation and with giving a false name.  *See id.* ¶ 25. For the remainder of

her life, Madelyn was in custody, at the mercy of her jailors' decisions to provide or withhold

medical care. *See id.*  And, tragically, Madelyn's fear of being arrested while sick proved to be

entirely justified.

C.      *The SPD Refuses to Provide Madelyn with Medical Treatment.*



*Complaint Figure 6: Madelyn unsuccessfully begs Defendants Zanazanian, McNabb, and Rodriguez for medical attention at SPD Headquarters.*

Shortly after her arrest, Madelyn was transported by the SPD to the SPD headquarters for

booking.  Compl. ¶ 31.  The booking area was manned by the three SPD employees who are

named individually as defendants: Sergeant Moises Zanazanian, Officer Remington McNabb,

and Ms. Sheila Rodriguez (the "SPD Defendants").  *See id.* ¶¶ 28–30.

During Madelyn's initial booking interview, Sergeant Zanazanian asked Madelyn

questions and entered her responses in a computer terminal, while Officer McNabb and Ms.

Rodriguez helped remove Madelyn's shoes and personal property. *See id.* ¶ 35. During this interview, which was audio and video recorded, Madelyn repeatedly told the SPD Defendants that she needed medical attention:

- Sergeant Zanazanian asked Madelyn, "Are you ill?" Madelyn responded, "*Yeah, I'm very ill right now. I can't even think straight. I'm gonna like literally pass out from pain.*" *See id.* ¶ 37.

- Sergeant Zanazanian asked Madelyn, "Are you seeking psychiatric care?" Madelyn responded, "*No, but I might need to go to the hospital.*" *See id.* ¶ 38.

- Sergeant Zanazanian asked Madelyn, "Why do you think you're gonna need to go to a hospital?" Madelyn responded, "*I have a really really really bad chest, like I don't know what happened to it, it feels like it's caving in, I can't even breathe. And my knees and my feet.*" *See id.* ¶ 39.

- Sergeant Zanazanian asked Madelyn, "What's wrong with your knees and feet?" Madelyn showed her swollen right knee and said, among other things, "*It's really bad.*" She then broke down in tears. *See id.* ¶ 40.

- Sergeant Zanazanian asked Madelyn, "Your left knee; what else?" Madelyn responded, "*No, my right knee, and I can't breathe, my chest really hurts, and I'm gonna pass out because I need water.*" *See id.* ¶ 41.

- Although Madelyn had clearly and repeatedly mentioned that she was having pain in her chest, Sergeant Zanazanian did not follow up about that. He instead asked Madelyn, "What's wrong with your feet?" Madelyn responded, "*A lot. I can't walk on them. They're too swollen. They're swollen.*" *See id.* ¶ 42.

- Madelyn stated, "*I'm in so much pain right now.*" *See id.* ¶ 43.

Nevertheless, the SPD Defendants did not transport Madelyn to the hospital. *See id.* ¶ 60. They did not provide her with medical treatment of any kind. *See id.* Instead, Ms. Rodriguez escorted Madelyn to her cell, where Ms. Rodriguez observed that Madelyn was in too much pain to even lie down on the bed. *See id.* ¶ 47.

About two hours later, Madelyn was escorted back to the booking area. *See id.* ¶ 48. This encounter was video recorded, but Sergeant Zanazanian instructed Officer McNabb not to

activate the audio recorder.  *See id.* ¶¶ 49–50.  Madelyn and Sergeant Zanazanian spoke for

about two minutes.  *See id.* ¶ 51.  When they were done talking, Madelyn was permitted to call

her mother, Maureen, in Vermont.  *See id.*  Sergeant Zanazanian, Officer McNabb, and Ms.

Rodriguez were nearby for the entire call and overheard it.  *See id.*  Among other things, they

heard Madelyn tell Maureen that she had been arrested, that she was really sick, that she was in

pain, and that she needed help.  *See id.* ¶ 52.  They also heard Madelyn tell Maureen that she had

asked for, and been denied, medical attention.  *See id.*

As the call progressed, Sergeant Zanazanian made statements to Madelyn and her mother.

*See id.* ¶53.  Among other things, he said he would not provide Madelyn with medical attention.

*See id.*  He then directed Madelyn to end the call, which she did.  *See id.* ¶¶ 54–55.  After

hanging up the phone, Madelyn can be seen on the video begging the SPD Defendants for

medical attention: she is seen crying, showing her swollen knee, and then making repeated

gestures pointing to her chest and ribcage area.  *See id.* ¶¶ 55–56; Fig. 6.  She was desperately

trying to convince an indifferent audience of her urgent need for medical care.  *See id.* ¶ 56.  But

these  defendants did not call for medical assistance.  *See id.* ¶ 57.  Instead, Sergeant Zanazanian

instructed Madelyn to leave the booking area.  *Id.*

While Madelyn was in SPD custody, it was obvious that she had serious medical needs,

including from her appearance, demeanor, and repeated statements that she was having chest

pain and difficulty breathing.  *See id.* ¶¶ 59–60.  But the SPD Defendants did not call an

ambulance for Madelyn, or otherwise transport Madelyn to a hospital.  *See id.*  Instead, these

defendants consciously and unreasonably refused to provide Madelyn with medical treatment of

any kind while she was in their custody, and knew or should have known of, and were

deliberately indifferent to, the serious risk to Madelyn's health and safety.  *See id.* ¶ 60.

