# Exhibit C

```
                                                          1

 1                             Volume 1, Pages 1-130

 2                                  Exhibits: 17-23

 3              UNITED STATES DISTRICT COURT

 4           FOR THE DISTRICT OF MASSACHUSETTS

 5     ------------------------------------------------

 6     MAURA O'NEILL, as administrator of the Estate of

 7     Madelyn E. Linsenmeir,

 8                   Plaintiff,

 9     vs.                      CA No. 3:20-cv-30036

10     CITY OF SPRINGFIELD, MOISES ZANAZANIAN,

11     REMINGTON McNABB, SHEILA RODRIGUEZ, HAMPDEN

12     COUNTY SHERIFF'S DEPARTMENT, and JOHN/JANE DOES

13     NOS. 1-5,

14                   Defendants.

15     ------------------------------------------------

16           REMOTE DEPOSITION OF SHEILA RODRIGUEZ

17            Friday, April 15, 2022, 10:05 a.m.

18                  Via Zoom Video Conference

19        ----Reporter:  Kathleen L. Good, CSR, RPR----

20                  K. L. GOOD & ASSOCIATES

21                    Post Office Box 367

22             Swampscott, Massachusetts 01907

23      Tel. 781-367-0815       Kathleen.Good@verizon.net

24
```

54

1  Madelyn was arrested and brought into booking.
2           On that Saturday, September 29,
3  2018, you held a shift as matron, correct?
4       A.   Yes, I did.
5       Q.   And you were assigned to the booking
6  area at 130 Pearl Street, correct?
7       A.   Yes, I was.
8       Q.   And you worked one shift?
9       A.   Yes, I did.
10      Q.   On September 29, 2018, you worked
11 from 4:00 p.m., to 12:00 a.m., correct?
12      A.   Yes.
13      Q.   Do you remember who else was working
14 in the booking during your shift?
15      A.   Besides Sergeant Z -- I cannot
16 pronounce his last name -- I do not recall the
17 officers.
18      Q.   Was it Sergeant Zanazanian?
19      A.   Yes.
20      Q.   So he was working during your shift?
21      A.   Yes, he was.
22      Q.   What about Officer Remington McNabb?
23      A.   I do not recall.
24      Q.   What about Officer James Trubia?

63

1   A.   Every fifteen minutes.  And between my
2  fifteen minutes, I would just pop my head to
3  check on the cell.
4   Q.   Aside from you, did anybody else
5  check on her in her cell during your shift?
6   A.   No.
7   Q.   Could Madelyn lie down on the bed in
8  the cell?
9   A.   She was able to.  She just complained
10 about it being hard, about the bed being hard.
11   Q.   What exactly did she say to you when
12 she complained about the bed being hard?
13   A.   That the bed was hard.
14   Q.   Anything else?
15   A.   No.
16   Q.   Did she say anything about her body
17 hurting?
18   A.   Just that her body was hurting.  That
19 was it.
20   Q.   Anything else?
21   A.   No.
22   Q.   Did Sergeant Zanazanian give you any
23 special instruction regarding Madelyn?
24   A.   No.

69

1  of body aches concern you?
2      A.   Body aches is, for me, all prisoners
3  complain about something.  I'm still going to
4  keep a close eye on them.
5      Q.   After Madelyn's phone call, what did
6  Madelyn do in her cell?
7      A.   She just sat there.
8      Q.   She didn't lie down?
9      A.   No.  Between the shift, yes.  But not
10 right away.
11     Q.   Did anyone take Madelyn's pulse?
12          MS. DeSOUSA:  Objection.
13     A.   No.
14     Q.   (By Mr. Looney) What about her
15 temperature?
16          MS. DeSOUSA:  Objection.
17     A.   No.
18     Q.   (By Mr. Looney) Did anyone take her
19 blood pressure?
20          MS. DeSOUSA:  Objection.
21     A.   No.
22     Q.   (By Mr. Looney) Did anyone listen to
23 her chest?
24          MS. DeSOUSA:  Objection.

```
                                              112
1    cartoon, I guess carton of milk, which she used
2    for water, correct?
3         A.    Yes.
4         Q.    And did she ask for water?
5         A.    Yes, she did.
6         Q.    You write:
7               "Madelyn cannot lay on the bed
8    because of her body aches."  Correct?
9         A.    What line are you in?  The second
10   paragraph?
11        Q.    Right here.
12        A.    Correct.
13        Q.    This is the bed in her cell,
14   correct?
15        A.    Correct.
16        Q.    Did she tell you that she couldn't
17   lie down?
18        A.    Yes, she did.
19        Q.    Did you ask her what was wrong, like
20   why her body was hurting?
21        A.    No, I did not.
22        Q.    Why not?
23              MS. DeSOUSA:  Objection.
24        A.    It didn't come to my mind to be asking
```

115

1    A.    Yes, you did.
2    Q.    I'm curious why you wrote those
3 statements.  Can you tell me why you included
4 those statements in your report?
5    A.    Because during my interview, it was
6 asked if I heard the sergeant made any smart
7 comments or myself made any comments.  I did not
8 interact with Madelyn.
9    Q.    During your interview, were you told
10 what sarcastic comments possibly were made?
11   A.    No.
12         MS. DeSOUSA:  Objection.
13   Q.    (By Mr. Looney) You write:
14         "During the shift, Madelyn
15 complained about body aches."  Correct?
16   A.    Correct.
17   Q.    And did she complain about this
18 throughout your shift?
19   A.    Every time I would do my fifteen-minute
20 check-in.
21   Q.    So every time you did your
22 fifteen-minute check-in --
23   A.    Yes.
24   Q.    -- she would tell you that her body

116

1  was hurting?
2      A.    Yes.  It went on and on for a couple of
3  hours.
4      Q.    So she told you multiple times?
5      A.    Yes, she did.
6      Q.    What did you say when she told you?
7      A.    I don't recall.
8      Q.    Did you take any action in response
9  to her telling you this multiple times?
10     A.    I just kept an eye close on her in case
11 there was any other symptoms.
12     Q.    Did you not think that her body
13 hurting and her telling you multiple times was
14 enough to take action?
15           MS. DeSOUSA:  Objection.
16     A.    I passed the message forward.  She did
17 not complain about anything else besides her body
18 aching.
19     Q.    (By Mr. Looney) Did you believe her?
20     A.    I did and I didn't.
21     Q.    Could explain what you mean?
22     A.    Yes, I can explain.
23           By meaning I do believe her, I do not
24 believe her, she did complain about her knee and

## SIGNATURE INFORMATION FOR COUNSEL

The original signature page/errata sheet has been sent to Lisa DeSousa, Att., to obtain signature from the deponent. When complete, please send original to Joshua Looney, Att., a copy of any errata should be sent to each party of record present at the deposition.

## WITNESS INSTRUCTIONS

After reading the transcript of your deposition, please note any change or correction and the reason on the errata/signature page.  DO NOT make any notations on the transcript itself.  If necessary, continue the format on a separate page.

**PLEASE SIGN AND DATE** the errata/signature page (before a notary if requested) and return it to your counsel.