UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

| | |
|---|---|
| MAURA O'NEILL, AS ADMINISTRATOR OF THE ESTATE OF MADELYN E. LINSENMEIR, PLAINTIFF | |
| v. | CIVIL ACTION NO. 3:20-CV-30036 |
| CITY OF SPRINGFIELD, MOISES ZANAZANIAN, REMINGTON MCNABB, SHEILA RODRIGUEZ, HAMPDEN COUNTY SHERIFF'S DEPARTMENT, EILEEN BARRETT, AND MAUREEN COUTURE, DEFENDANTS | LEAVE TO FILE GRANTED ON JANUARY 5, 2024 |

MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT OF THE DEFENDANTS, HAMPDEN COUNTY SHERIFF'S DEPARTMENT, EILEEN BARRETT, AND MAUREEN COUTURE

SUMMARY STATEMENT

Madelyn Linsenmeir ("Madelyn") was an inmate at the Western Massachu-setts Regional Women's Correctional Center (the "WCC") for less than four days, from the afternoon of Sunday, September 30, 2018 to the morning of Thursday, October 4, 2018, when WCC staff discovered she was in distress and immediately called for an ambulance to transport her to the Baystate Medical Center Emergency Room.  Tragically, Madelyn died at Baystate on Sunday, October 7, 2018, from com-plications of infective endocarditis, brought on by long-term heroin use.

In Count II of the Amended Complaint, the plaintiff charges the Hampden County Sheriff's Department (the "HCSD"), which operates the WCC, with violation of Title II of the Americans with Disability Act ("ADA"), alleging that HCSD per-sonnel denied Madelyn access to medical care, that the medical care Madelyn did receive was inadequate, and that the HCSD refused to make a reasonable accom-modation for Madelyn by providing her with medically-adequate detoxification pro-gram. The ADA claim fails because it is undisputed that WCC medical staff provid-ed extensive examination and appropriate treatment for Madelyn's reasonably dis-cernable medical complaints, Madelyn had numerous opportunities to raise addi-tional medical complaints and did not, Madelyn never experienced problematic withdrawal symptoms, and Madelyn did not request another course of treatment as an accommodation.

In Count III, the plaintiff charges two WCC staff, correctional officer Eileen Barrett and registered nurse Maureen Couture, with deliberate indifference to

1

Madelyn's serious medical needs. The basis of the claim against Barrett is that she did not immediately notify the WCC's medical staff when Madelyn mentioned that she had pain in her chest in response to medical screening questions during the booking process, but instead personally escorted Madelyn to the medical department for her medical screening immediately after the intake procedure. The basis of the claim against Couture is that she failed to take vitals or send Madelyn to the hospital after a report from an officer that Madelyn had stumbled on the stairs on the way up to the medical department to provide a urine sample. Based on the undisputed facts, including the videos of the two encounters, a reasonable trier of fact could not find that either Barrett's or Couture's conduct rose to the level of deliberate indifference and Barrett and Couture are both entitled to qualified immunity as to Count III.

In Count IV, the plaintiff charges Barrett and Couture with violation of the Massachusetts Wrongful Death Statute. This claim fails for the same reasons as Count III and the defendants are entitled to common law, good faith immunity.

<u>BRIEF SUMMARY OF FACTS</u>

After battling Opiate Use Disorder for nearly half her life, Madelyn Linsenmeir walked out of a treatment program in Vermont in August of 2018 and, for the next forty days, her whereabouts were unknown.  (SOF, ¶¶ 6, 8-10, 12-13.) On September 29, 2018, Madelyn was arrested by the Springfield, Massachusetts Police and transferred to the Western Massachusetts Regional Women's Correctional Center (the "WCC") the next day. (SOF, ¶¶ 16, 21.) After less than four days at the

WCC, WCC staff found Madelyn nearly unresponsive in her bed and had her rushed to the hospital, where she died three days later from complications of infective endocarditis. (SOF, ¶¶122, 124-126.)

Although Madelyn had complained of chest pain to both her family and the Springfield Police in the days prior to her arrival at the WCC, it is undisputed that neither her family nor the Springfield Police informed anyone at the WCC about these complaints, and WCC staff remained completely in the dark as to this history for the duration of her stay at the WCC. (SOF, ¶¶24-26, 29-32.) Whatever the reason, Madelyn stopped complaining about her condition even before she arrived at the WCC; she did not complain to the police or her fellow detainee on the way over to the WCC from the police department. (SOF, ¶¶26-28.) She did not complain to her lawyer at court on her first full day in HCSD custody. (SOF, ¶¶71, 75.)

Upon arrival at the WCC on September 30, 2018, Madelyn first went through the intake procedure, conducted by Barrett, including answering a series of questions from Barrett. (SOF, ¶33.) When asked if she was experiencing pain, Barrett recorded in the intake software that Madelyn answered "Yes," identifying the pain as located in her leg and in her torso and back. (SOF, ¶¶34,35.) The option provided to Barrett by the software was "torso (chest, back)" and that is the option Barrett checked. (SOF, ¶36.)  The interview is recorded on security video. (SOF, ¶39.)

After the intake interview was complete, Barrett allowed Madelyn to shower, provided her with a meal and beverage, and then escorted her to the Medical Department for a full medical examination conducted by two nurses. (SOF, ¶¶40, 41,

43, 44-67.) There is no allegation or evidence that Madelyn complained of chest pain or difficulty breathing to either of these two nurses. (SOF, ¶67.)

Due to Madelyn's report of heavy alcohol use, the WCC nurses placed her on the WCC's Alcohol Withdrawal Protocol, which treats the danger of what could be life-threatening alcohol withdrawal with Librium. (SOF, ¶¶46, 60-61.) Librium is also useful in alleviating the unpleasant effects of opiate withdrawal. (SOF, ¶63.) Madelyn was given a stat dose of Librium to proactively treat the threat of withdrawal. (SOF, ¶¶49, 51, 65.)

On October 2, 2018, Madelyn was called from her housing unit to the Medical Department to give a urine sample for an STD test. (SOF, ¶87.) On her way up to medical, escorted by correctional officer Gina Walters, Madelyn stumbled and then sat down on the stairs. (SOF, ¶89.) Walters remained with Madelyn and then assisted her the rest of the way to the Medical Department by holding her arm. (SOF, ¶90.) This incident was captured on security video. (SOF, ¶¶89-90.) Walters did not feel the situation was serious enough to radio for support. (SOF, ¶92.)

Upon arriving at the Medical Department, Madelyn was met by two nurses, Alexandra Russ and Couture. (SOF, ¶93.) Although Walters could not recall if she told Couture about Madelyn's fall on the stairs, viewing the facts in the light most favorable to the plaintiff, we must assume she did. (SOF, ¶96.) Upon arriving in Medical, Madelyn took a seat. After some brief conversation during which Couture gestures toward the bathroom where Madelyn is to produce the urine sample, Couture then approaches Madelyn and leans up against the wall facing her. (SOF, ¶99.)

