```
                                                    1
 1                            Volume 1, Pages 1-218
 2                                 Exhibits: 24-26
 3              UNITED STATES DISTRICT COURT
 4           FOR THE DISTRICT OF MASSACHUSETTS
 5      -----------------------------------------
 6      MAURA O'NEILL, as administrator of the Estate of
 7      Madelyn E. Linsenmeir,
 8                   Plaintiff,
 9      vs.                    CA No. 3:20-cv-30036
10      CITY OF SPRINGFIELD, MOISES ZANAZANIAN,
11      REMINGTON McNABB, SHEILA RODRIGUEZ, HAMPDEN
12      COUNTY SHERIFF'S DEPARTMENT, and JOHN/JANE DOES
13      NOS. 1-5,
14                   Defendants.
15      -----------------------------------------
16            REMOTE DEPOSITION OF REMINGTON McNABB
17               Friday, May 6, 2022, 10:11 a.m.
18
19               Via Zoom Video Conference
20        ----Reporter:  Kathleen L. Good, CSR, RPR----
21                   K. L. GOOD & ASSOCIATES
22                     Post Office Box 367
23              Swampscott, Massachusetts 01907
24       Tel. 781-367-0815      Kathleen.Good@verizon.net
```

1    A.    Yeah.
2    Q.    And then in the video, did you reach
3 and turn off the audio?
4    A.    Did that happen?
5    Q.    Did you see that in the video?
6    A.    I don't remember if I -- did the audio
7 already cut out?
8         MR. McFADDEN:  Just to be clear, why
9 don't we go back ten seconds here and we can do
10 it again.
11         (Video played.)
12         (Video stopped.)
13         MR. McFADDEN:  I started the video at
14 5:42:34.
15    Q.    So that time, did you hear the
16 sequence of you said, Good?  Sergeant
17 Zanazanian said, Yeah, and then you turned off
18 the audio?
19    A.    Yes.
20    Q.    Is it your understanding that that
21 was Sergeant Zanazanian instructing you to turn
22 off the audio?
23    A.    Yeah.
24    Q.    In 2018, was it typical that you

167

1  would ask permission from the sergeant, the
2  booking sergeant, before turning the audio on
3  or off?
4            MR. VIGLIOTTI:  Objection.
5       A.   I wouldn't say it's typical.  He can do
6  it, but it appeared in this video that he was
7  maybe moving the other way and I was already
8  standing there.  So I just asked him if we were
9  good to shut off.
10           I wouldn't say that usually the booking
11 officer does that on his own.
12      Q.   (By Mr. McFadden) So sometimes the
13 booking sergeant would turn the audio on and
14 off in 2018?
15      A.   Yes.
16      Q.   And sometimes when you were the
17 booking officer, you would turn it on or off in
18 2018?
19      A.   Yes.
20      Q.   When you, as the booking officer,
21 turned the audio recording on or off, it was
22 your practice to get the permission from the
23 sergeant, right?
24           MR. VIGLIOTTI:  Objection.

168

1  A.   I believe that any time before I turned
2  it on, personally, that I would get confirmation
3  from the sergeant first.
4  Q.   (By Mr. McFadden) In 2018, was it
5  your practice that if the sergeant didn't give
6  you that confirmation, if he said don't turn it
7  on in some way, that you would not activate the
8  audio?
9  MR. VIGLIOTTI:  Objection.
10  A.   Yeah.  If he, for any reason, would
11  tell me not to turn it on, I wouldn't just turn
12  it on anyway.
13  MR. McFADDEN:  I'm just going to play
14  it through to the end of the video.  It's just
15  another minute or so.
16  (Video played.)
17  (Video stopped.)
18  Q.   Officer McNabb, the video, Exhibit 1
19  just ended, it's 5:43:21 on the time stamp, and
20  you saw in that clip after the audio turned
21  off, did you see that you and Sergeant
22  Zanazanian were talking to each other?
23  A.   Yeah.  It looked like he was saying
24  something.

169

1     Q.   Do you have any memory of what he
2 said to you at that time?
3     A.   No.
4     Q.   Do you have any memory of what you
5 said back to him at that time?
6     A.   No.
7     Q.   Then after that, it looked like you
8 and Officer Trubia were talking.
9     A.   Yeah.
10     Q.   Do you have any memory of what you
11 said to Officer Trubia at that time?
12     A.   No.
13     Q.   Do you have any memory of what
14 Officer Trubia said to you at that time?
15     A.   No.
16         MR. McFADDEN:  I'm going to close the
17 Exhibit 1.
18         (Screen share stopped.)
19         MR. McFADDEN:  I'm going to open
20 Exhibit 2, which is another video.  Exhibit 2 is
21 a video produced to us by the City of Springfield
22 and the file name is Booking Desk Phone Calls
23 SQDC.  I'm going to pull it up here.
24         (Pause.)