D.      *The HCSD Refuses to Provide Madelyn with Medical Treatment.*

On September 30, 2018, Madelyn was transferred to the Western Massachusetts Regional

Women's Correctional Center (WCC), a component of the HCSD.  Compl. ¶ 61.  Because the

WCC's policy was to intentionally and unnecessarily put opioid users in extreme discomfort

through a medically inappropriate detoxification protocol, the staff at the WCC were acclimated

to be deliberately indifferent to the medical complaints made by or on behalf of incarcerated

opioid users, and to intentionally discriminate against such detainees because of their history of

opioid use.  *See id.* ¶ 63–64.

On September 30, 2018, during the medical intake process, WCC staff determined that

Madelyn had a diagnosis of, among other things, "Alcohol abuse" and "Opioid abuse."  *See id.* ¶

65.  WCC staff placed Madelyn into a detoxification protocol, and she was ordered to receive

Librium (a drug commonly used to treat symptoms of alcohol withdrawal), plus ibuprofen, ice,

and vitamin B complex.  *See id.* ¶ 66.

On or about September 30 and October 1, Madelyn repeatedly asked WCC staff,

including defendants John/Jane Doe Nos. 1–5, for medical attention as they made their rounds in

the orientation unit where she was housed.  *See id.* ¶ 67.  Madelyn told them repeatedly she was

sick and not "dope sick" (*i.e.*, not sick from withdrawal), and that her chest was tight and that her

heart hurt.  *See id.*  Madelyn repeatedly asked them to take her to get medical help.  *See id.*

WCC staff members told Madelyn that the situation was her own fault for using drugs.  *See id.*

Over the next several days, Madelyn's condition visibly deteriorated. *See id.* ¶ 68.  She became

increasingly lethargic and unresponsive.  *See id.*  Between October 2 and the morning of October

4, 2018, other detainees told WCC staff on multiple occasions that Madelyn was ill and needed

medical attention.  *See id.* ¶ 69.

But the WCC's staff did not address Madelyn's complaints of chest pain or difficulty breathing. *See id.* ¶ 70. From October 1 until the morning of October 4, 2018, the only medical care Madelyn received was the medication described above and a routine tuberculosis and STD screening. *See id.* Other medical records for this time period are captioned "Daily Medical Rounds," followed by a blank page—the WCC's staff didn't even take her vital signs. *See id.*

E.      *Madelyn Continues to be Unresponsive and Dies.*

On the morning of October 4, 2018, WCC medical staff visited Madelyn's cell, purportedly to evaluate a different prisoner. *See* Complaint ¶71. They observed that Madelyn was "in severe distress" constituting a "Medical Emergency." *See id.* Among other symptoms, Madelyn was "initially unresponsive" and later provided only "incoherent" responses to verbal stimuli. *See id.* Medical staff called an ambulance, which transported Madelyn to the Baystate Medical Center in Springfield (where she remained in HCSD custody). *See id.* ¶¶ 71–72. Within hours of her arrival, the hospital's medical staff diagnosed Madelyn with tricuspid valve endocarditis, "innumerable" pulmonary emboli and cavitary lesions of the lungs, and acute hypoxemic respiratory failure, among other things. *See id.* ¶ 72.

By that time, it was too late for Madelyn's infections to be successfully treated. *See id.* ¶ 74. She died on October 7, 2018, still at the hospital and in the custody of the HCSD. *See id.* The cause of death was sepsis arising from her heart infection, or "Complications of Methicillin-Resistant *Staphylococcus Aureus* Septicemia in the Setting of the Tricuspid Valve Endocarditis." *See id.* ¶ 75. The medical examiner also found "Septic Emboli and Cavitary Lesions of the Lungs," "Septic Emboli and Infarctions of the Kidneys," and "Septic Arthritis" in her swollen right knee. *See id.*

Had Madelyn received appropriate medical treatment while in the defendants' custody, she would have survived and been spared conscious pain and suffering. *See id.* ¶ 76. Madelyn's

pain, suffering, and death were caused by the defendants' conduct, including their deliberate, intentional, and unreasonable refusal to provide her with necessary medical treatment.  *See id.* ¶ 78.

## II.     THE HCSD'S DISCLOSURE OF NEW MEDICAL RECORDS AFTER THE COMPLAINT WAS FILED

Before filing this complaint, Madelyn's family and her estate (the "Estate") engaged, through counsel, in an extensive investigation of the circumstances leading up to her death, including requesting all police, corrections, and medical records concerning her from the City and the HCSD.[1]  After receiving authorization from the Estate, the HCSD produced her medical records in February 2019.

However, after this suit was filed, the HCSD unexpectedly made a supplemental production that included new medical records.  *See* Rosensweig Decl. Ex. A (documents marked JMS/MEDSCREEN-1 to 3, produced March 30, 2020).[2]  These new records are identified as documenting a "Medical Screening."  *See id.* at JMS/MEDSCREEN-1.  Specifically, the new records reflect that Madelyn was asked "*Are you in pain?*"  *See id.*  The new records further state that her answer was "*Yes*" and that the "Area(s) of Pain" were "*Torso (Chest, Back)*" and "*Right Leg (Hip, Knee, Ankle, Foot).*"  *See id.*  These records confirm that Madelyn notified the HCSD of her serious medical needs upon admission.  The records do not reflect that any treatment was