4

Madelyn then eases back in her chair and the two proceed to converse for about five and a half minutes, during which time Madelyn drinks a cup of water. (SOF, ¶¶100-102, 104, 106.) After Madelyn finishes the water, Couture directs Madelyn to the bathroom and she gets up, enters the bathroom, and when she emerges, produces a cup containing her urine sample. (SOF, ¶¶108, 109, 112.) Couture then accompanies Madelyn to the exit of the Medical Department and Madelyn returns to her housing unit. (SOF, ¶¶113-115.) Again, this entire interaction was captured on security video. (SOF, ¶¶93-115.)

On October 3, 2018, the day before she is rushed to the hospital, Madelyn is seen on security video moving about her housing unit and attending the orientation presentation for new inmates. (SOF, ¶116.) Madelyn appears to be paying attention to the presentation and is seen reading and marking up paperwork that was provided to her as part of the orientation. (SOF, ¶¶118-119.)

In 2018, prior to the advent of full Medically Assisted Treatment (MAT) programs in Massachusetts Sheriffs' Departments, the HCSD was already providing a comprehensive withdrawal regimen, involving numerous Policies and Procedures and Nursing Protocols. (SOF, ¶¶127-132.)  This regimen included the use of Librium to treat alcohol detoxification and MAT drugs, including methadone and buprenorphine, to address opiate withdrawal. (SOF, ¶¶62, 128-131.) The availability of buprenorphine was not limited to inmates satisfying specific criteria, such as already having a prescription for buprenorphine, but was also available for any inmate showing moderate or greater withdrawal through a withdrawal scale assess-

ment or anyone exhibiting symptoms that recommend MAT intervention. (SOF, ¶128.)

<u>SUMMARY JUDGMENT STANDARD</u>

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate where, after drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue of material fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, (1986); *Pagano v. Frank*, 983 F.2d 343, 347 (1st Cir. 1993). A party seeking summary judgment in federal court may rely on those portions of the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file that demonstrate the absence of a genuine material fact and show that they are entitled to judgment as a matter of law. *See* Fed. R. Civ. Pro. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is material if, based upon the substantive law at issue, it might affect the outcome of the case. *See Anderson*, 477 U.S. at 248; *Mack v. Great Atl. and Pac. Tea Co., Inc.*, 871 F.2d 179, 181 (1st Cir. 1989). A material issue is "genuine" if there is sufficient evidence to permit a reasonable trier of fact to resolve the issue in the non-moving party's favor. *See Anderson*, 477 U.S. at 248; *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 24 (1st Cir. 1989). The moving party bears the initial burden of demonstrating an absence of evidence to support essential elements of the opposing party's claims. *See Celotex*, 477 U.S. at 325.

The burden then shifts to the non-moving party to set forth specific facts and competent summary judgment evidence to raise a genuine issue of material fact on

each essential element of any claim on which she bears the burden of proof at trial. Fed. R. Civ. Pro. 56(c).  The non-moving party may not rest on mere allegations or denials in her pleadings but must produce affirmative evidence and specific facts. *Anderson*, 477 U.S. at 256.  She meets this burden only if she shows that a "reasonable jury could return a verdict for the non-moving party." *Id.* at 248. A mere "scintilla of evidence" will not preclude granting a motion for summary judgment. *Id.* at 252.

<u>ARGUMENT</u>

I.      <u>Barrett and Couture are entitled to Summary Judgment on Count III, alleging unconstitutional failure to provide medical care in violation of 42 U.S.C. §1983</u>.

    a.    <u>The standard for a 42 U.S.C. §1983 claim for denial of medical care</u>

The standard the plaintiff must meet to prevail on her claims against Barrett and Couture is a high one. "[T]o succeed in an Eighth Amendment claim under §1983 claim based on denied . . . medical care," a plaintiff must prove (1) an <u>objectively serious medical need</u> and (2) that defendant exhibited "<u>deliberate indifference</u>" to the prisoner's needs. *Lopes v. Riendeau*, 177 F. Supp. 3d 634, 657 (D.Mass. 2016) (citing *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014)) (emphasis added).[1]

---

[1] Madelyn was a pretrial detainee at the time of her incarceration and death.  "Fourteenth Amendment substantive due process requires the government to provide" adequate medical care to pretrial detainees. *Miranda-Rivera v. Toledo-Dávila*, 813 F.3d 64, 74 (1st Cir. 2016) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239 (1983)). While the "boundaries of this duty have not been plotted exactly . . . it is clear that they extend at least as far as the protection that the Eighth Amendment gives to a convicted prisoner." *Id.*; see also *Burrell v. Hampshire Cty.,* 307 F.3d 1, 7 (1st Cir. 2002) (noting that "the standard to be applied" in Fourteenth Amendment cases by pretrial detainees "is the same as that used in Eighth Amendment cases"). Government officials violate the Eighth or Fourteenth Amendments "if they display deliberate indifference to a prisoner's [or pretrial detainee's] serious medical needs." *Miranda-Rivera*, 813 F.3d at 74 (internal quotations omitted).

"Deliberate indifference" requires that defendant be subjectively "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [she] must also draw the inference." *Ruiz-Rosa v. Rullan*, 485 F.3d 150, 156 (1st Cir. 2007) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, (1994)).  The standard encompasses a "narrow band of conduct":  subpar care amounting to negligence or even malpractice does not give rise to a constitutional claim, *Feeney v. Corr. Med. Servs., Inc.*, 464 F.3d 158, 162 (1st Cir. 2006); rather, the treatment provided must have been so inadequate as "to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind,'" *Estelle v. Gamble* 429 U.S. 97, 105-106 (1976); *see also Alsina-Ortiz v. Laboy*, 400 F.3d 77, 82 (1st Cir. 2005) ("Willful blindness and deliberate indifference are not mere negligence; these concepts are directed at a form of scienter in which the official culpably ignores or turns away from what is otherwise apparent."). "[D]eliberate indifference in this context may be shown by the denial of needed care as punishment and by decisions about medical care made recklessly with 'actual knowledge of impending harm, easily preventable.'" *Leavitt v. Corr. Med. Servs.*, 645 F.3d 484, 497 (1st Cir. 2011) (citing *Ruiz-Rosa*, 485 F.3d at 156). *See also Watson v. Caton*, 984 F.2d 537, 540 (1st Cir. 1993) ("The courts have consistently refused . . . to conclude that simple medical malpractice rises to the level of cruel and unusual punishment."). The requisite intent can be shown where treatment is denied "in order to punish the inmate" or with "wanton disregard" for the inmate's health. *Perry*

*v. Roy*, 782 F.3d 73, 79 (1st Cir. 2015) (internal quotation marks and citations omitted).