170

1           (Screen shared.)
2      Q.   Officer McNabb, are you seeing the
3  video of the booking area?
4      A.   Yes.
5      Q.   Do you see it says time stamp
6  7:38:19?
7      A.   Yes.
8      Q.   Do you see that the date is
9  9/29/2018?
10     A.   Yes.
11     Q.   So at this time, did you have any
12 awareness that Madelyn was going to come back
13 into the booking area?
14     A.   I don't remember.
15     Q.   I'm going to play the video forward
16 now.
17          (Video played.)
18          (Video stopped.)
19          MR. McFADDEN:  I stopped the video,
20 Exhibit 2, at 7:38:31.
21     Q.   Do you see that two people have
22 entered into the booking area from the left
23 side?
24     A.   Yes.

171

1  Q.  Can you identify those people?
2  A.  That's Madelyn again and the matron,
3  Sheila.
4  Q.  Do you see that you have moved your
5  body towards the button that activates the
6  audio recording?
7       MR. VIGLIOTTI: Objection.
8  A.  Yeah, I'm standing there.
9  Q.  (By Mr. McFadden) Do you see that
10 your left hand is down by the button that
11 activates the audio recording?
12 A.  I guess. I can't see the button right
13 now.
14 Q.  Would you agree with me that your
15 left hand is in very close proximity to the
16 place where the button that activates the audio
17 recording is?
18 A.  Yes.
19 Q.  You also see that your head is
20 tilted down in the direction of the button that
21 activates the audio recording?
22      MR. VIGLIOTTI: Objection.
23 A.  Yes. It's tilted down.
24 Q.  (By Mr. McFadden) Is it correct that

                                                              172

1   at this time, you were preparing to activate
2   the audio recording?
3           MR. VIGLIOTTI:  Objection.
4       A.  I don't know.
5       Q.  (By Mr. McFadden) Do you have any
6   other explanation for why you walked over to
7   the audio recording button, put your hand near
8   it and you're looking at it?
9           MR. VIGLIOTTI:  Objection.
10          MR. COYLE:  Objection.
11          You may answer.
12      A.  Yeah.  I don't know.  But there's other
13  paperwork on the desk right there that I could be
14  looking at.  My hand is close to that too so I
15  don't know.
16      Q.  (By Mr. McFadden) So looking at this
17  video, you're not sure why you walked over to
18  the vicinity of the audio button?
19      A.  No.
20      Q.  Sitting here today, do you have any
21  memory of doing that?
22      A.  No.
23          MR. McFADDEN:  I'm going press play
24  again and do a short clip.

173

1       (Video played.)
2       (Video stopped.)
3       MR. McFADDEN: I'm going to stop it
4  at 7:38:35. We just watched from about 7:38:31
5  to 7:38:35 in Exhibit 2.
6       Q.   Did you see Sergeant Zanazanian lift
7  up his hand towards you, his right hand?
8       A.   No. I was not even focusing on him.
9       Q.   Let's watch that again, but I'd ask
10 you to keep an eye on Sergeant Zanazanian's
11 right hand. We'll start at 7:38:29.
12      (Video played.)
13      (Video stopped.)
14      MR. McFADDEN: I stopped it again at
15 7:38:35.
16      Q.   Did you see that Sergeant Zanazanian
17 lifted up his right hand with his finger
18 extended?
19      A.   Yeah.
20      Q.   Did you see he made a gesture sort
21 of moving the finger?
22      A.   Yeah.
23      MR. VIGLIOTTI: Objection.
24      A.   He had his finger up yeah.

1   Q.   (By Mr. McFadden) Then did you see
2   that after that, you walked away from the
3   location of the audio recording button?
4        MR. VIGLIOTTI:  Objection.
5   A.   Yeah.  I walked away.
6   Q.   (By Mr. McFadden) Looking at that,
7   would you agree that that was Sergeant
8   Zanazanian instructing you not to activate the
9   audio recording?
10       MR. VIGLIOTTI:  Objection.
11  A.   No.  I wouldn't agree that -- again, I
12  don't know what we were -- I don't know what I
13  was even doing over there.
14  Q.   (By Mr. McFadden) Looking at the
15  video we just saw, do you have any
16  understanding of what Sergeant Zanazanian's
17  hand gesture communicated?
18       MR. VIGLIOTTI:  Objection.
19  A.   No.
20  Q.   (By Mr. McFadden) Is it correct that
21  the audio recording has not been activated?
22  A.   Yes.
23  Q.   Would it surprise you to hear that
24  Sergeant Zanazanian testified that the audio