---

[1] The City initially failed to produce any records, resulting in Madelyn's family, though counsel, filing a public records lawsuit captioned *Maureen Linsenmeir v. City of Springfield*, Docket No. 1879CV00872 (Mass. Super.). When the City did ultimately produce records after the suit was filed, the City falsely denied the existence of an internal investigation into the matter.  *See* Compl. ¶ 82.  Counsel subsequently learned of the investigation through other means, and demanded that the City to produce interview notes and investigation reports that it had unlawfully withheld.  *See id.*

[2] Because the HCSD defendants have moved to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), the court may choose to consider materials outside the pleadings, *see Groden v. N&D Transportation Co., Inc.*, 866 F.3d 22, 24 n.3 (1st Cir. 2017), or alternatively could order the plaintiff to amend to add any new information necessary to the Court's decision.

provided for Madelyn's chest and leg pain in response, or that the HCSD took any other action to help Madelyn.

## III.   **ARGUMENT**

A motion to dismiss must accept as true all well-pleaded facts in the Complaint, "analyzing those facts in the light most hospitable to the plaintiff's theory, and drawing all reasonable inferences for the plaintiff." *See United States ex rel. Hutcheson v. Blackstone Medical, Inc.*, 647 F.3d 377, 383 (1st Cir. 2011).  Defendants, however, ignore certain allegations and suggest that others should trigger inferences favorable to themselves.  But that is not the law.  The Complaint contains more than sufficient "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery."  *See Hutcheson*, 647 F.3d at 384 (internal quotation marks omitted).

### A.   *Count I Should Not Be Dismissed.*

Count I alleges that the City and the SPD Defendants violated the Constitution by failing to provide Madelyn with medical care while she was in police custody.  *See* Compl. ¶¶ 87–94. The resulting delay in Madelyn's access to medical care allowed her condition to deteriorate and ultimately caused her death, as well as her conscious suffering.  *See id.* ¶¶ 76–78.  Nevertheless, these defendants appear to argue that, under the First Circuit's decision in *Coscia v. Town of Pembroke*, 659 F.3d 37 (1st Cir. 2011), they cannot be liable because Madelyn was in the HCSD's custody, not theirs, at the particular moment of her death.  *See* Springfield Mem. at 5–7. In fact, *Coscia* says no such thing.

For Section 1983 claims, although a defendant's violation of the plaintiff's legal rights might have occurred at a particular moment in time, the defendant's liability normally extends to damages proximately caused by the violation.  *See, e.g.*, *Stamps v. Framingham*, 813 F.3d 27, 36–39 (1st Cir. 2017).  Questions of causation are governed by common law tort principles,

subject to certain narrow exceptions such as the holding in *Coscia*.  *See Drumgold v. Callahan*, 707 F.3d 28, 48 (1st Cir. 2013).  In *Coscia*, a prisoner was found to be at high risk of suicide.  *See Coscia*, 659 F.3d at 38–39.  Police released him on his own recognizance, and he committed suicide about fourteen hours later.  *See id.* at 39.  The First Circuit assumed that "the familiar principles of tort causation requiring connection in fact would be satisfied" by these facts.  *See id.* at 40.  Nevertheless, the court relied on Due Process principles to establish a narrow exception to the usual rules of causation: there was no liability because the decedent was released, and was free to seek his own medical assistance, well in advance of his death.  *See id.* at 40–41.

Coscia* explained that this exception to ordinary causation principles arose out of the inherent differences between a state of custody and a state of release.  In custody, "'the prisoner is unable by reason of the deprivation of his liberty to care for himself,'" and therefore "'must rely on prison authorities to meet his medical needs.'"  *Id.* at 41 (quoting *Deshaney v. Winnebago Cty. Dep't of Soc. Svcs.*, 489 U.S. 189, 198–99 (1989); *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).  But because the government's duty relies on the notion that "a person in custody 'must rely' on those who control him," the court reasoned that this notion "does not support liability for harm occurring *after release* when the individual is no longer forced to rely on authorities who limit action on his own behalf or intervention by others on the outside that would avoid harm."  *Id.* (emphasis added).  Therefore, "*[w]ith the restoration of the detainee's liberty*, . . . the legal chain of preventative . . . causation must be taken to have ended."  *Id.* (emphasis added).  The First Circuit accordingly held that "in the absence of a risk of harm created or intensified by state action there is no due process liability for harm suffered by a prior detainee *after release from custody* in circumstances that do not effectively extend any state

11

impediment to exercising self-help or to receiving whatever aid by others may normally be available." *See id.* (emphasis added).

Here, *Coscia*'s narrow exception does not apply for two reasons.  First, unlike the plaintiff in *Coscia*, who was quite alive when released from custody, Madelyn had already experienced pain and suffering due to lack of medical care by the time she was transferred to the HCSD, and the infectious process that led to her death was already in motion. Second, and again unlike the plaintiff in *Coscia*, Madelyn was *never released from custody* after her arrest, and therefore the normal opportunities to seek and receive medical attention were never restored to her.  Instead, unlike in *Coscia*, Madelyn's transfer to a different custodian "effectively extend[ed]" the "state impediment to exercising self-help or to receiving whatever aid by others may normally be available." *See* 659 F.3d at 41.  The holding of *Coscia*, by its own terms, does not control.  *See id.*  Because Madelyn never had any opportunity to acquire medical care for herself as a free person after her arrest, the chain of causation remains intact, exactly as the Complaint alleges.[3]  *See* Compl. ¶ 76–78; *see also Estate of Perry v. Wenzel*, 872 F.3d 439, 459 (7th Cir. 2017) (finding adequate evidence that city police caused a prisoner's death by failing to provide "any treatment," even though the prisoner did not actually die until after he was transferred to county custody).