The operative question is whether each individual provider, through their "own individual actions, has violated the Constitution," not whether they are collectively liable or whether HCSD as an entity is liable. *Air Sunshine, Inc. v. Carl*, 663 F.3d 27, 33 (1st Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). The court thus must address whether each individual HCSD personnel's care was "so clearly inadequate as to amount to a refusal to provide essential care." *Zingg v. Groblewski,* 907 F.3d 630, 635 (1st Cir. 2018). Based on all of the evidence, no reasonable jury could find that Barrett or Couture drew the inference that a substantial risk of serious harm to Madelyn existed and then was indifferent to the point of wantonly inflicting pain on Madelyn.

> b.  <u>No reasonable jury could find, on the undisputed facts, that either Barrett or Couture wantonly inflicted harm on Madelyn.</u>

Because this is a summary judgment motion, the Court must view the facts in the light most favorable to the plaintiff and draw all reasonable inferences in her favor.  *See Anderson*, 477 U.S. at 249. Since the word "chest" is part of the item Barrett checked on the Medical Screening sheet (SOF ¶36) and Madelyn did have a recent history of chest pain (SOF ¶17), a reasonable jury could conclude Madelyn did answer Barrett's inquiry by stating that the location of her pain was in the chest. In light of Madelyn's later diagnosis, a jury could find this constituted a serious medical need.

The plaintiff cannot prevail on the subjective element of her claim, however.

First, there is simply no evidence that Barrett understood there existed a substantial risk of serious harm to Madelyn and yet proceeded in a manner that constituted a wanton infliction of pain. Barrett would not have known of Madelyn's history of chest pain at that time of the intake because no one reported this to the WCC. (SOF ¶¶25, 29-32.)

Second, the jury will have the benefit of a video of the entire interview (SOF ¶39 and cited video evidence.) There is nothing about Madelyn's demeanor in the video that could be seen as obviously communicating to Barrett that she is at risk of serious harm.  Indeed, based on Madelyn's demeanor, it is impossible to pinpoint when, on the video, Madelyn makes the complaint of chest pain.  Likewise, there is nothing about Barrett's demeanor on the video to suggest she is wantonly inflicting pain on Madelyn by ignoring her grave medical complaint. Even without sound, it is obvious from Barrett's demeanor – her facial expressions and hand gestures – that Barrett is treating Madelyn in a polite and friendly manner.

Third, everything Barrett did after the interview was to make Madelyn more comfortable. Barrett provides her with a meal and a drink. (SOF, ¶40.) Barrett allows Madelyn to shower, something that seemed to result in an immediate improvement of her demeanor. (SOF, ¶¶41-42.)  Finally, Barrett personally escorts Madelyn to the Medical Department so that she can be seen for her intake health screen. (SOF, ¶43.)

While on these facts, the plaintiff could arguably make a showing that Barrett's failure to take immediate action in response to Linsenmeir's complaint of

chest pain was negligent, "[a] finding of deliberate indifference requires more than a showing of negligence." *Page v. Sharpe*, 487 F.2d 567, 569 (1st Cir. 1973) ("Mere negligence, in the absence of conduct which shocks the conscience, in giving or failing to supply medical treatment to prisoners will not suffice.") On the undisputed facts, no reasonable jury could find Barrett deliberately indifferent to Madelyn's serious medical need and Barrett is entitled to summary judgment in her favor on Count III.

Likewise, no reasonable jury could find Maureen Couture deliberately indifferent to Madelyn's serious medical need. Viewing the facts in the light most favorable to the plaintiff, the jury could conclude that Madelyn's fall in the stairwell was symptomatic of her underlying, life-threatening condition.  Although the testimony is not clear, a jury could conclude that Walters did tell Couture that Madelyn had just stumbled and gone down while climbing the stairs.

A reasonable jury could <u>not</u> conclude, however, that a report from Walters would have made Couture subjectively aware of Madelyn's underlying, serious medical condition. Walters did not perceive the event as serious enough to radio for support from the stairwell and there is no allegation that Walters was deliberately indifferent. (SOF, ¶92.) Walters only stayed in the Medical Department for about 15 seconds, so any report of the incident in the stairwell would have been very brief. (SOF, ¶95.) Walters is visible on video as she drops Madelyn off in Medical, and she says very little. (SOF, ¶95.) So, to the extent there was a report at all, it was far from an impassioned account of a disturbing event. The jury's impression of the vid-

eo from the stairwell is irrelevant, because it is undisputed that Couture did not witness the event. (SOF, ¶89.)

The conversation between Madelyn and Couture is all on video. (SOF, ¶¶100-109.) As in the recordings from Intake, there is nothing about Madelyn's demeanor to suggest that she is communicating a serious medical need to Couture during their conversation. (SOF, ¶101.) Madelyn is composed and says very little. (SOF, ¶101.) She is not distraught, tearful, pointing to her chest, or in any other way communicating a serious medical need and no reasonable jury could interpret the video that way. (SOF, ¶101.) When the conversation finishes, Madelyn produces a urine sample and then leaves the Medical Department under her own power. (SOF, ¶¶112-115.) The plaintiff alleges that, while Madelyn was in the bathroom, Couture "spoke with other staff and made hand gestures to her chest." (Amend. Compl. ¶73.) This is not supported by the video. (SOF, ¶¶93-114.)

As with Barrett, Couture would have had no knowledge of Madelyn's recent health complaints, as it is undisputed no one told the WCC staff prior to or upon Madelyn's arrival. (SOF, ¶¶25, 29-32.) Even if Couture was able to recall the details of her Intake Admission Screen of Madelyn, which took place two days prior, that would not be significant. (SOF, ¶55.) Madelyn made no report of chest pain at that visit, her vitals were largely normal, and she denied any acute or chronic health problems, chronic fever, cough, weight loss, or loss of appetite. (SOF, ¶¶56-58.) Couture's knowledge that Madelyn had an injured knee would not have been a cause for alarm. (SOF, ¶62.) To the contrary, it would provide a fairly benign explanation for

Madelyn missing a step on her way up.

Plaintiff may have sufficient evidence to show that Couture received a report of Madelyn tripping or falling on the stairs a few minutes prior to her arrival in medical and that Couture did not take any steps in response to this report to adequately ascertain Madelyn's health status. While these facts might support a finding that Couture did not provide adequate care to Madelyn, "[s]ubstandard care, malpractice, negligence, inadvertent failure to provide care, and disagreement as to the appropriate course of treatment are all insufficient to prove a constitutional violation." *Ruiz-Rosa*, 485 F.3d at 156, citing *Feeney*, 464 F.3d at 161-62. The undisputed facts, given all permissible inferences in the light most favorable to the plaintiff, simply do not and cannot demonstrate that Couture was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," that she in fact drew this inference, and that in doing so, Couture intentionally denied or delayed access to medical care. *Burrell*, 307 F.3d at 8 (1st Cir. 2002) (quoting *Farmer*, 511 U.S. at 837, (1994)). See *Kosilek*, 774 F.3d at 83. Nor can the plaintiff proffer "evidence that the failure in treatment was <u>purposeful</u>." *Id.* (emphasis added). Absent facts which establish the foregoing, Plaintiff's claim of deliberate indifference cannot proceed.

     c. <u>Barrett and Couture are entitled to qualified immunity.</u>

Barrett and Couture are entitled to qualified immunity because the evidence is insufficient for a reasonable jury to find that either of these WCC staff violated Madelyn's clearly established rights. The doctrine of qualified immunity shields

"[g]overnment officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). The test for the applicability of qualified immunity consists of two prongs: "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Maldonado v. Fontanes*, 568 F.3d 263, 268-269 (1st Cir. 2009).