1  recording should have been activated?
2          MS. DeSOUSA: Objection.
3      A.   No.  It doesn't surprise me either way,
4  no.
5      Q.   (By Mr. McFadden) So would you agree
6  with Sergeant Zanazanian that the audio
7  recording should have been activated at this
8  time, 7:38:35, in Exhibit 2?
9          MR. VIGLIOTTI: Objection.
10     A.   I can't say whether or not -- like I
11 said, it's not -- I don't understand it as that
12 it has to be recording if a detainee comes out
13 later on in the day.  I don't know if that's
14 policy or not for them.  I don't know.
15         MS. DeSOUSA: Dan, when you get to a
16 logical breaking point, can we just take a
17 three-minute break?  I have to return a quick
18 phone call.  That's all.
19         MR. McFADDEN: Why don't we go two
20 more minutes.
21         MS. DeSOUSA: Whenever it's logical
22 for you.  I just wanted to bring it to your
23 attention.
24         MR. McFADDEN: Sure.  Thank you.

```
                                                    176
 1      Q.   Would it surprise you to hear that
 2 Sergeant Zanazanian testified that the failure
 3 to activate the audio recording button at this
 4 time was an oversight?
 5           MR. VIGLIOTTI:  Objection.
 6      A.   No.
 7      Q.   (By Mr. McFadden) You were the
 8 person standing there with your finger on the
 9 button, right?
10           MR. VIGLIOTTI:  Objection.
11           MR. COYLE:  Objection.
12      A.   You can't see -- I can't see where my
13 hand is from this video when I was standing
14 there.
15      Q.   (By Mr. McFadden) But you would
16 agree with me, on the video, at the approximate
17 time 7:38, you are standing in very close
18 proximity to the audio recording button with
19 your hand very near the button.  That's evident
20 from the video, right?
21           MR. VIGLIOTTI:  Objection.
22      A.   Yeah.  You can see me standing over
23 there and my hand is near the desk, yeah, where
24 the button is, correct.
```

1  Q.  (By Mr. McFadden) So if Sergeant
2  Zanazanian were to say that it was an oversight
3  not to press that button, and you were the
4  person with your hand at the button, you know,
5  would it be your oversight?
6       MR. VIGLIOTTI:  Objection.
7       MS. DeSOUSA:  Objection.
8  A.  I don't believe so.  It's not -- it
9  wasn't my job, I believe, that I'm the one who
10 makes the decision whether or not to turn on the
11 audio recording.  And from the video, I can't
12 even see where my hand was.  I could have been
13 adjusting my belt, for all I know.
14 Q.  (By Mr. McFadden) Whose job was it
15 to decide whether to turn on the audio
16 recording?
17 A.  I don't know.  I believe it's the
18 supervisor's job.
19 Q.  At this time, in Exhibit 2, who
20 would that be?
21 A.  The supervisor in the video is Sergeant
22 Zanazanian.
23 Q.  So at this time, in Exhibit 2, is it
24 your testimony that it was Sergeant

178

1  Zanazanian's decision whether or not to
2  activate the audio recording?
3         MS. DeSOUSA: Objection.
4         MR. VIGLIOTTI: Objection.
5     A.    It's my understanding that it's not up
6  to me when to turn on and turn off the audio.
7     Q.    (By Mr. McFadden) That's just what
8  I'm trying to get at. It's not up to you.
9         Whose decision do you understand it
10 to be?
11    A.    The supervisor, the sergeant who is
12 standing right there.
13    Q.    What is his name?
14    A.    Sergeant Zanazanian.
15        MR. McFADDEN: Why don't we take a
16 break right now.
17        (Screen share stopped.)
18        (Recess.)
19        MR. McFADDEN: Back on the record.
20 I'm going to share Exhibit 2, which is the video.
21        (Screen shared.)
22    Q.    Officer McNabb, are you seeing
23 Exhibit 2, the video, up on your screen now?
24    A.    Yes.

1   Q.   So we are currently at 7:38:35.  I'm
2   going to press play and I would ask you just to
3   watch and then we'll talk about it.
4            (Video played.)
5            (Video stopped.)
6            MR. McFADDEN:  I paused the video at
7   7:40:35, Exhibit 2.
8   Q.   Officer McNabb, in the segment we
9   just watched, did you see that Madelyn and
10  Sergeant Zanazanian were speaking with each
11  other for about two minutes?
12  A.   Yeah.
13  Q.   Did it appear to you that Madelyn
14  was crying for some of that conversation?
15  A.   I don't know if she's crying but -- you
16  could say that.
17  Q.   Do you have any memory of what
18  Madelyn or Sergeant Zanazanian said during that
19  conversation?
20  A.   No.
21  Q.   Look at the video.  I just want to
22  make sure we identify the people who are in
23  frame.  This is 7:40:35.
24            Just to make sure, that's Madelyn

```
                                                           216
 1              CERTIFICATE OF COURT REPORTER
 2              I, Kathleen L. Good, Certified Shorthand
 3  Reporter and Registered Professional Reporter, do
 4  certify that the deposition of REMINGTON McNABB, in
 5  the matter of O'Neill vs. City of Springfield, et
 6  al., on May 6, 2022, was stenographically recorded
 7  by me; that the witness appeared before me via
 8  videoconference and provided satisfactory evidence
 9  of identification, as prescribed by Executive Order
10  455 (03-13) issued by the Governor of the
11  Commonwealth of Massachusetts, before being sworn by
12  me, a Notary Public in and for the Commonwealth of
13  Massachusetts; that the transcript produced by me is
14  a true and accurate record of the proceedings to the
15  best of my ability; that I am neither counsel for,
16  related to, nor employed by any of the parties to
17  the above action; and further that I am not a
18  relative or employee of any attorney or counsel
19  employed by the parties thereto, nor financially or
20  otherwise interested in the outcome of the action.
21              Kathleen L. Good
22              _____
23              Kathleen L. Good, CSR, RPR
24
```