---

[3] To the extent the City and the SPD Defendants might ultimately argue under ordinary tort causation principles that the HCSD's conduct constituted a superseding cause of Madelyn's death (which they have not argued here), any such argument would require a factually intense process of weighing numerous factors.  *See, e.g.*, *Wagenmann v. Adams*, 829 F.2d 196, 212 (1st Cir. 1987).  Plaintiff asserts that the City and SPD Defendants would be liable under such a test, but in all events the defendants have not yet raised the issue, and cannot properly raise such an argument in the context of a motion to dismiss.  *See Springer v. Seaman*, 821 F.2d 871, 876–79 (1st Cir. 1987).

B.     *Count II Should Not Be Dismissed.*

The Court should also deny the HCSD's motion to dismiss Count II for lack of subject matter jurisdiction based on a claim of sovereign immunity.[4]  Title II of the ADA abrogates state sovereign immunity at least insofar as the alleged conduct also violates the Fourteenth Amendment.  *See United States v. Georgia*, 546 U.S. 151, 159 (2006).  Accordingly, Count II is not barred by sovereign immunity because it alleges both unlawful discrimination under the ADA *and* a deprivation of medical care that violates the Fourteenth Amendment.[5]  *See id.*  HCSD's motion to dismiss should be denied.[6]

1.     Count II adequately alleges that HCSD violated the ADA by denying Madelyn medical services because of her opioid use disorder

Title II of the ADA prohibits a "public entity" from discriminating against a "qualified individual with a disability" because of her disability.  42 U.S.C. § 12132.  HSCD qualifies as a "public entity" under the ADA as an "instrumentality" of a state or local government.  *See Pa. Dep't of Corrections v. Yeskey*, 524 U.S. 206, 210 (1998).  And the Complaint establishes the three elements of a Title II claim: (1) that Madelyn was a qualified individual with a disability, opioid use disorder; (2) that Madelyn was denied the benefits of HCSD's medical services; and,

---

[4] As discussed below, there is no sovereign immunity issue with respect to Section 1983 claims against the John/Jane Doe Defendants, who are sued in their individual capacities. Plaintiff has not brought ADA claims against the John/Jane Doe Defendants.

[5] Because the ADA violations alleged in the Complaint violated the Fourteenth Amendment, there is no need for the Court to consider whether any alleged conduct that may have violated the ADA, but not the Fourteenth Amendment, is nevertheless actionable as a valid exercise of Congress's authority to abrogate the state's sovereign immunity. *See Georgia,* 546 U.S. at 159.

[6] In the alternative, if the Court is not able to determine whether the Complaint states a viable Title II claim at this stage, the Court should deny Defendants' 12(b)(1) motion to dismiss Count II as premature and allow Plaintiff discovery to elicit evidence regarding the nature of her claims.  *See Buchanan v. Maine*, 469 F.3d 158, 173 n.8 (1st Cir. 2006) ("[T]he Georgia protocol may require the State to defend litigation before obtaining a ruling on immunity.  It may be difficult in some instances to determine on motions under Rule 12(b)(6) whether plaintiff's complaint stated a viable Title II claim. . . .  As a result, there may need to be further specificity about the precise nature of the plaintiff's claims and some discovery after the suit begins.").

(3) that HCSD's denial of benefits was by reason of Madelyn's opioid use disorder.  *See Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 5 (1st Cir. 2000).

The HSCS does not contest the first element.  Because of her opioid use disorder, Madelyn was a qualified individual with a disability.  *See, e.g.*, *Jones v. City of Boston*, 752 F.3d 38, 58 (1st Cir. 2014) (recovering from opioid addittiction "may be" a disability); *A Helping Hand, LLC v. Baltimore Cty., MD*, 515 F.3d 356, 367 (4th Cir. 2008) ("Unquestionably, drug addiction constitutes an impairment under the ADA."); 28 C.F.R. § 35.108(b)(2) ("Physical or mental impairment includes . . . drug addiction[.]").  Recovering from opioid addiction is a disability. *See Smith v. Aroostook Cty.*, 376 F. Supp. 3d 146, 159 (D. Me. 2019) (undisputed); *Pesce v. Coppinger*, 355 F. Supp. 3d 35, 45 (D. Mass. 2018) (undisputed).

As to the second element, the Complaint alleges that the HCSD denied Madelyn the benefit of medical care.  Under the ADA, "the medical care provided to [an] incarcerated population qualifies as a 'service' that disabled inmates must receive indiscriminately." *Pesce*, 355 F. Supp. at 45 (citing *Yeskey*, 524 U.S. at 210); *see also Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274, 284 (1st Cir. 2006).  Here, the Complaint alleges that HCSD "did not treat Madelyn's complaints of chest pain or difficulty breathing."  *See* Compl. ¶¶ 64, 70.  HCSD refused to do so despite multiple requests from Madelyn and from Madelyn's fellow detainees to provide Madelyn with medical attention. *See id.* ¶¶ 67, 69.  This was part and parcel to the facility's practice to ignore the medical needs of opioid users during the withdrawal process.  *See id.* ¶¶ 64, 70.  By denying care, HCSD also denied Madelyn a reasonable accommodation.