For purposes of this motion, HCSD defendants concede that "[i]t is clearly established . . . that jail officials violate the due process rights of their detainees if they exhibit a deliberate indifference to the medical needs of the detainees . . . ." *Id*. "To demonstrate deliberate indifference a plaintiff must show (1) a grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) his failure to take easily available measures to address the risk." *Penn v. Escorsio*, 764 F.3d 102, 110 (1st Cir. 2014) citing *Camilo-Robles v. Hoyos*, 151 F.3d 1, 7 (1st Cir. 1998).

Although the right the plaintiff alleges is clearly established, to avoid qualified immunity the bounds and contours of a violation of that right must also be sufficiently clear such that no reasonable official could believe anything other than that the conduct of Barrett and Couture at the time constituted deliberate indifference and therefore a violation of Madelyn's constitutional right. Qualified immunity "protects all but the plainly incompetent or those who knowingly violate

the law." *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) (internal quotation marks and ci-

tations omitted). If *any* reasonable official could reasonably have believed, on the

basis of the facts known at the time, "that no violation existed," the defendant offi-

cial is entitled to immunity. *Dirrane v. Brookline Police Dep't*, 315 F.3d 65, 69 (1st

Cir. 2002). Under this standard, the question is whether any reasonable official in

the position of each of the defendants at the time would have reasonably believed

that "[her] actions, or willful failure to act, amounted to 'deliberate indifference' to

the serious risk" to Madelyn. *Bowen*, 966 F.2d at 13.

> i.  <u>Barrett was not indifferent to Madelyn's complaint of chest pain.</u>

There is simply no evidence to support the contention that any reasonable of-

ficer in Barrett's position would have known that his or her actions or inactions con-

stituted a violation of Madelyn's constitutional right. It is undisputed that the WCC

was not informed of any complaints or concerns made by Madelyn prior to her arri-

val at the WCC.  (SOF, ¶¶25-32.) The only evidence that Barrett had any knowledge

of Madelyn's "serious medical condition" was that she selected "yes" to an intake

questionnaire regarding "torso pain" that included "chest". (SOF, ¶¶34-36.)  The

plaintiff claims that in response to this report, Barrett should have asked Madelyn

follow up questions or notified the medical staff that she was experiencing chest

pain.

Mere failure to perceive a significant risk does not satisfy the knowledge re-

quirement for deliberate indifference unless the risk is so obvious or the "acts or

omissions [are] so dangerous" that a defendant's knowledge can be inferred. *Cortes-*

*Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988); *see Farmer*, 511 U.S. at 838, 839, 842; *Manarite*, 957 F.2d at 956. In the absence of actual knowledge, plaintiff has not offered any admissible evidence that Madelyn's risk was so obvious that the defendants' knowledge can be inferred.

Under these circumstances, a reasonable official in the shoes of Barrett would not believe that her failure to ask follow-up questions or alert the medical department to Madelyn's response to this intake question constituted a violation of her constitutional right. *See Maldonado*, 568 F.3d at 269; *Bowen*, 966 F.2d at 17-18.

      ii.  <u>Couture was not indifferent to the report of Madelyn stumbling on the stairs.</u>

Plaintiff asserts that the Couture's failure to particularly respond to a report that Madelyn, moments prior to her arrival in the medical unit, had stumbled and fell on the stairs constituted deliberate indifference to Madelyn's serious medical need. Construing the record in the light most favorable to the plaintiff and assuming that Couture was indeed given this report, the question is whether any reasonable nurse, under the circumstances, would have known that the failure to provide follow up care related to the stumble and fall constituted deliberate indifference to Madelyn's constitutional right.

A reasonable nurse under the circumstances here would understand that following up on report of stumble and fall is for the purpose of ensuring inmate health and safety, but would be unaware that Madelyn had any underlying medical need related to a reported stumble. Where "[t]he focus is on what the jailers knew and what they did in response," *Burrell*, 307 F.3d at 8, a reasonable nurse under the cir-

16

cumstances would not have understood that the failure to follow up after a report that she stumbled and fell on the steps moments earlier violated Madelyn's constitutional right to adequate medical care. *See Lucia*, 971 F. Supp. 2d at 165-66 (reaching same conclusion).

There is no evidence to support a contention or to demonstrate that any reasonable nurse in Couture's position would have known that her actions or inactions constituted a violation of Madelyn's constitutional rights. Plaintiff claims that, in response to a report that Madelyn had just stumbled and fell on the stairs, Couture should have taken Madelyn's vitals, alerted someone of her medical condition, and documented the encounter. However, just as with Barrett, under these circumstances, a reasonable nurse in the shoes of Couture would not believe that her failure to take vitals, document the encounter, or notify "anyone else" about Madelyn's present medical condition constituted a violation of her constitutional right. *See Maldonado*, 568 F.3d at 269; *Bowen*, 966 F.2d at 17-18.

II.   <u>The HCSD is entitled to Summary Judgment on Count II, brought pursuant to Title II of the ADA, because this Court lacks subject matter jurisdiction over the claim.</u>

Count II of the Amended Complaint alleges that the HCSD violated Madelyn's rights under Title II of the ADA. The United States Supreme Court has considered the issue of Eleventh Amendment sovereign immunity in the context of a claim pursuant to Title II of the ADA and set forth the analysis courts must apply, "on a claim-by-claim basis," to determine whether a particular claim brought pursuant to Title II of the ADA is barred by the Eleventh Amendment. *United States v.*

*Georgia*, 546 U.S. 151, 159 (2006). Applying the analysis set forth in *Georgia*, the claims brought against the HCSD in Count II of the Complaint are barred by the Eleventh Amendment to the United States Constitution and its protection of the states' sovereign immunity and, therefore, this Court lacks subject matter jurisdiction as to Count II.

The Supreme Court's "step-by-step analysis for Title II claims" set forth in *Georgia* requires that this Court

> 'determine … on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.'