As to the third element, the Complaint properly alleges that HCSD's denial of medical care was because of Madelyn's opioid use disorder.  Among other things, the Complaint alleges that the HCSD's policy of putting opioid users through a torturous withdrawal process

conditioned the staff to ignore their suffering.  *See* Compl. ¶ 64.  Additionally, there is direct

evidence of discriminatory animus: staff members who declined to respond to Madelyn's

complaints told her "the situation was her own fault for using drugs."  *See id.* ¶ 67.  Further, the

denial of care to Madelyn was so egregious and inconsistent with sound medical practice as to

constitute evidence of discriminatory motive in and of itself.  *See Messere v. Clarke*, No. 11-

12166, 2015 WL 5609959, at \*11–13 (D. Mass. Sept. 22, 2015) (denying motion to dismiss in

part because refusal to adequately treat condition that ultimately required surgery was so

unreasonable as to support inference of animus) (citing *Kiman*, 451 F.3d at 285); *see also Smith*,

376 F. Supp. 3d at 160 ("The Defendants' statements and actions suggest the kind of 'apathetic

attitude' towards individuals with disabilities that the ADA intends to remedy.").

### 2. Count II also adequately alleges that the HCSD violated Madelyn's constitutional right to medical care

Because Madelyn was being held pretrial, and not as a convicted prisoner, her

constitutional claim for denial of medical care is governed by the Fourteenth Amendment's Due

Process Clause.  *See Gaudreault v. Salem*, 923 F.2d 203, 208 (1st Cir. 1990).  The Fourteenth

Amendment is "at least" as protective as the Eighth Amendment's prohibition on cruel and

unusual punishment, which prohibits deliberate indifference to a prisoner's serious medical need.

*See Ruiz-Rosa v. Rullan*, 485 F.3d 150, 155–56 (1st Cir. 2007).  The Eighth Amendment's

"deliberate indifference" standard requires a objective showing of a serious medical need, as well

as a subjective showing that the defendant was "aware of facts from which the inference could be

drawn that a substantial risk of serious harm exists, and [that] he must also [have drawn] the

inference."  *Leavitt v. Corr. Med. Servs., Inc.*, 645 F.3d 484, 497 (1st Cir. 2011) (quotation

omitted).

However, numerous courts have recently concluded that pre-trial arrestees like Madelyn—who could not be subjected to any punishment at all—are entitled to objectively reasonable medical care, without any requirement to show subjective disregard.  In *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472–73 (2015), the Supreme Court held that the Due Process Clause does not require pretrial detainees alleging excessive force to show a subjective intent to harm.  Since then, numerous courts have held that subjective motive or intent has no role to play in any form of conditions-of-confinement case, including claims for denial of medical care, brought by pretrial detainees or those civilly committed to correctional facilities.[7]  *See Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019) (holding objective standard articulated in *Kingsley* applied to conditions claims by pretrial detainees); *Colbruno v. Kessler*, 928 F.3d 1155, 1161–63 (10th Cir. 2019) (forced nudity claim); *Miranda v. Cty. of Lake*, 900 F.3d 335, 351–52 (7th Cir. 2018) (medical care claim); *Gordon v. Cty. Of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018) (medical care claim); *Darnell v. Pineiro,* 849 F.3d 17, 34–35 (2d Cir. 2017) (conditions claim); *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1070–71 (9th Cir. 2016) (en banc) (failure to protect claim).

In all events, the Complaint contains sufficient allegations to show Eighth Amendment deliberate indifference, specifically that Madelyn had an objectively serious medical need, for which the HCSD knowingly and deliberately failed to provide any treatment. *See Leavitt*, 645 F.3d at 498–500.  Madelyn's objectively serious medical needs were clear; they included chest

---

[7] To counsel's knowledge, the First Circuit has not yet had occasion to address these implications of *Kingsley*. However, the First Circuit has recognized that a more favorable standard than "deliberate indifference" likely applies in the context of people who are not serving a sentence. *See Battista v. Clarke*, 645 F.3d 449, 453 (1st Cir. 2011) ("Because [plaintiff] is civilly committed, a different, more plaintiff-friendly standard arguably applies[.]"). As noted, the Court need not decide the issue at this time, because subjective deliberate indifference is pled in all events.

pain and difficulty breathing.  *See Gladu v. Correct Care Solutions*, No. 17-504, 2019 WL

5423019, at *11 (D. Me. 2019) (denying motion to dismiss deliberate indifference claim and

holding chest pain is a serious medical need because "a layperson is highly likely to recognize

the need for medical attention when a person complains of severe, radiating chest pain, because

this symptom is a well-known sign of a heart attack or underlying cardiac condition."); *see also*

*Perry v. Roy*, 782 F.3d 73, 79 (1st Cir. 2015) (painful jaw that would not open was serious

medical need).  And the Complaint alleges that HCSD's staff were subjectively aware of

Madelyn's symptoms, that they chose not to address them, and that they derided Madelyn for

complaining about something they viewed as her own fault.  *See* Compl. ¶¶ 67–70.  These

allegations are confirmed by HCSD's recent production of records documenting that Madelyn

communicated her complaint of chest pain to the facility (which could be added to the Complaint

by amendment if needed).  *See* Rosensweig Decl. Ex. A.  This scenario—affirmative notice of a

serious medical condition coupled with a conscious failure to act—is a textbook example of

deliberate indifference.  *See Perry*, 782 F.3d at 80 (seventeen-hour delay in bringing prisoner

with jaw pain to hospital presented triable issue of fact on deliberate indifference); *Leavitt*, 645

F.3d at 498–500 (failure to treat HIV infection presented triable issue of fact on deliberate

indifference); *Consolo v. George*, 58 F.3d 791, 794 (1st Cir. 1995) (delay in bringing detainee

who could barely stand due to pelvic injury constituted deliberate indifference).