*Buchanan v. Maine*, 469 F.3d 158, 172 (1st Cir. 2006) (quoting *Georgia*, 546 U.S. at 159 (2006)).  The first step is to determine whether the HCSD's alleged conduct violated Title II. *Id.* "If the State's conduct does not violate Title II, the court does not proceed to the next step in the analysis. The claim ends." *Id.*

    a.  <u>The plaintiff cannot prove that the HCSD violated Title II of the ADA.</u>

In order to prevail on her Title II claim, the plaintiff must prove that "(1) [Madelyn was] a 'qualified individual with a disability'; (2) [s]he was 'excluded from participation in, or denied the benefits of a public entity's services, programs, or activities or was otherwise discriminated against'; and (3) this exclusion, denial of benefits, or discrimination was 'by reason of [her] disability.'" *Sosa v. Massachusetts Dep't of Corr.*, 80 F.4th 15, 30 (1st Cir. 2023) (quoting *Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 283 (1st Cir. 2006)). "[A] claim under Title II may be premised on one

of three theories of discrimination: (1) intentional discrimination or disparate treatment; (2) failure to make a reasonable accommodation; (3) disparate impact." *Id.*

The plaintiff's claim under Title II of the ADA is grounded in four bases, none of which are viable on the undisputed facts.[2] The plaintiff's first basis is that HCSD personnel intentionally discriminated against Madelyn by denying her access to medical care. (Amend. Compl. ¶106.) ("Because of Madelyn Linsenmeir's disability, the Hampden County Sheriff's Department personnel intentionally discriminated against her [and] deprived her of the benefits of its medical programs.") The second basis is that, because of Madelyn's disability, HCSD personnel "failed to provide her with adequate treatment for her medical conditions." (*Id.*)  The third basis is that, because of Madelyn's disability, HCSD personnel were deliberately indifferent to her serious medical needs." (*Id.*) The plaintiff's fourth basis is that the HCSD failed to make a reasonable accommodation for Madelyn by providing her with a "medically adequate detoxification program." (Amend. Compl. ¶107.) It appears from the Amended Complaint that the "medically adequate detoxification program" to which the plaintiff is referring is "opioid replacement therapy, such as methadone." (Amend. Compl. ¶64.)

> i. <u>First basis: The plaintiff cannot prevail on her claim that HCSD intentionally discriminated against Madelyn in violation of Title II of the ADA, by denying her access to medical care.</u>

The plaintiff alleges that HCSD personnel intentionally discriminated

---

[2] The first three bases appear to be based on "intentional discrimination" theory, while the fourth is based on the "reasonable accommodation" theory. See *Kiman*, 451 F.3d, at 283.

against Madelyn and deprived her of the benefits of its medical programs (Amend. Compl. ¶106.) The grounds for this allegation appears to be the allegations that, on September 30 and October 1, 2018, Madelyn "repeatedly asked WCC staff for medical attention" due to chest pain and that the staff "told Madelyn that the situation was her own fault for using drugs" and that "between October 2 and the morning of October 4, other detainees told WCC staff on multiple occasions that Madelyn was ill and needed medical attention." (Amend. Compl. ¶¶70, 75.)

Accepting these allegations as true, as we must at the summary judgment stage, the plaintiff still cannot prove, on the undisputed facts, that Madelyn was denied the benefits of the HCSD's medical services, as she was seen in the WCC's Medical Department on September 30, October 1 and October 2, and there is no evidence that she complained of chest pain in these visits or otherwise requested medical attention and was denied. There is no dispute that Madelyn was seen in the WCC's medical department by two different nurses on September 30 and by a third nurse on October 1 and there is no allegation that Madelyn complained of chest pain at either of these visits or sought treatment other than the treatment that was provided. (Amend. Compl. ¶¶68, 69; SOF, ¶¶44, 67, 79.) There is no dispute that Madelyn was seen in the WCC's Medical Department on October 2 and there is no evidence that Madelyn requested any care other than that which was provided. (SOF, ¶¶93-115 and cited video evidence.) The undisputed facts also demonstrate that Madelyn had significant opportunities to raise her need for medical care with others, both inside and outside the WCC, on September 30, October 1, and October

3, and did not do so. (SOF, ¶¶24-28, 68-78, 116-119.)

To prevail on a claim under Title II of the ADA, it is not enough for the plaintiff to prove that, in isolated instances certain, unidentified WCC staff responded inappropriately to requests for medical care and did not send Madelyn to the Medical Department at the time of the request. In order to obtain relief under Title II of the ADA, the plaintiff must prove that Madelyn was "excluded from participating in or denied the benefits" of the WCC's medical services. *Parker v. Universidad de P.R.*, 225 F.3d 1, 5 (1st Cir. 2000). The plaintiff cannot prove liability on the part of the HCSD under Title II of the ADA where the HCSD provided meaningful access to the HCSD medical programs and there is no evidence that there was any discriminatory motivation on the part of the HCSD. See *Nunes v. Mass. Dep't of Corr.*, 766 F.3d 136, 145-146 (1st Cir. 2014) (Where department still provided meaningful access to medications and no evidence of intent by department to impose burden on plaintiffs because of disability, summary judgment for defendant affirmed.) The undisputed facts demonstrate that Madelyn had regular, meaningful access to medical services at the WCC and many opportunities to raise her complaints of chest pain with medical staff (and others). There is no evidence that the HCSD harbored any discriminatory motive.

> ii. <u>Second basis: The plaintiff cannot prevail on her claim that the medical treatment Madelyn received at the HCSD was so inadequate that it violated Title II of the ADA.</u>

Medical care in the correctional setting does fall within the coverage of the ADA. *Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 284 (1st Cir 2006). However,

"there is a limited basis for a challenge to medical treatment decisions if and only if the challenge is framed within a larger theory of disability discrimination." *Buchanan*, 469 F.3d at 176. The First Circuit has described two situations in which a challenge based on a treatment decision might be made:

> (1) the treatment decision was so unreasonable as to be arbitrary and capricious, raising an implication of pretext for some discriminatory motive, and (2) if not pretextual, the treatment decision was based on stereotypes of the disabled rather than an individualized inquiry as to the plaintiff's conditions.

*Id.* citing *Kiman*, 451 F.3d at 284-85.  The plaintiff cannot prevail in either scenario.

### 1. The plaintiff cannot prove that the medical care provided to Madelyn was arbitrary and capricious.

In the Amended Complaint, the plaintiff correctly alleges that Madelyn was an inmate at the WCC for a period of less than four full days, arriving on September 30, 2018 and leaving via ambulance for Baystate Medical Center on the morning of October 4, 2018. (Amend. Compl. ¶¶62, 77-78.) It is undisputed that, during this short time at the WCC, Madelyn received extensive medical attention.