       3.     Count II does not merely allege medical malpractice

      The Court should also reject HCSD's attempt to recast the Complaint's allegations of

denial of medical treatment as a mere "medical malpractice claim."  *See* HCSD Mem. at 16.

HCSD tries to bolster this argument by claiming that "various treatment decisions were made

based on regular and accurate assessments of Madelyn's specific condition and those decisions

demonstrate the specific attention that the WCC staff paid to the particular needs of inmates with

substance use disorder." HCSD Mem. at 8–9. This argument, however, fails for at least three reasons.

*First*, HCSD did not provide *any* treatment in response to Madelyn's chest pain, heart pain, or difficulty breathing. *See* Compl. ¶¶ 67, 70. The Complaint is clear that WCC staff ignored Madelyn's requests for medical assistance to treat these issues while it held her in custody. *See* Compl. ¶ 67. The mere fact that Madelyn *saw* medical personnel at various times does not defeat a claim of deliberate indifference if those personnel did not *act* to help her. *See, e.g.*, *Perry*, 782 F.3d at 76, 80 (three evaluations by nurses, who did nothing); *Leavitt*, 645 F.3d at 498–500 (multiple visits with physician's assistant, who did not act).

*Second*, the WCC's assessments of Madelyn's "specific condition" were neither "regular" nor "accurate." As the Complaint alleges, the WCC staff did not "monitor [Madelyn] for the complications known to arise from opioid use," nor did they regularly "take her vital signs." Compl. ¶ 70. The WCC's "Daily Medical Rounds" records are "blank" for the four days that Madelyn was held at the WCC after her intake. *See* Compl. ¶ 70. And the WCC staff did not even attempt to assess Madelyn's chest pain, difficulty breathing, and other symptoms. *See* Compl. ¶¶ 64, 67, 70.

*Third*, the HCSD's own cited authority, *Kiman v. New Hampshire Department of Corrections*, shows that the WCC's refusals to provide Madelyn with treatment for opioid withdrawal and to provide her with medical assistance for her chest pain and difficulty breathing were not "reasoned medical judgments." 451 F.3d 274, 285 (1st Cir. 2006). In *Kiman*, the "prison medical staff sought Kiman's medical records, arranged an outside specialist consultation, and made reasoned medical judgments about the types of treatment and physical

therapy that they thought were appropriate in his case" to treat his sclerosis.  *Id.*  In contrast, the HCSD simply refused to treat Madelyn's symptoms until it was too late.

    C.    *Counts III and IV Should Not Be Dismissed for Naming "Doe" Defendants.*

    The HCSD argues that the Plaintiff cannot proceed against the "Doe" defendants.  This is not correct.  The First Circuit allows plaintiffs to file complaints against unnamed defendants who cannot be reasonably identified prior to discovery.  *See Martinez-Rivera v. Sanchez Ramos*, 498 F.3d 3, 8 (1st Cir. 2007) (reversing in part dismissal of complaint for failure to identify defendants; "a plaintiff may bring suit against a fictitious or unnamed party where a good-faith investigation has failed to reveal the identity of the relevant defendant and there is a reasonable likelihood that discovery will provide that information.") (citing *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971)); *Wilson v. Town of Mendon*, 294 F.3d 1, 7 n.16 (1st Cir. 2002) (noting "the right of a plaintiff to proceed against a "John Doe" defendant whose identity can only be established through discovery. . . . [that is based on a] principle of fairness recogniz[ing] that a plaintiff . . . may not know or have the opportunity to learn the identity of the alleged wrongdoer").  Once the defendants are identified through discovery, First Circuit precedent allows plaintiffs to promptly amend their complaints under Federal Rule of Civil Procedure 15.  *See Wilson*, 294 F.3d at 7 n.16 ("Once [the unnamed defendant's] identity is discovered, a plaintiff is permitted under the liberal regime of Rule 15 to substitute the true defendant for the fictitious 'John Doe.'").

    The First Circuit's decision in *Martinez-Rivera* is controlling here.  In *Martinez-Rivera*, the plaintiffs had sued several police officers for the death of their family who was shot during a police raid, including some unnamed officers.  *See id.* at 7–8.  Reversing the district court's dismissal of the complaint, the First Circuit noted the difficulty plaintiffs have in identifying defendants in complaints alleging police brutality under Section 1983.  *See id.* at 8 n.5.  The First

Circuit held that the plaintiffs should have the opportunity through discovery to identify those

defendants and amend their complaint "once those identities are revealed." *See id.*; *see also*

*Carmona v. Toledo*, 215 F.3d 124, 126 (1st Cir. 2000) (reversing district court's denial of

plaintiff's motion for leave to amend 1983 complaint to identify a previously unknown police

officer whose identity was revealed through discovery).

The Court should therefore allow the counts against these unnamed HCSD employees to

proceed until the Estate can amend the Complaint to substitute identified parties after discovery.