On September 30, 2018, immediately after completing the booking process, Barrett escorted Madelyn to the WCC's Medical Department, where two registered nurses, Jennifer Wisnaskas and Couture, conducted an exhaustive medical screening of Madelyn. (SOF, ¶¶43-67.) Among other things, this medical screening included inquiry into Madelyn's substance use and withdrawal status, in response to which Madelyn reported use of both alcohol and heroin; inquiry to determine whether Madelyn was actively withdrawing from alcohol or opiates (SOF, ¶¶46, 48-51); inquiry into any cardiac problems or breathing difficulties (SOF, ¶47); inquiry

22

into Madelyn's right knee pain, examination of the knee, and treatment of that pain with ice and Motrin, in response to Madelyn's report that the pain was the result of an injury (SOF, ¶¶52-54); a complete check of Madelyn's vital signs, including her temperature (98.2 degrees) and blood pressure (100/80) (SOF, ¶56); and inquiry into whether Madelyn had any acute or chronic health problems or a history of chronic fever, cough, weight loss, or loss of appetite (SOF, ¶¶57-58).

In light of Madelyn's report of heavy alcohol use, WCC medical staff ordered that she be placed on the WCC's alcohol withdrawal protocol, which treated the more dangerous potential for alcohol withdrawal, while also providing benefits if Madelyn experienced withdrawal from opioids. (SOF, ¶¶60-63.) The alcohol withdrawal protocol included treating withdrawal with Vitamin B and pharmacologically with Librium and Couture obtained the appropriate orders to start Madelyn on a Librium taper, with a decreasing dosage over an eight-day period and a stat dose in the Medical Department that day. (SOF, ¶¶60-66.) There is no allegation or evidence that Madelyn complained to Wisnaskas or Couture about chest pain, despite ample opportunity to do so. (SOF, ¶67.)

On October 1, after returning from Court, Madelyn was again seen by a nurse in the WCC's Medical Department to have her tuberculosis test planted. (SOF, ¶¶79-86.) There is no allegation or evidence that Madelyn complained to the nurse about chest pain or requested any other medical care, despite the opportunity to do so. (SOF, ¶83.)

As already detailed above, on October 2, Madelyn was again seen in the

WCC's Medical Department, this time by two nurses, Alexandra Russ and Couture, and the entire encounter was recorded on security video. (SOF, ¶93-115.) As also detailed above, there is nothing about Madelyn's demeanor on the video to suggest that she is communicating a serious medical need while in the Medical Department. (SOF, ¶101.) With a full video record of Madelyn's entire visit to the Medical Department on October 2, there is simply no evidence that Madelyn reported chest pain or otherwise requested medical care and was denied. (SOF, ¶¶101-114.) Madelyn visited the Medical Department on October 2 to provide a urine sample for an STD test and the evidence demonstrates only that WCC medical staff provided Madelyn with the appropriate care on that date and that she returned to her housing unit in no apparent distress. (SOF, ¶¶87, 93-115.)

On the morning of October 4, 2018, two WCC nurses visited Madelyn's housing unit to check on the well-being of two other inmates. (SOF, ¶120.) The nurses quickly discovered that Madelyn was in medical distress, immediately called for an ambulance and then provided continued care to Madelyn until paramedics arrived and she was transported to the hospital via ambulance. (SOF, ¶122-124.)

The plaintiff cannot prevail on her claim that the treatment decisions made by medical staff were so unreasonable as to be *arbitrary and capricious*.  To the contrary, the undisputed facts demonstrate that the treatment decisions of the WCC medical staff, including the established withdrawal protocols already in place to treat inmates with substance use disorder (SOF, ¶¶60-66, 127-131), the correct diagnosis of opioid use disorder (SOF, ¶¶46, 50-51), the daily administration of drugs

to address potential withdrawal (SOF, ¶¶63, 65-66), the recognition of Madelyn's medical emergency and immediate call for an ambulance and hospitalization (SOF, ¶¶120-124) were all made based on regular and accurate assessments of Madelyn's specific condition and the specific attention that the WCC medical staff paid to the particular needs of inmates with substance use disorder.

The Court has the benefit of documentary and video evidence and deposition testimony produced through the extensive discovery in this case. The documentary evidence demonstrates that the medical care that Madelyn received, especially medication provided proactively to keep her out of withdrawal, was thoroughly reasonable based on how she presented, what she reported, and what she did *not* report (e.g. chest pain) at her intake medical screening. (SOF, ¶¶49, 51, 60-67.) The video evidence demonstrates that Madelyn continued to actively move about within the WCC and participate in programs through October 3, 2018, providing a reasonable explanation for why Madelyn was not sent to the hospital sooner. (SOF, ¶¶39, 42, 83, 86-89, 93-119.) The deposition testimony demonstrates that Madelyn had many opportunities to report that she was in medical distress, to medical staff, a fellow detainee, and her lawyer, and she did not do so. (SOF, ¶¶25-28, 37, 47, 57, 67-78.)

The plaintiff cannot produce evidence to support her position that WCC medical personnel failed or refused treatment to address Madelyn's alleged chest pain or difficulty breathing. (Amend. Compl. ¶76.) There is no evidence that Madelyn ever raised these complaints with medical staff, even though she was in the Medical Department three different times over less than four days. (SOF, ¶¶67, 79, 83, 99-114.)

In light of this undisputed evidence, the plaintiff cannot establish that the treatment Madelyn received, including the fact that she was not sent to the hospital until the morning of September 4, 2018, was "so unreasonable as to be arbitrary and capricious." *Buchanan*, 469 F.3d at 176, citing *Kiman*, 451 F.3d at 284-85.

Instead, it seems clear that the plaintiff's actual position, expressly or impliedly repeated throughout the Amended Complaint, is not that there was no medical treatment, but that the medical treatment that was indisputably provided to Madelyn at the WCC was inappropriate or inadequate (*see e.g.* Amend. Compl., ¶¶64, 69, 74, 76. Even if this claim was supported by the evidence, it is not actionable under the ADA. *Kiman*, 451 F.3d at 284 (quoting *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996)) ("[t]he ADA does not create a remedy for medical malpractice.") *See also Buchanan*, 469 F.3d 158, 172 ("the ADA does not set a standard of care for services") (citing *Cercpac v. Health & Hosps. Corp.*, 147 F.3d 165, 168 (2d Cir. 1998).

2. <u>The plaintiff cannot prove that the treatment decisions made with regard to Madelyn's care were based on stereotypes of those with substance use disorder</u>.

Likewise, there is no evidence that the treatment decisions with regard to Madelyn's care were made on stereotypes of people with substance use disorder. The exhaustive intake screening conducted on October 1, and the resulting medical treatment, were obviously based on a detailed inquiry into Madelyn's condition on that date. (SOF, ¶¶44-67.) The treatment decisions made on October 4, including the decision to send Madelyn to the hospital immediately via ambulance, were obvi-

ously based on an individualized inquiry into her condition by the two nurses, Belle-Isle and Neill. (SOF, ¶¶120-124.)

The treatment decisions made on October 1 and 2, were routine medical testing procedures, based on the need to determine if Madelyn had any communicable diseases, and not a stereotype. (SOF, ¶¶79, 87.) There is no evidence that the decision not to provide any additional treatment at these routine visits was based on a stereotype of those with substance use disorder.

    iii.  <u>Third basis: The plaintiff cannot prevail on her claim of deliberate indifference to a serious medical need</u>.