Like the plaintiff in *Martinez-Rivera*, the Estate is suing on behalf of a family member who died

at the hands of law enforcement.  Without the testimony of the decedents, both the *Martinez-*

*Rivera* plaintiffs and the Estate representative, Maura O'Neill, are poorly positioned to identify

the specific correctional officers who interacted with Madelyn at specific times.  These are

matters that can be confirmed through discovery from the HCSD and its staff members.  And,

because the Estate is also suing the HCSD as an entity, this discovery will occur, and may

support a subsequent amendment, regardless of whether the "Doe" defendants remain in the case

or not.  It consequently makes little practical sense to dismiss them at this point.  And, dismissing

the "Doe" defendants would create unfortunate litigation incentives—counsel for the Estate do

not wish to publicly accuse anyone of causing a death without a high degree of certainty that

they are naming the right person.

Cases cited by the HCSD are not to the contrary.  Both *Price v. Marsh*, No. 2:12-CV-

05442, 2013 WL 5409811 (S.D.W. Va. Sept. 25, 2013) and *Njoku v. Unknown Special Unit*

*Staff*, No. 99-7644, 2000 U.S. App. LEXIS 15695 (4th Cir. July 7, 2000) are cases that held that

*judgment* could not be entered against unnamed defendants.  In *Price*, the plaintiff had failed to

timely move to amend his complaint after discovering "Trooper John Doe's" actual identity

during discovery.  See *Price*, 2013 WL 5409811 at *3.  The district court denied plaintiff's

untimely motion to amend and, because "judgment may not be entered against an unnamed

party," dismissed Trooper John Doe from the case.  *Id.* at *6.  In *Njoku*, the Fourth Circuit

reversed the district court's award of damages against unnamed defendants because "there is no

basis to permit a judgment against an unidentified John Doe defendant to be sustained."  *Njoku*,

2000 U.S. App. LEXIS 15695 at *2–3.  Also, the Fourth Circuit remanded the case "with

instructions . . . to afford Njoku a reasonable opportunity to properly identify these [unnamed]

defendants." *Id.* at *3.

Moreover, the Eleventh Circuit cases HCSD cites are simply at odds with First Circuit

law and cannot support dismissal of the Doe defendants.  *See, e.g.*, *Richardson v. Johnson*, 598

F.3d 734, 738 (11th Cir. 2010) (holding, contrary to the law of this Circuit as set forth in

*Martinez* and *Wilson*, that in the Eleventh Circuit, the description of Doe defendants must be so

specific that the name is surplusage).  Even if the Eleventh Circuit law applied here, which it

does not, the cases cited by HCSD are distinguishable because the plaintiffs in those cases filed

claims on their own behalf—not on behalf of a decedent who died in custody and is unavailable

to provide identifying information.[8]

Also, HCSD fails to cite to any authority holding that *Ashcroft* and *Twombly* require

dismissing complaints filed against Doe defendants who have not been identified prior to

discovery. Again failing to cite to any First Circuit precedent, HCSD instead cites to dicta from

the *Price* decision that merely speculates that *Twombly* and *Ashcroft* "see[m] to indicate that

---

[8] *See Isles v. Doe 1*, No. 3:18-CV-632-J-32JRK, 2018 WL 2317969 (M.D. Fla. May 22, 2018) (pro se prisoner filing
against one unnamed prison warden and seven unnamed prison officers); *Williams v. DeKalb Cty. Jail*, 638 F. App'x
976 (11th Cir. 2016) (pro se prisoner filing against named officers and a "J.E.S. team" who attacked him);
*Richardson v. Johnson*, 598 F.3d 734 (11th Cir. 2010) (pro se prisoner filing against named officers and one
unnamed officer).

complaints naming unidentified parties as defendants should be dismissed." *See Price*, 2013 WL 5409811 at *4.  The court's holding in *Price*, however, is based on two different grounds: (1) the fact that the plaintiff filed an untimely motion to amend his complaint long after the Doe defendant had been identified through discovery; and (2) that *trial*—not a complaint—could not proceed against the Doe defendant because judgment cannot be entered against an unnamed defendant.  *See id.* at *6.  Here, the case is in its earliest stages, and the Complaint makes specific allegations of behavior by the Doe defendants that would support liability.  *See* Compl. ¶¶ 67, 85, 104–115.

> D.  *The Doe Defendants Are Named in Their Individual Capacities in Counts III and IV.*

HCSD's claim that "it appears that [the John/Jane Does] are sued in their official capacities" lacks merit. *See* HCSD Mem. at 19.  The John/Jane Does are sued in their individual capacities; that is, plaintiffs seek to hold them individually liable for damages for their actions. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ( "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law."); *cf. id.* ( "Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent.") (internal quotations omitted).  Unlike state employees sued in their official capacities, "state officials, sued in their individual capacities, are 'persons' within the meaning of [Section] 1983." *Hafer v. Melo*, 502 U.S. 21, 31 (1991).  The Court should therefore allow the Section 1983 claims to proceed against the Doe defendants.

Also, the Court should allow the state law wrongful death claims under M.G.L. ch. 229, Section 2 to proceed against the Doe defendants because it is clear from the Complaint that they are sued in their individual capacity.  *See Parker v. Chief Justice For Admin. & Mgmt. of Trial*

*Court*, 67 Mass. App. Ct. 174, 180 (2006) ("With respect to intentional torts, . . . claims against the public employer are barred [because of sovereign immunity], but may be asserted against the public employee in his individual capacity [under the Massachusetts Torts Claims Act]."). In addition to asserting Count IV against the Doe defendants, the Complaint also asserts the same count against Defendants Zanazanian, McNabb, and Rodriguez, who are expressly named in the Complaint in their individual capacities. *See* Compl. ¶¶ 5–7.