The plaintiff also cannot prevail on her apparent position that the HCSD staff "were deliberately indifferent to [Madelyn's] serious medical needs" (Amend. Compl., ¶106) and that this deliberate indifference creates a claim under Title II of the ADA. This allegation raises two questions that remain open questions in the First Circuit: 1) "whether a public entity can be held liable for money damages under Title II of the ADA based on the conduct of [an employee who is not involved in policymaking]" and 2) "whether a showing of deliberate indifference is enough to support recovery of money damages under Title II." *Gray v. Cummings*, 917 F.3d 1, 16-17, n.9. In *Gray*, the First Circuit declined to answer either of these questions. *Id.* at 18. For the plaintiff's claim to survive summary judgment on this basis, this Court would have to answer both questions in the affirmative.[3]  This Court should not do so for three reasons.

First, with regard to Barrett and Couture, as set forth above, the plaintiff

---

[3] There is no evidence that either Barrett, Couture, or the unidentified "WCC staff" held policymaking positions with the HCSD. (*See* Amend. Compl. ¶¶ 70, 75.)

cannot prove that either Barrett or Couture was deliberately indifferent to Madelyn's serious medical needs.  Second, with regard to the unidentified "WCC staff," the plaintiff has not provided any identifying information regarding these individuals. (*See* Amend. Compl. ¶¶ 70, 75.) Finally, as also set forth above, it is undisputed that Madelyn was in the WCC Medical Department three out of the less than four days that she was at the WCC and there is no evidence that Madelyn made any complaints in these visits, other than the complaints or conditions for which she received medical treatment (knee pain and withdrawal).  For the foregoing reasons, this Court should decline to find liability under Title II on the part of the HCSD on the basis of the plaintiff's deliberate indifference claim (Amend. Compl. ¶106).

> iv. <u>Fourth basis: The plaintiff cannot prevail on her claim that the HCSD failed to provide a reasonable accommodation to Madelyn</u>.

The plaintiff alleges that the WCC's "standard practice and procedure" was to "force" inmates into withdrawal rather than providing them with medically appropriate care. (Amend. Compl, ¶¶64, 65.) It is undisputed that, when Madeline was an inmate at the WCC, the WCC maintained detailed withdrawal regimens to address different health situations. (SOF, ¶¶60-63, 127-131.) Among these was the "Opiates: Withdrawal" Nursing Protocol, which provides for the administration of buprenorphine, a Medically Assisted Treatment (MAT) medication, to alleviate the withdrawal symptoms of any patient withdrawing from opioids, even if the patient is not already prescribed MAT, if the patient was exhibiting moderate or greater withdrawal symptoms or there were other reasons to recommend treatment. (SOF,

¶¶128-129.) Therefore, the plaintiff cannot establish, on the undisputed facts, that it was the WCC's standard practice to force detainees into withdrawal. Therefore, the plaintiff's fourth basis, the HCSD's alleged failure to provide reasonable accommodation, must fail because no accommodation was necessary.

The plaintiff also cannot prevail on the reasonable accommodation claim because there is no allegation that Madelyn (or anyone acting on her behalf) ever requested that she be placed on methadone. "[T]he ADA's reasonable accommodation requirement usually does not apply unless triggered by a request." *Kiman*, 451 F.3d at 283 quoting *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 261 (1st Cir 2001). The only exception to this is a situation where the need for the accommodation is obvious. *Id.* The plaintiff cannot claim that, in this case, the need was obvious. Indeed, the plaintiff's position is that Madelyn reported to unidentified staff that she was *not* suffering from withdrawal. (Amend. Compl. ¶70.)

For all the foregoing reasons, the allegations in the Amended Complaint make out, at best, a claim for medical malpractice, and certainly do not support a claim under Title II of the ADA. Without a valid claim under Title II of the ADA, "the court does not proceed to the next step in the analysis. The claim ends." *Buchanan*, 469 F.3d at 172 (citing *Toledo*, 454 F.3d at 31-40).

b. Even if this Court were to find a valid claim here pursuant to Title II, this Court would still lack subject matter jurisdiction to hear the claim due to the Commonwealth's sovereign immunity.

Under the Supreme Court's required analysis, even if this Court were to find that the HCSD violated Title II, this Court would then have to determine whether

the misconduct also violated the Fourteenth Amendment or, if it did not, "whether Congress's abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Georgia*, 546 U.S. at 159.

>   i. <u>The Complaint does not state a claim for a violation of the Eighth Amendment prohibition on cruel and unusual punishment through deliberate indifference</u>.

The first of these two questions is answered easily in the negative.  In a case such as this, alleging inadequate medical care in the context of a correctional institution, the plaintiff could only make out a constitutional claim for violation of the Fourteenth Amendment by stating a valid claim for violation of the Eighth Amendment prohibition of cruel and unusual punishment through deliberate indifference to a serious medical need.  *See Georgia*, 546 U.S. at 157 (citing *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463 (1947) (the Due Process Clause of the Fourteenth Amendment incorporates the Eighth Amendment's guarantee against cruel and unusual punishment)).  As already explained above, and in more detail in this section, the plaintiff's allegations of regular medical treatment provided to Madelyn defeats any claim for deliberate indifference and so the plaintiff cannot make out a constitutional violation.[4]

The Eighth Amendment's prohibition against cruel and unusual punishment includes an inmate's right to adequate medical care. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). In order for an inmate to establish that her right to adequate medical care has been violated, however, the inmate must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."

---

[4] See also the discussion of the Sec. 1983 claims against Barrett and Couture, above.

*Estelle*, 429 U.S. at 103-04; *see also Ruiz-Rosa*, 485 F.3d at 156; *Torraco v. Maloney*, 923 F.2d 231, 234 (1st Cir. 1991).

In this case, the undisputed facts demonstrate that Madelyn received daily medical care during her short stay at the WCC, including care specifically targeted to address her substance use disorder and medical care to address her infection, once that became apparent. (SOF, ¶¶44, 65-66, 70, 93.) To the extent that the plaintiff's allegations could be read as stating, with sufficient specificity, a claim that the medical care was inadequate or that medical staff did not recognize Madelyn's infection soon enough, those are negligence claims and do not state a constitutional claim under the Eight Amendment.

  ii. <u>The misconduct alleged in the Complaint is not of the type that would validate the abrogation of sovereign immunity.</u>

The final consideration, then, is whether the alleged misconduct, even if it does not violate the Constitution, is of a type that validates "Congress's purported abrogation of sovereign immunity as to that class of conduct." *Georgia*, 546 U.S. at 159. The Supreme Court has held that Title II of the ADA validly abrogates sovereign immunity as to … some classes of state conduct that do not facially violate the Constitution but are prohibited by Title II in order to prevent and deter unconstitutional conduct.'" *Toledo*, 454 F.3d at 31 (quoting *Tennessee v. Lane*, 541 U.S. 509, 518, 529 (2004)).