E.     *Count IV Should Not Be Dismissed Based on Determinations about the Defendants' Mental State, Which is Quintessentially a Jury Question.*

The SPD Defendants also argue that Count IV should be dismissed as against them because the Complaint fails to allege that they acted with an "intentional" state of mind.  Mem. at 8.  The Complaint does make that allegation, however (Compl. ¶ 113), and any attack on that allegation cannot properly be resolved at the dismissal stage.  *See, e.g.*, *De Prins v. Michaeles*, 236 F. Supp. 3d 482, 491 (D. Mass. 2017) (denying dismissal because "[t]he issue of fraudulent intent . . . should be evaluated on the basis of a factual records and cannot be decided on a motion to dismiss"); *Edsall v. Assumption College*, 367 F. Supp. 2d 72, 85 (D. Mass. 2005) (denying dismissal; because presence of "malice" is an issue that "inevitably turns on motivations and intent, it is ill-suited for resolution in a motion to dismiss.").  The cases cited by the Springfield defendants clearly demonstrate this principle.  In *Justiniano v. Walker*,[9] the court denied a motion to dismiss that challenged the adequacy of intent allegations.  *See* No. 15-CV-11587, 2016 WL 5339722, at *4 (D. Mass. Aug. 24, 2016).  And in all the others, the respective courts addressed the issue of intent on either a fully developed factual record at summary

---

[9] The court in *Justiniano* did allow a motion to dismiss on a separate wrongful death claim, but it was against the superintendent of the state police who was not present on the scene, and who was sued solely on a theory of supervisory liability arising from an alleged failure to train and maintain adequate policies.  *See* 2016 WL 5339722, at *7.  Count IV in this case is solely against individuals present at the scene.

judgment or in the context of trial.  *See Kowalski v. Gagne*, 914 F.2d 299, 303 (1st Cir. 1990)

(summary judgment, relying on collateral estoppel from prior jury verdict); *Stamps v.*

*Framingham*, 38 F. Supp. 3d 146, 149, 160 (D. Mass. 2014) (summary judgment where "the

undisputed evidence shows that [the] defendant did not intend to shoot" the decedent, and

plaintiff conceded it was an accidental discharge); *Farrah v. Gondella*, 725 F. Supp. 2d 238, 246

& n.9 (D. Mass. 2010) (denying defendant's motion for summary judgment); *Foster v. McGrail*,

844 F. Supp. 16, 25 (D. Mass. 1994) (post-trial motions).

In all events, the Complaint here specifically alleges that the Springfield defendants were

acting intentionally when they denied Madelyn the medical attention necessary to save her

life.  *See* Compl. ¶ 113.  And the facts would certainly permit a jury to so find.  This is not a case

where the Springfield defendants simply failed to discovery that Madelyn was sick, or

disregarded a risk that she might be, or even provided her with treatment that, in hindsight, fell

short.  Rather, Madelyn repeatedly and explicitly told these defendants that she was experiencing

severe chest pain and difficulty breathing.  *See id.* ¶¶ 37–45, 51–53.  They observed that she was

in agony.  *See id.* ¶¶ 33, 36, 47, 56–57.  She begged them for help.  *See id.* ¶ 56; Fig. 6.  Yet the

defendants made a conscious decision to provide no care, and defendant Zanazanian specifically

communicated that decision to Madelyn and her mother.  *See id.* ¶¶ 53, 60.  These defendants

also took steps to prevent the creation of evidence of their wrongful conduct, including

intentionally failing to activate the audio recording equipment during Madelyn's phone call.  *See*

*id.* ¶¶ 49–50.  A jury could clearly draw an inference that, as the complaint alleges, the

Springfield defendants knew exactly what they were doing and intended to do it.  *See, e.g.*,

*Justiniano*, 2016 WL 5339722, at *4.

## **CONCLUSION**

For all the foregoing reasons, Plaintiff respectfully requests that the pending motions to dismiss be denied.  If, however, the Court is inclined to grant the motions, then Plaintiff respectfully requests that the Estate be given leave to amend the Complaint to address any concerns that might result in such dismissal.


June 1, 2020                                               Respectfully submitted,

*/s/ Joshua M. Looney*
Matthew R. Segal (BBO # 654489)
Jessie J. Rossman (BBO # 670685)
Daniel L. McFadden (BBO #676612)
American Civil Liberties Union
Foundation of Massachusetts, Inc.
211 Congress Street
Boston, MA 02110
(617) 482-3170

Elizabeth Matos (BBO # 671505)
David Milton (BBO # 668908)
Prisoners' Legal Services of Massachusetts
50 Federal St.
Boston, MA 02110
(617) 482-2773

Martin M. Fantozzi (BBO # 554651)
Richard J. Rosensweig (BBO # 639547)
Joshua M. Looney (BBO # 703636)
Goulston & Storrs PC
400 Atlantic Avenue
Boston, MA 02110
(617) 482-1776

*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

       I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF.  I am not aware of any party who is a non-registered participant, and therefore electronic filing is the sole means of service of this document.

Dated: June 1, 2020                      /s/ Joshua M. Looney
                                         Joshua M. Looney, Esq.