The analysis of whether the state conduct challenged in this instance validly abrogates sovereign immunity involves a three-pronged inquiry:

  (1) [F]irst, the court must identify with some precision the scope

31

of the constitutional right at issue, (2) second, the court must de-
termine whether Congress identified a history and pattern of
unconstitutional conduct by the states with respect to that right,
and (3) third, the legislation must be a congruent and propor-
tional response to [the] history and pattern of unconstitutional
discrimination.

*Cox v. Mass. Dep't of Corr.*, 2018 U.S. Dist. LEXIS 55482, *26-*27 (D. Mass. 2018)

(quoting *Bd. Of Trustees of Univ. of Ala. V. Garrett*, 531 U.S. 356, 365 (2001) and

*Toledo*, 454 F.3d at 39 (internal citations and quotation marks omitted)).

In the context of prison medical care, the first two prongs have been identi-

fied as satisfied, with the first prong identifying the constitutional right at issue as

being the Eighth Amendment right of inmates to be free from deliberate indiffer-

ence by prison officials to their serious medical needs. *Cox*, 2018 U.S. Dist. LEXIS

55482 at 36-37. For the purposes of this motion, the HCSD defendants adopt that

position and focus on the third prong of the analysis, which requires a determina-

tion of whether the proposed remedy is "a congruent and proportional response to

the history and pattern of unconstitutional discrimination." *Id.* at 37.

In order to answer this question, we must first determine what the plaintiff's

proposed remedy is, or what behavior of the HCSD the plaintiff alleges must be pro-

scribed in order to prevent or deter unconstitutional conduct. Due to the vague and

conclusory language of the Amended Complaint, answering this question is not an

easy task. Reading the Amended Complaint generously, however, it would appear

that the conduct the plaintiff seeks to proscribe through the Title II claim can be

identified as the two bases for the Title II claim, as already set forth above: 1) the

allegedly inadequate medical care provided to Madelyn at the WCC (Amend. Compl.

32

¶106), and 2) the alleged failure by the HCSD to make a reasonable accommodation for Madelyn by providing her with a "medically adequate detoxification program" (Amend. Compl. ¶107). Neither of these is a congruent or proportional response to unconstitutional, deliberate indifference to serious medical needs. The first, at best, will deter the tort of medical negligence, not prevent unconstitutional deliberate indifference to serious medical needs. The second will promote medically adequate detoxification programs over medically inadequate programs. Once again, this is, at best, an effort to deter medical negligence, not deliberate indifference. Therefore, these are not responses, at all, to unconstitutional conduct, much less congruent responses. The HCSD is entitled to summary judgment on Count II because this Court lacks subject matter jurisdiction to consider the claim and because the plaintiff cannot, on the undisputed facts, prevail on her Title II claim.

III. <u>Barrett and Couture are entitled to Summary Judgment on Count IV, alleging a claim under the Massachusetts Wrongful Death Statute.</u>

a. <u>The plaintiff cannot prove that Barrett and Couture intentionally caused Madelyn's death.</u>

The allegation of wrongful death in the Amended Complaint distinguishes it from the typical, negligence-based claim: "The defendants caused Madelyn Linsenmeir's death by intentional acts." (Amend. Compl. ¶119.) The named defendants, as with the deliberate indifference count (Count III), are Barrett and Couture. It would seem this sparsely worded count alleges essentially the same allegations as Count III, i.e. that Barrett deliberately failed to follow up promptly on Madelyn's complaint of chest pain and that Couture failed to take Madelyn's vitals after learn-

ing that she had stumbled on the stairs.  Count IV, as against Barrett and Couture, fails for the same reasons that Count III fails, as explained above.

       b.  <u>Barrett and Couture are entitled to good faith immunity</u>.

Even if this Court were to conclude that the wrongful death count (to the extent that it sounds in tort) sets forth actionable claim, it is nonetheless barred by the individual defendants' good faith immunity from common law tort claims. It is well-settled in Massachusetts that a public official who makes an erroneous decision while acting within the scope of his authority cannot be held personally liable for damages. *Gildea v. Ellershaw*, 363 Mass. 800, 820 (1973).  In order for this common law immunity to apply, a defendant need only have been authorized, in the exercise of judgment and discretion, "to make a decision and to perform acts in the making of that decision." *Gildea*, 363 Mass. at 820. If so, the defendant's decision and act must have been "within the scope of his duty, authority, and jurisdiction." *Id*. If these conditions are met, a defendant is not liable for "negligence or other error in the making of that decision." *Id*. To overcome the immunity, a plaintiff must allege and prove that the official acted with "malice or corruption." *Id*.

Subsequent cases have dictated that a public employee's good faith should be presumed and evaluated generously. "The question whether the evidence supported a cause of action under the *Gildea* exception must be considered in the light of the principle...that there is every presumption in favor of the honesty and sufficiency of the motives actuating public officers in actions ostensibly taken for the general wel-

fare." *Ramos v. Board of Selectmen of Nantucket*, 16 Mass.App.Ct. 308, 314 (1983), *rev. denied* 390 Mass. 1103 (1983) (internal citations and quotations omitted).

*Gildea* immunity may only be defeated by allegations of malice or corruption. 363 Mass. at 820. "One acts with actual malice when moved by 'a spiteful, malignant purpose' that is unrelated to a legitimate interest.'" *Anzalone v. Admin. Office of Trial Court*, 457 Mass. 647, 660 (2010). The plaintiff does not allege in the Amended Complaint that either Barrett or Couture acted with malice. Indeed, the video evidence of Barrett's and Couture's encounters with Madelyn ensures that no reasonable jury could find that either acted with malice toward Madelyn. (SOF, ¶¶39, 87.)

Barrett and Couture are entitled to common law qualified immunity with regard to the Wrongful Death claim and they are entitled to summary judgment in their favor on Count IV.

## CONCLUSION

For the foregoing reasons, the defendants, Hampden County Sheriff's Department, Eileen Barrett, and Maureen Couture, respectfully move this Court to enter Summary Judgment in their favor on Counts II, III, and IV.

Respectfully submitted,
HAMPDEN COUNTY SHERIFF'S DE-
PARTMENT, EILEEN BARRETT, AND
MAUREEN COUTURE

By their attorney,
ANDREA CAMPBELL
ATTORNEY GENERAL

By: */s/ Thomas E. Day*

35

Thomas E. Day
Special Assistant Attorney General
BBO #655409
Lauren F. Olanoff
BBO #669371
Michael G. McDonough
BBO #682128
EGAN, FLANAGAN AND COHEN, P.C.
67 Market Street
P.O. Box 9035
Springfield, MA 01102-9035
(413) 737-0260
ted@efclaw.com
lfo@efclaw.com
mgm@efclaw.com

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies of this document will be mailed, first-class mail, postage prepaid, to any unregistered participants on January 6, 2024.

/s/ Thomas E. Day
Thomas E. Day

36