**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| | ) | |
| | ) | |
| MAURA O'NEILL, as administrator of the Estate | ) | |
| of Madelyn E. Linsenmeir, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 20-30036-MGM |
| v. | ) | |
| | ) | Motion for leave granted on February 15, |
| CITY OF SPRINGFIELD, MOISES | ) | 2024 |
| ZANAZANIAN, REMINGTON MCNABB, | ) | |
| SHEILA RODRIGUEZ, HAMPDEN COUNTY | ) | |
| SHERRIFF'S DEPARTMENT, EILEEN | ) | |
| BARRETT AND MAUREEN COUTURE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**PLAINTIFF'S OPPOSITION TO THE HCSD DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

SUMMARY OF THE FACTS ............................................................................. 3

I.   *Ms. Linsenmeir reported chest pain to Officer Barrett during booking into the WCC, and Officer Barrett took no action to help her.* ..................................................... 3
  A.  After booking, the HCSD prescribed Ms. Linsenmeir a medication for alcohol withdrawal and Motrin and ice for her knee, and provided no other medical care for roughly four days. ....................................................................................... 4
    ii.  *Ms. Linsenmeir reported chest pain on September 30, but received no medical evaluation and treatment.* ......................................................................... 6
    iii. *Ms. Linsenmeir was placed in wheelchair on October 1, but received no medical evaluation and treatment.* ........................................................... 6
    iv.  *Ms. Linsenmeir was disoriented and collapsed while trying to ascend a single flight of stairs on October 2, and the event was reported to Nurse Couture, but Ms. Linsenmeir received no medical evaluation and treatment.* ..................... 8
  B.  On October 3, other prisoners sought medical help for Ms. Linsenmeir, but she received no medical evaluation or treatment. ................................................. 11

LEGAL STANDARD ........................................................................................ 14

ARGUMENT ..................................................................................................... 14

I.   *Genuine disputes of material fact preclude summary judgment against the Estate's ADA claim.* ................................................................................................... 14
  A.  HCSD denied Ms. Linsenmeir the benefit of its medical services. ...................... 15
  B.  HCSD denied Ms. Linsenmeir the benefit of its medical services on the basis of her disabilities. ............................................................................................... 18
    i.   *The record contains direct evidence of HCSD's staff members' discriminatory animus.* ..................................................................................................... 19
    ii.  *HCSD's denial of medical care to Ms. Linsenmeir was so arbitrary and capricious as to imply it was a pretext for a discriminatory motive.* .............. 19
    iii. *HCSD's denial of medical care to Ms. Linsenmeir was based on stereotypes about people with substance use disorders rather than an individualized inquiry into her condition.* ......................................................................... 23
  C.  No other grounds warrant summary judgment against Plaintiff's ADA claim. ... 25
    i.   *Sovereign immunity does not bar the Plaintiff's ADA claim.* ........................ 25
    ii.  *A Showing of Deliberate Indifference Entitles the Plaintiff to Damages under the ADA.* ................................................................................................... 28
    iii. *On this record, HCSD can be held liable for money damages under Title II.* 29
II.  *Genuine disputes of material fact preclude summary judgment on the Estate's §1983 claims against the Individual Defendants.* ........................................................... 31

A.  The Individual Defendants deprived Ms. Linsenmeir of her Fourteenth
     Amendment right to adequate medical care.......................................... 31
B.  Ms. Linsenmeir suffered a serious medical need................................... 32
C.  A reasonable jury could conclude that the Individual Defendants were deliberately
     indifferent to Ms. Linsenmeir's serious medical needs. ....................................... 33
D.  The Individual Defendants are not entitled to qualified immunity...................... 36
III.  *Genuine disputes of material fact preclude summary judgment against the Estate's*
      *wrongful death claim against the Individual Defendants.* ........................................ 38

CONCLUSION.................................................................................................. 39

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Choate,*
    469 U.S. 287 (1985)....................................................................................................... 29

*Alfano v. Lynch,*
    847 F.3d 71 (1st Cir. 2017)........................................................................................... 36

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)....................................................................................................... 14

*Basta v. Novant Health Inc.,*
    56 F.4th 307 (4th Cir. 2022) ......................................................................................... 28

*Brison v. Wellpath, LLC,*
    662 F. Supp. 3d 67 (D. Mass. 2023) ............................................................................ 32

*Buchanan v. Maine,*
    469 F.3d 158 (1st Cir. 2006)......................................................................................... 19

*Burlington Indus., Inc. v. Ellerth,*
    524 U.S. 742 (1998)....................................................................................................... 30

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)....................................................................................................... 14

*cf. Fernandez-Salicrup v. Figueroa-Sancha,*
    790 F.3d 312 (1st Cir. 2015)......................................................................................... 16

*Cf. Kiman v. New Hampshire Dep't of Corr.,*
    451 F.3d 274 (1st Cir. 2006).................................................................................... 17, 22

*Cox v. Massachusetts Dep't of Correction,*
    No. CV 13-10379-FDS, 2018 WL 1586019 (D. Mass. Mar. 31, 2018) ................ 19, 27, 28, 30

*Delano-Pyle v. Victoria Cnty., Tex.,*
    302 F.3d 567 (5th Cir. 2002) ........................................................................................ 30

*Deluca v. Merner,*
    322 F. Supp. 3d 201 (D. Mass. 2018) .......................................................................... 39

*DeVito v. Chicago Park Dis.,*
    83 F.3d 878 (7th Cir. 1996) .......................................................................................... 30

*Donlon v. Hillsborough Cnty,*
    No. 18-cv-549, 2019 WL 2062436 (D.N.H. May 9, 2019) ..................................... 17, 23

*Duvall v. Cnty of Kitsap*,
  260 F.3d 1124 (9th Cir. 2001) ............................................................... 30

*Farmer v. Brennan*,
  511 U.S. 825 (1994) ............................................................................. 33

*Feeney v. Corr. Med. Servs., Inc.*,
  464 F.3d 158 (1st Cir. 2006) .................................................................. 35

*Gebser v. Lago Vista Independent School District*,
  524 U.S. 274 (1998) ............................................................................. 30

*Gladu v. Correct Care Sols.*,
  No. 2:17-cv-00504-JAW, 2019 WL 5423019 (D. Me. Oct. 23, 2019) ...................... 32

*Glik v. Cunniffe*,
  655 F.3d 78 (1st Cir. 2011) .................................................................... 36

*Gray v. Cummings*,
  917 F.3d 1 (1st Cir. 2019) ................................................................. 28, 29

*Hale v. King*,
  07-60997 (5th Cir., filed Apr. 9, 2010) ...................................................... 27

*Ingram v. Kubik*,
  30 F.4th 1241 (11th Cir. 2022) ............................................................... 30

*Irish v. Fowler*,
  979 F.3d 65 (1st Cir. 2020) .................................................................... 36

*Kingsley v. Hendrickson*,
  576 U.S. 389 (2015) ......................................................................... 31, 33

*Kosilek v. Spencer*,
  774 F.3d 63 (1st Cir. 2014) .................................................................... 31

*Lachance v. Town of Charlton*,
  990 F.3d 14 (1st Cir. 2021) .................................................................... 36

*Lacy v. Cook Cnty., Illinois*,
  897 F.3d 847 (7th Cir. 2018) .................................................................. 29

*Leavitt v. Corr. Med. Servs. Inc.*,
  645 F.3d 484 (1st Cir. 2011) ............................................................... 32, 33

*Lesley v. Hee Man Chie*,
  250 F.3d 47 (1st Cir. 2001) ............................................................ 17, 18, 20

*Lewis v. Spurwink Servs., Inc.*,
  No. 2:22-CV-00054-NT, 2022 WL 17454078 (D. Me. Dec. 6, 2022) ..................................... 28

*Lund v. Cowan*,
  5 F.4th 964 (9th Cir. 2021) ........................................................................................... 30

*M.P. by & through Jared P. v. Jones*,
  No.22-cv-002200, 2023 WL 5938915 (D. Colo. Sept. 12, 2023) ........................................... 30

*Mata v. Saiz*,
  427 F.3d 745 (10th Cir. 2005) .................................................................................... 32, 36

*Meyer v. Holley*,
  537 U.S. 280 (2003)....................................................................................................... 30

*Nelson v. Salem State Coll.*,
  446 Mass. 525 (2006) ..................................................................................................... 39

*Nunes v. Mass. Dep't of Corr.*,
  766 F.3d 136 (1st Cir. 2014)........................................................................................... 18

*O'Connor v. Steeves*,
  994 F.2d 905 (1st Cir. 1993) .......................................................................................... 14

*Parker v. Universidad de P.R.*,
  225 F.3d 1 (1st Cir. 2000)............................................................................................... 14

*Penn v. Escorsio*,
  764 F.3d 102 (1st Cir. 2014)........................................................................................... 37

*Penn. Dep't of Corr. v. Yeskey*,
  524 U.S. 206 (1998)....................................................................................................... 15

*Perry v. Roy*,
  782 F.3d 73 (1st Cir. 2015)............................................................................................. 32

*Pesce v. Coppinger*,
  355 F. Supp. 3d 35 (D. Mass. 2018) ................................................................................ 15

*Rosen v. Montgomery Cnty. Maryland*,
  121 F.3d 154 n.3 (4th Cir. 1997) ..................................................................................... 30

*Ruiz-Rosa v. Rullan*,
  485 F.3d 150 (1st Cir. 2007)........................................................................................... 31

*S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*,
  729 F.3d 248 (3d Cir. 2013) ........................................................................................... 28

*Short v. Hartman,*
    87 F.4th 593 (4th Cir. 2023) ................................................................. 31

*Smith v. Aroostook Cnty.,*
    376 F. Supp. 3d 146 (D. Me.) ............................................................... 19

*Stepanischen v. Merchants Despatch Transp. Co.,*
    722 F.2d 922 (1st Cir. 1983) ................................................................ 38

*Suboh v. Dist. Attorney's Off. of Suffolk Dist.,*
    298 F.3d 81 (1st Cir. 2002) .................................................................. 37

*Tennessee v. Lane,*
    541 U.S. 509 (2004) .............................................................................. 26

*Toledo v. Sanchez,*
    454 F.3d 24 (1st Cir. 2006) ............................................ 25, 26, 28, 37

*United States v. Georgia,*
    546 U.S. 151 (2006) .............................................................................. 25

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977) .............................................................................. 18

**Other Authorities**

20 U.S.C. § 1681 ........................................................................................ 30

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................. 14

## **INTRODUCTION**

Madelyn Linsenmeir had endocarditis when she arrived at the Hampden County Sheriff's Department's ("HCSD") Western Massachusetts Regional Women's Correctional Center ("WCC") on September 30, 2018. She reported her serious medical symptoms, including chest pain, repeatedly to the WCC's staff. And she clearly was very, very sick—on October 2, for example, she was visibly disoriented and then collapsed in the presence of a WCC staff member while attempting to ascend a single flight of stairs.

As described below, the WCC's staff did nothing to treat Madelyn's reported concerns and obviously deteriorating physical condition. When Madelyn arrived at the WCC, she was placed into a detoxification protocol and was prescribed a medication for alcohol withdrawal, as well as Motrin and ice for knee pain. For roughly four days thereafter, she received no medical evaluation or treatment of any kind, except the prescribed medications and the routine tuberculosis and STD screenings provided to all new prisoners. The "Daily Medical Rounds" during this time involved no medical care and are documented (accurately) as blank pages.

Madelyn was undergoing a dangerous withdrawal process. She repeatedly reported serious symptoms, including chest pain. She had outward symptoms of obvious serious illness. Other prisoners even sought help on her behalf. Yet the WCC's staff did nothing to help her. Just the opposite: staff responded with callous comments that the situation was Madelyn's own fault and she shouldn't do drugs. "This is what you do to yourself, this is what happens," they said. Madelyn was finally taken to the hospital on October 4 only after medical staff entered her cell to evaluate her cellmate and happened to notice—apparently by chance—that Madelyn was lying unresponsive in the cell. Madelyn's mother rushed to the hospital, where she saw that Madelyn couldn't breathe and "she just kept saying she was afraid to die . . . She said she was afraid. She didn't want to die."

The Estate's experts will testify that failing to monitor Ms. Linsenmeir and denying her medical treatment for days had no medical justification, fell below the standard of care, and constituted disregard for known, severe risks to her health. The WCC's staff could have saved her life by providing proper care at any time through at least October 2, but they did not, and Ms. Linsenmeir died as a result.

Tragically, Ms. Linsenmeir is no longer alive tell her story in her own words. But ample evidence remains from which a jury could find that HCSD unlawfully discriminated against Ms. Linsenmeir and denied her medical care based on her diagnosed disability of substance use disorders. As the Court has already ruled, this can be shown in multiple ways, including evidence of statements directly showing discriminatory animus, evidence of the staff becoming acclimated to stereotypes about incarcerated people who use substances (*e.g.*, assuming all of their medical complaints are attributable to withdrawal), and evidence of medical treatment decisions that are so unreasonable as to be arbitrary and capricious. *See* May 5, 2021 Order (D.E. 33). The evidence presented now fit these categories precisely. Moreover, the evidence demonstrates that two particular staff members—Officer Eileen Barrett (who took a complaint of chest pain from Ms. Linsenmeir and did nothing to help her) and Nurse Maureen Couture (who saw Ms. Linsenmeir after she collapsed in the stairs and did nothing to help her)—unlawfully denied Ms. Linsenmeir medical care in violation of her constitutional rights. Accordingly, the motion by Barrett, Couture (the "Individual Defendants), and the HCSD (collectively, the "HCSD Defendants") for summary judgment should be denied.

## SUMMARY OF THE FACTS

I.   *Ms. Linsenmeir reported chest pain to Officer Barrett during booking into the WCC, and Officer Barrett took no action to help her.*

By the time Ms. Linsenmeir was in Springfield Police Department ("SPD") custody on September 29, 2018, she was already suffering from endocarditis, a potentially fatal heart infection Plaintiff's Statement of Additional Facts ("SOF") ¶1. During her time in SPD custody, Ms. Linsenmeir repeatedly reported chest pain and difficulty breathing, which were likely the result of septic pulmonary emboli in her lungs caused by the infection. PSOF ¶2; HCSOF ¶17.

When the SPD transferred Ms. Linsenmeir to HCSD custody on September 30, she informed HCSD staff of her medical needs at the earliest opportunity. PSOF ¶¶11-13. During WCC booking, the booking officer was required to ask incoming prisoners questions—including medical questions—and record the responses in the Jail Management System ("JMS"). PSOF ¶4. Among other things, the JMS system recorded whether the incoming prisoner reported pain in various listed body parts. PSOF ¶5. However, medical staff did not review the JMS responses in the computer after they were entered. PSOF ¶6. Instead, the practice was that booking staff would telephone the medical staff if they decided to report medical concerns communicated during the intake. PSOF ¶7.

Defendant Eileen Barrett interviewed Ms. Linsenmeir at booking. PSOF ¶8. Ms. Linsenmeir said she was in pain. PSOF ¶10. Officer Barrett asked her about each of the body parts listed in the JMS system. PSOF ¶11. Officer Barrett recorded a positive answer for pain in the right leg and "torso (chest/back)", which, given Ms. Linsenmeir's earlier reports about chest pain, supports a reasonable inference that Ms. Linsenmeir also reported her chest pain to Officer Barrett. PSOF ¶12; D.E. 173 ("HCSD Mem.") at 9. Officer Barrett did not ask any follow-up questions. PSOF ¶14. She also did not call medical to communicate Ms. Linsenmeir's report of pain in her

3

chest and other areas, or otherwise initiate any response to Madelyn's medical complaints. PSOF ¶15.

Although Officer Barrett testified that she did not interact with Ms. Linsenmeir again after the booking process, that testimony was not true. PSOF ¶16. Later that day, Officer Barrett accompanied Ms. Linsenmeir to the medical unit for the WCC's medical intake process. PSOF ¶17. Officer Barrett did not tell the two nurses who performed the intake that Ms. Linsenmeir had reported chest pain, PSOF ¶18; HCSOF ¶43, and she later drafted an incident report concerning the booking process that omitted Ms. Linsenmeir's report of chest pain. PSOF ¶19. Under the heading "Immediate Action Taken," the report is blank, indicating—consistent with all the other evidence—that Officer Barrett took no action to initiate treatment for Ms. Linsenmeir's report of chest pain. PSOF ¶20.

A. *After booking, the HCSD prescribed Ms. Linsenmeir a medication for alcohol withdrawal and Motrin and ice for her knee, and provided no other medical care for roughly four days.*

During Ms. Linsenmeir's medical intake, the two nurses—nurses Jennifer Wisnaskas and defendant Maureen Couture—asked Ms. Linsenmeir a series of questions, visually observed her, did a urine test, and took her height, weight, and vital signs. PSOF ¶21. Many of the questions related to Ms. Linsenmeir's reported daily use of one bundle of heroin and one-quarter to half a gallon of alcohol. PSOF ¶22. The nurses measured Ms. Linsenmeir's alcohol and opioid withdrawal symptoms using the CIWA-Ar and COWS tools, respectively, but they did not ask Ms. Linsenmeir about her past experiences with alcohol withdrawal. PSOF ¶23. Nor did any of the questions ask Ms. Linsenmeir if she was experiencing pain in her chest or difficulty breathing. PSOF ¶25. The nurses diagnosed Ms. Linsenmeir with "alcohol abuse" and "opioid abuse," and

prescribed Librium and vitamin B for the treatment of alcohol withdrawal. PSOF ¶26. They also prescribed Motrin and ice for the pain in Ms. Linsenmeir's knee. PSOF ¶27.

Any medically reasonable protocol for alcohol withdrawal—regardless of the severity of the withdrawal or the location of the treatment—requires at a minimum some continued monitoring of vitals and/or withdrawal symptoms after the initial intake screening. PSOF ¶28. But from the time that Ms. Linsenmeir completed her medical intake on September 30 to time the HCSD officers found her unresponsive in her cell on the morning of October 4, the HCSD did not take Ms. Linsenmeir's vitals or provide Ms. Linsenmeir with any medical evaluation or treatment except for the medications described above and routine tuberculosis and STD screenings. PSOF ¶29.

Aside from documents recording these medications and screenings, Ms. Linsenmeir's only medical records from this time period are the "Daily Medical Rounds" pages from October 1 through October 4, each of which is entirely blank. PSOF ¶30. Video evidence confirms that those "Daily Medical Rounds" involved no medical evaluation or treatment of any kind. PSOF ¶31. Nurse Joan Walden performed the rounds on October 2, 3, and 4, for example: on October 3, her "medical round" consisted of merely looking into Ms. Linsenmeir's cell through the window of the closed cell door; and on October 2 and 4 her "medical round" consisted of walking through the housing unit without looking at or interacting with Ms. Linsenmeir at all. PSOF ¶¶32, 33.

     *i.   The HCSD's failure to provide Ms. Linsenmeir with medical evaluation and treatment for her serious medical condition for roughly four days had no medical justification.*

The HCSD's failure to provide Ms. Linsenmeir with medical care for her serious medical needs for roughly four days when she was obviously very sick was medically unjustified. PSOF ¶34. As described below, Ms. Linsenmeir specifically asked for medical help for chest pain, other prisoners asked for medical help on her behalf, and Ms. Linsenmeir displayed symptoms of severe

illness that should have triggered an immediate medical response. PSOF ¶35. The failure to even monitor Ms. Linsenmeir's vital signs and/or symptom severity during this period of time was especially egregious given that she had been prescribed Librium for her alcohol withdrawal; indeed, this failure was a violation of community medical standards that had no medical justification and constituted disregard for the known, severe medical risks associated with treating alcohol withdrawal. *Id.*

    ii.    *Ms. Linsenmeir reported chest pain on September 30, but received no medical evaluation and treatment.*

On the evening of September 30 through the morning of October 1, Ms. Linsenmeir was housed in Unit 1B. PSOF ¶36. In that unit, HCSD staff perform periodic rounds at the cells. PSOF ¶37. Ms. Linsenmeir told them that she was sick, and not from being "dopesick." PSOF ¶38. She told them she had pain in her chest. PSOF ¶39. She said "my heart hurts" and "chest feels tight," among other things. PSOF ¶40. She asked multiple times to be taken to medical. PSOF ¶41. HCSD staff members responded by telling her that it was her own fault that she was there, and that she shouldn't do drugs. PSOF ¶42. Nobody took her to the medical unit or provided her with any healthcare. PSOF ¶43.

    iii.    *Ms. Linsenmeir was placed in wheelchair on October 1, but received no medical evaluation and treatment.*

On October 1, Ms. Linsenmeir was visibly unwell. PSOF ¶44. After her court appearance, she told another prisoner in the van back to the WCC that she felt sick. PSOF ¶45. Ms. Linsenmeir was then taken to medical for a routine tuberculosis screening. PSOF ¶46. She left in a wheelchair. PSOF ¶47. A jury could reasonably infer that she made some type of medical complaint serious

enough to warrant being provided a wheelchair.[1] PSOF ¶48. Yet HCSD staff did not take her vital signs, examine her, or provide any other medical evaluation and treatment besides the scheduled tuberculosis screening. PSOF ¶49. They did not even document that they had placed her in a wheelchair. PSOF ¶50.



*Fig. 1: Ms. Linsenmeir leaves medical in a wheel chair on October 1.*

Ms. Linsenmeir was allowed to use the wheelchair until she arrived in her new housing unit, Unit 1A. PSOF ¶51. That evening, a corrections officer on duty in Unit 1A called medical for Ms. Linsenmeir, but medical staff did nothing. PSOF ¶52, 53. Without examining Ms. Linsenmeir, they simply told the officer, "[S]he'll be ok." PSOF ¶53. Ms. Linsenmeir received no medical evaluation or treatment in response to that call. PSOF ¶54.

---

[1] That inference cannot be rebutted by testimony, as the nurse who provided the wheelchair testified that she doesn't remember making the decision to do so, and WCC staff did not record any information about the decision in Ms. Linsenmeir's medical records. *See* Declaration of Julius Halstead ("Halstead Decl.") Ex. 7 (Ferriter Dep. 68:13-20).

  iv. *Ms. Linsenmeir was disoriented and collapsed while trying to ascend a single flight of stairs on October 2, and the event was reported to Nurse Couture, but Ms. Linsenmeir received no medical evaluation and treatment.*

On October 2, Ms. Linsenmeir was taken back to medical again to provide a urine sample for a routine STD screening. PSOF ¶55. On the way to medical, she was disoriented and had difficulty complying with simple instructions. PSOF ¶56.



*Fig. 2: Disoriented Ms. Linsenmeir being re-directed into the stairwell*

To get to medical, she was ordered to walk up a single flight of stairs, which she could not do without great difficulty or without assistance. PSOF ¶57. On the video, she can be seen struggling up the staircase, supporting herself on the walls, before collapsing onto the stairs. PSOF ¶58. The corrections officer escorting her was forced to lift her off the staircase and support her under the arm as they continued towards medical. PSOF ¶59.



*Figure 3: Ms. Linsenmeir collapses while attempting to ascend a single flight of stairs*

When they got to medical, Nurse Couture was on duty. PSOF ¶60. The officer told Nurse Couture

what had happened in the stairwell. PSOF ¶61; HCSD Mem. at 13. On video, Nurse Couture can

then be seen engaging in conversation with Ms. Linsenmeir for more than 5 minutes. PSOF ¶62.

9



*Figure 4: Nurse Couture speaks with Ms. Linsenmeir after her collapse*

At no time during that interaction does Nurse Couture take Ms. Linsenmeir's vital signs, or physically examine her, or provide any other medical evaluation or treatment. PSOF ¶63. And, despite knowing that she was required to document all medical issues, Nurse Couture made no record of their visit whatsoever, let alone of the fact that Ms. Linsenmeir had collapsed while attempting to ascend a single flight of stairs, of their subsequent conversation, or of Nurse Couture's decision not to conduct any physical examination. PSOF ¶64. Instead, following their lengthy conversation, Nurse Couture merely sent Ms. Linsenmeir into the restroom to provide the scheduled urine sample. PSOF ¶¶65-66. While Ms. Linsenmeir was providing the sample, Nurse Couture stood near the restroom door—as she waited for Ms. Linsenmeir to provide the sample, Nurse Couture can be seen speaking to a person off camera and gesturing to her chest. PSOF ¶67.



*Figure 5: Nurse Couture gestures to her chest after talking with Ms. Linsenmeir*

A jury could reasonably conclude that Ms. Linsenmeir reported her chest pain and other serious symptoms to Nurse Couture, as she had done to other staff on multiple prior occasions.[2] PSOF ¶68. Ms. Linsenmeir left medical that day without receiving any medical evaluation or treatment of any kind. PSOF ¶69.

B.     On October 3, other prisoners sought medical help for Ms. Linsenmeir, but she received no medical evaluation or treatment.

By the end of the day on October 3, another prisoner in Ms. Linsenmeir's housing unit had observed that she had become very lethargic and at times seemed too weak to stand up or come out for meals. PSOF ¶70. It was obvious to that prisoner that Ms. Linsenmeir needed medical attention. PSOF ¶¶71-72. Multiple prisoners tried to speak up for Ms. Linsenmeir and asked the WCC staff members to get her medical attention. PSOF ¶73. The HCSD staff responded with

---

[2] Nurse Couture and the other staff member present both testified that they have no memory of what Ms. Linsenmeir said to Couture during their conversation in the medical unit on October 2, so there will be no evidence to contradict this conclusion. *See* Halstead Decl. Exs. 2 (Couture Dep. 86:19-87:13, 88:1-21), 11 (Russ Dep. 54:12-55:5).

disdain, including gestures such as rolling their eyes. PSOF ¶74. One HCSD staff member said to Ms. Linsenmeir, "this is what you do to yourself, this is what happens." PSOF ¶75. In response to these complaints, Ms. Linsenmeir did not receive any medical evaluation or treatment on October 3. PSOF ¶76, 77.

     i.   *The HCSD's failure to provide Ms. Linsenmeir with medical evaluation and treatment in response to her serious medical condition caused her death.*

By the evening of October 3 and into the morning of October 4, Ms. Linsenmeir was in septic shock. PSOF ¶78. She could not stand up, could not sit up in bed, could not eat, and could barely move her head. PSOF ¶79. She was reduced to crawling across the floor on her hands and knees to get to the toilet. PSOF ¶80. Despite the fact that "Daily Medical Rounds" and medication administration occurred during this time, none of the WCC staff did anything to help her. PSOF ¶81. Finally, later on the morning of October 4, medical staff came to Ms. Linsenmeir's cell to check on her cellmate. PSOF ¶82. They noticed—purely by chance—that Ms. Linsenmeir was "unresponsive" and in "severe distress." *Id.* Even though the responding nurse knew nothing about Ms. Linsenmeir, her first action was to attempt to question Ms. Linsenmeir about detoxing and what drugs she used. PSOF ¶83. The nurse then called an ambulance to take Ms. Linsenmeir to the hospital. PSOF ¶84.

After Ms. Linsenmeir arrived at the hospital, her mother and father rushed down from Vermont, where they resided. PSOF ¶85. When Ms. Linsenmeir's mother arrived at the hospital, she observed that Ms. Linsenmeir was panting and couldn't breathe well. PSOF ¶86. Ms. Linsenmeir told her mother repeatedly that she was afraid and that she didn't want to die. PSOF ¶87. But it was too late; Ms. Linsenmeir died in the hospital, still in custody, on October 7 from complications from her endocarditis and associated overwhelming infection. PSOF ¶88.

Ms. Linsenmeir's death was caused by the HCSD Defendants' failures to provide her with medical care. PSOF ¶89.[3] Had the HCSD Defendants properly monitored Ms. Linsenmeir during her alcohol withdrawal, or provided medical evaluation and treatment in response to her repeated complaints and serious symptoms, Ms. Linsenmeir's endocarditis would likely have been diagnosed. PSOF ¶90. And, if she had received treatment at any time from September 30 through at least October 2, her life would have been saved. PSOF ¶91.

ii.   *HCSD policies at the time of Ms. Linsenmeir's incarceration required non-pregnant people with opioid use disorder to enter a withdrawal protocol, and did not require the monitoring of the vital signs or symptoms of people in their alcohol withdrawal protocol.*

At the time of Ms. Linsenmeir's incarceration at the WCC, the HCSD did not provide maintenance medication for opioid use disorder to any incarcerated people with opioid use disorder other than pregnant patients. PSOF ¶111. Instead, the HCSD's policies at the time stated that non-pregnant patients with opioid use disorder would be placed on a withdrawal protocol of a tapered buprenorphine dose of just a few days. PSOF ¶112. The goal of this policy was "to ameliorate, but not eliminate withdrawal as the non-pregnant patient is discontinuing opioids." PSOF ¶113. As a result, WCC staff commonly experienced women undergoing the process of detox. PSOF ¶114. In addition, at the time of Ms. Linsenmeir's incarceration at the WCC, the alcohol withdrawal policy did not require medical staff to ever check the vital signs or symptom severity of a person who was prescribed Librium for alcohol withdrawal after their initial screening. PSOF ¶99. There is no medical justification for this omission, as any medically reasonable alcohol withdrawal

---

[3] As described in Plaintiff's Opposition to the Municipal Defendants' Motion for Summary Judgment, both SPD and HCSD had separate opportunities to provide Ms. Linsenmeir with adequate medical care that would have saved her life, both failed to do so, and so both are separate but-for and proximate causes of her death. D.E. 178.

protocol requires at minimum some continued monitoring of vitals and/or symptom severity. PSOF ¶104.

## LEGAL STANDARD

A court may grant summary judgment only where the record evidence "shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists where the evidence "is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. The burden is on the moving party to show "that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). If the moving party has satisfied its burden, only then does the burden shift to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. *Celotex Corp.*, 477 U.S. at 324. The Court must view the entire record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).

## ARGUMENT

I.    ***Genuine disputes of material fact preclude summary judgment against the Estate's ADA claim.***

To successfully make out a claim under Title II of the ADA, a plaintiff must show that she: (1) "is a qualified individual with a disability;" (2) "was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against;" and (3) "that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability." *Parker v. Universidad de P.R.*, 225 F.3d 1, 5 (1st Cir. 2000)**Error! Bookmark not defined.**; *see also* 42 U.S.C. 42 U.S.C. §12132. This Court already

concluded that "the facts and inferences" in the Complaint satisfied this standard, as they "plausibly demonstrate that Ms. Linsenmeir was denied medical care because of her opioid use disorder." May 5, 2021 Order (D.E. 33). Discovery has now produced a record that bears out these allegations. Specifically, there is no dispute that Ms. Linsenmeir—whom HCSD staff diagnosed with both opioid use disorder (OUD) and alcohol use disorder (AUD)—was a "qualified individual" under the ADA. *See* PSOF ¶92; HSOF ¶¶9; *Pesce v. Coppinger*, 355 F. Supp. 3d 35, 45 (D. Mass. 2018). And as demonstrated below, the facts readily support a jury determination that HCSD denied Ms. Linsenmeir critical medical care on the basis of these substance use disorders. As a result, HCSD's motion for summary judgment on the Estate's ADA claim must be denied.

### A.    HCSD denied Ms. Linsenmeir the benefit of its medical services.

Medical care constitutes a "service" under the ADA that jails and prisons must provide indiscriminately to disabled incarcerated people. *See Pesce*, 355 F. Supp. 3d at 45; *Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998). Here, HCSD did not merely provide Ms. Linsenmeir "inappropriate or inadequate" medical treatment. HCSD Mem. at 26. After Ms. Linsenmeir's initial medical intake on September 30, the HCSD provided *no* medical treatment aside from dispensing medication and conducting routine PPD and STD testing. PSOF ¶31. As a result, a jury could reasonably conclude that in the face of Ms. Linsenmeir's obviously and dangerously deteriorating condition, despite repeated health complaints both from herself and on her behalf by others, and notwithstanding her diagnosed alcohol withdrawal, HCSD did *nothing*; it did not seek out medical help, provide an examination with a doctor within the facility, or even conduct regular monitoring of her condition. *Id*. This amounts to a denial of medical treatment of her serious medical condition that is actionable under the ADA.

15

Contrary to HCSD's attempt to reframe this issue, the record demonstrates that it is very much disputed whether Ms. Linsenmeir "received extensive medical attention" during her time at the WCC. HCSD Mem. at 25. It is true that HCSD conducted routine PPD and STD testing and provided Librium, vitamin B and Motrin. PSOF ¶¶26-27. But this did *nothing* to address Ms. Linsenmeir's serious medical needs. Deposition and declaration testimony from numerous people incarcerated with Ms. Linsenmeir reveals that she looked increasingly unwell during her time at the facility—a conclusion that a jury could also reach from their own review of the videos—and that both she and others repeatedly asked staff for medical attention for her serious symptoms—including chest pain—that was never provided. PSOF ¶¶3, 5, 13, 16, 72-74. Ms. Linsenmeir's interactions with medical staff during her PPD and STD testing on October 1 and 2 fared no better in securing any treatment for her serious medical need. There is no audio for the videos of these interactions, and Ms. Linsenmeir can no longer speak for herself. But a jury could reasonably infer from the fact that Nurse Ferriter placed Ms. Linsenmeir in a wheelchair soon after Ms. Linsenmeir had told a fellow prisoner that she was sick, that Ms. Linsenmeir *also* reported her serious ailments to Nurse Ferriter; a jury could reach a similar conclusion based on Ms. Linsenmeir's lengthy conversation with Nurse Couture, and Nurse Couture's motion towards her chest, immediately following Ms. Linsenmeir's collapse in the stairwell. PSOF ¶¶58-59, 62-64, 67.[4] Neither nurse conducted an examination, took vitals, transferred Ms. Linsenmeir to the hospital or entered a referral for a visit with a doctor at HCSD. PSOF ¶¶65, 95, 106. In other words, a jury could

---

[4] That is especially so given that these nurses neither remembered nor documented the contents of these conversations. PSOF ¶18; *cf. Fernandez-Salicrup v. Figueroa-Sancha*, 790 F.3d 312, 324 (1st Cir. 2015) (reversing grant of summary judgment because where it is "possible" to read record evidence, including "complete silence," in favor of a party opposing summary judgment, "that is exactly how the district court should have interpreted it").

reasonably conclude they provided *no* medical treatment for Ms. Linsenmeir's reported condition. This denial of medical care was repeated in the medical department's non-response to a call for Ms. Linsenmeir on the evening of October 1—without any examination, they simply stated "she'll be ok." PSOF ¶53. It is further reflected by the Daily Medical Rounds, whose blank records mirror the absence of any medical evaluation or treatment provided. PSOF ¶¶20, 30. Indeed, at no point between September 30 and the morning of October 4 did the HCSD even take Ms. Linsenmeir's vitals or check the symptom severity of her alcohol withdrawal. PSOF ¶¶30-31.

At its heart, HCSD's argument appears to rely on the bare number of times that Ms. Linsenmeir saw a medical staff member. *See, e.g.,* HCSD. Mem. at 25 (noting that Ms. Linsenmeir met with medical staff "three different times in less than four days"); HCSD. Mem. at 28 ("it is undisputed that Madelyn was in the WCC Medical Department three out of the less than four days that she was at the WCC"). But the number of interactions demonstrates, rather than disproves, the denial of medical care given that medical staff ignored Ms. Linsenmeir's serious medical needs during these interactions. A prisoner who daily saw medical staff to receive insulin while presenting with a visibly broken arm that remained undocumented, unexamined, and unset would accurately label their situation a denial of medical care. So too here.

As this Court found, "the facts pled" in the Complaint "do not merely amount to medical malpractice," May 5, 2021 Order (D.E. 33), and the record now supports the conclusion that this was not "simply a reasoned medical judgment with which the patient disagree[d]." *Lesley v. Hee Man Chie*, 250 F.3d 47, 55 (1st Cir. 2001). Instead, a reasonable jury could conclude that HCSD unlawfully denied medical care to Ms. Linsenmeir. *Cf. Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274, 287 (1st Cir. 2006) (determining that failure to provide medications was "an outright denial of medical services" rather than a "medical 'judgment' subject to differing opinion");

*Donlon v. Hillsborough Cnty*, No. 18-cv-549, 2019 WL 2062436, at *8-9 (D.N.H. May 9, 2019) (finding plausible ADA claim where jail staff "failed to treat [plaintiff] in any way for [her] withdrawal").[5]

> **B.    HCSD denied Ms. Linsenmeir the benefit of its medical services on the basis of her disabilities.**

A reasonable jury could also conclude that this denial of medical services was on the basis of Ms. Linsenmeir's disabilities. Both direct and circumstantial evidence can demonstrate "disparate treatment on the account of disability, i.e., that the disability actually motivated the defendant's challenged adverse conduct." *Nunes v. Mass. Dep't of Corr.*, 766 F.3d 136, 144 (1st Cir. 2014); *see Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).[6] Circumstantial evidence includes both medical care that "was so unreasonable—in the sense of being arbitrary and capricious—as to imply that it was pretext for some discriminatory motive such as animus, fear, or apathetic attitudes," and care that "was discriminatory on its face, because it rested on stereotypes of the disabled rather than an individualized inquiry into the patient's condition." *Lesley*, 250 F.3d at 55 (cleaned up). The record in this case contains all three forms of evidence of disparate treatment.

---

[5] This record is dispositively different from that in *Nunes v. Mass. Dep't of Corr.*, 766 F.3d 136 (1st Cir. 2014), relied upon by HCSD. *See* HCSD 21. In *Nunes*, the prison continued to provide the necessary medical care—there, HIV medication—the only complaint was that it had switched from allowing prisoners to keep the medication on their person to requiring them to obtain the medications in the med line. *See Nunes*, 766 F.3d at 138-39. Here, the Estate does not allege that HCSD simply altered the location of the necessary medical care; instead, the record supports its allegation that HCSD declined to provide this medical care entirely. *See supra.*

[6] The Estate does not rely on either disparate impact or failure to provide reasonable accommodations as theories of ADA liability here.

i.     *The record contains direct evidence of HCSD's staff members'*
       *discriminatory animus.*

Individuals' statements can reflect "the kind of 'apathetic attitude' towards individuals with disabilities that the ADA intends to remedy." *Smith v. Aroostook Cnty*., 376 F. Supp. 3d 146, 160 (D. Me.) *aff'd,* 922 F.3d 41 (1st Cir. 2019). Here, one of Ms. Linsenmeir's cellmates attests that she heard Ms. Linsenmeir repeatedly ask to be taken to medical, which WCC staff refused to do while "telling her it was her own fault that she was there and that she shouldn't do drugs." PSOF ¶42; Halstead Decl. Ex. 15 (Champagne Decl. ¶4). Another woman who was incarcerated in the same housing block as Ms. Linsenmeir confirmed that WCC staff "responded with disdain" when she and others asked for them to provide medical assistance to Ms. Linsenmeir, recalling "that a WCC staff member said to Madelyn, 'this is what you do to yourself, this is what happens.'" PSOF ¶75; Halstead Decl. Ex. 15 (Cox Dec. ¶5). It was this woman's "impression that the WCC staff members assumed [Madelyn] was detoxing." PSOF ¶76; Halstead Decl. Ex. 15 (Cox Dec. ¶5). As this Court already found, these kinds of statements demonstrate a "direct discriminatory animus" on the basis of Ms. Linsenmeir's substance use disorders that violates the ADA. May 5, 2023 Order (D.E. 33).[7]

ii.    *HCSD's denial of medical care to Ms. Linsenmeir was so arbitrary and*
       *capricious as to imply it was a pretext for a discriminatory motive.*

The record also supports allegations that this Court determined "plausibly demonstrat[e] that 'the treatment decision was so unreasonable as to be arbitrary and capricious,' which itself raises an inference of 'discriminatory motive.'" May 5, 2023 Order (D.E. 33) (quoting *Buchanan*

---

[7] In addition to demonstrating disparate treatment on their own, these statements bolster the inference of disparate treatment established by circumstantial evidence, as described *infra*. *See Smith*, 376 F. Supp. 3d at 160 (holding that circumstantial evidence of disparate treatment was "bolstered" by defendants' statements).

*v. Maine*, 469 F.3d 158, 176 (1st Cir. 2006)). As described *supra*, both visual cues and repeated verbal complaints made clear Ms. Linsenmeir's need for medical care throughout her incarceration. Yet time and again, HCSD staff did nothing.

As Dr. Kimmel states, HCSD's "failure to seek or provide medical attention for Ms. Linsenmeir on September 30—particularly for her report of chest pain—had no medical justification." PSOF ¶93. There was similarly "no medical justification not to investigate why a young, ambulatory patient needs a wheelchair," on October 1, where at a "bare minimum the medical staff should have investigated [Ms. Linsenmeir's] symptoms and obtained vital signs" given her "unsteady gate, her placement in a wheelchair, and her treatment for alcohol withdrawal with chlordiazepoxide." PSOF ¶94. And there was "no medical justification" for the denial of medical care following Ms. Linsenmeir's collapse on the stairwell on October 2 given the "quite dramatic outward changes from just several days before," which rendered necessary "an immediate medical evaluation" including "taking her vital signs, a physical examination, and asking her questions about her symptoms" in order "to determine the cause of the fall, apparent confusion, [and] shortness of breath". PSOF ¶95.

Based on this evidence, a reasonable jury could readily conclude that the HCSD's repeated denials of medical care were so "devoid of any reasonable medical support" as to imply that they were discriminatory. *Lesley*, 250 F.3d at 55. HCSD's only response is to posit an alternative interpretation of the record that improperly construes the evidence in the light most favorable to Defendants. *See* HCSD Mem. 23-25. This merely demonstrates the existence of genuine disputes of material facts that render summary judgment inappropriate.

The record reveals a related basis on which a jury could conclude that the HCSD's denial of medical care was so arbitrary and capricious as to be discriminatory. Namely, HCSD failed to

assess Ms. Linsenmeir's vitals even once after her initial intake and prior to the emergency that led her to be rushed to the hospital—including during her visits to medical on October 1 (when she was placed in a wheelchair) and on October 2 (immediately following her collapse in the stairwell). This failure conflicted with their own recognition of the severe dangers of alcohol withdrawal, the risks of Librium, and the bare minimum requirements for any medically reasonable treatment of alcohol withdrawal.

HCSD medical staff prescribed Librium for Ms. Linsenmeir's diagnosed AUD because, in Nurse Couture's own words, "we were more concerned about the alcohol she had been using because with an alcohol detox, it is much more serious," PSOF ¶96. Nurse Keisha Williams, HCSD's 30(b)(6) witness designated to speak to medical protocols for responding to patients undergoing withdrawal, testified that HCSD's policy to prioritize treating alcohol withdrawal reflected its "dangerousness" and "seriousness". PSOF ¶98; Halstead Decl. Ex. 24 (Williams Dep. 54:16-23; 76:10-19).

Notwithstanding this knowledge of the perils of alcohol withdrawal, at the time of Ms. Linsenmeir's incarceration, HCSD's official policy did not require medical staff to *ever* check the vital signs or symptom severity of a person who was prescribed Librium for alcohol withdrawal after their initial screening. PSOF ¶99. Adhering to this practice, HCSD did not take Ms. Linsenmeir's vitals at any point after her intake on September 30 until immediately before she was taken to the hospital on October 4. PSOF ¶29.

As one of the Estate's medical experts, Dr. Justin Berk, explains, there is no medical justification for either the HCSD's alcohol withdrawal policy in 2018 or the application of that policy to Ms. Linsenmeir. PSOF ¶100; Halstead Decl. Ex. 13 (Berk Rep. 3, 10-12). "[P]eople experiencing alcohol withdrawal can progress from normal vital signs to becoming very sick quite

quickly"; as a result "alcohol withdrawal syndrome can be deadly without frequent monitoring." PSOF ¶101; Halstead Decl. Ex. 13 (Berk Rep. at 4-5).[8] In addition, as acknowledged by the HCSD, the side effects of Librium can include sedation, *see* PSOF ¶102, as well as discoordination, PSOF ¶103. Consequently, "*any* medically reasonable protocol — regardless of the severity of the withdrawal or the location of the treatment — requires at a minimum *some* continued monitoring of vitals and/or withdrawal symptoms after the initial screening." PSOF ¶104. HCSD's failure to do so as a general matter, and for Ms. Linsenmeir in particular, "has no conceivable medical justification[.]" PSOF ¶104, 106.[9] HCSD itself apparently agrees. Its current policy—adopted after Ms. Linsenmeir's time in the facility—requires that any prisoner undergoing alcohol withdrawal must now receive three vitals-checks within the first twenty-four hours of assessment, two checks within the next twenty-four hours, and daily checks for another two days. PSOF ¶107.

This record readily supports the conclusion that HCSD's continued failure to check Ms. Linsenmeir's vitals even after they had prescribed her Librium due to the dangers of alcohol withdrawal, observed that she required a wheelchair for transport, and learned that she had collapsed in a stairwell, was so arbitrary and capricious as to imply a pretext of discriminatory motive. *Cf. Kiman*, 451 F.3d at 288 (finding triable ADA claim regarding officers' failure to allow plaintiff to use a shower chair in part because they had "acknowledged, through the issuance of a shower chair, [his] serious disability related needs"); *Donlon*, 2019 WL 2062436, at *8-9 (holding

---

[8] *See also* Halstead Decl. Ex. 13 (Berk Rep. at 9) ("In my experience overseeing the care of patients experiencing withdrawal, many patients who demonstrate normal vital signs or CIWA scores during their first 24 hours of incarceration can still later develop severe alcohol withdrawal that necessitated transport for hospitalization).
[9] As Dr. Kimmel explains, "had Ms. Linsenmeir's vital signs and/or symptoms been checked between October 1 and October 3, it is very likely that an abnormality would have been detected, prompting further medical evaluation that would have diagnosed and treated her endocarditis at a time when her chance of survival was still more likely than not." PSOF ¶119.

"facts alleged raise[d] a plausible inference of such unreasonable care that would imply pretext for a discriminatory motive," where plaintiff had complained of withdrawal symptoms and "jail staff then observed her acting disoriented, confused and unable to maintain personal hygiene over the course of the week prior to her hospitalization").

iii.   <u>*HCSD's denial of medical care to Ms. Linsenmeir was based on stereotypes about people with substance use disorders rather than an individualized inquiry into her condition.*</u>

Finally, a reasonable jury could conclude that HCSD's denial of medical care to Ms. Linsenmeir was based not on an individualized inquiry into her own medical needs, but rather on their stereotype that the medical complaints of anyone with substance use disorder stemmed either from withdrawal (for which they should be blamed) or malingering (which need not be believed). HCSD's own policies prevented such individualized analysis from occurring. As described above, in accordance with HCSD's alcohol withdrawal policy, HCSD took no took no vital signs for Ms. Linsenmeir between her intake on September 30 and October 4. PSOF ¶¶30-31. Nor did HCSD perform a differential diagnosis to determine the cause of her serious medical symptoms. Determining whether symptoms suffered by a person with a substance use disorder are attributable to withdrawal or another cause is critical because "one of the greatest threats of alcohol withdrawal and opioid withdrawal is that it can mimic other pathologies that need urgent attention." PSOF ¶108; Halstead Decl. Ex. 13 (Berk Rep. at 4). Nevertheless, HCSD neither trained nor required its staff to conduct such an analysis. PSOF ¶109. As a result, HCSD failed to conduct an individualized inquiry into Ms. Linsenmeir's' visibly deteriorating health and her serious medical complaints of chest pain.

At the time of Ms. Linsenmeir's incarceration, HCSD staff was surrounded by an incarcerated population whose majority experienced some form of substance use disorder. PSOF

23

¶110. Yet at that the time, the HCSD did not provide maintenance medication for opioid use disorder to any incarcerated people with opioid use disorder other than pregnant patients. PSOF ¶111. Instead, HCSD policy stated that non-pregnant people with opioid use disorder would  be placed on a withdrawal protocol of a tapered buprenorphine dose of just a few days. PSOF ¶112. The HCSD policies explained the differences in the goals between these protocols: "in pregnancy the direct goal is *prevention/cessation* of withdrawal signs/symptoms, and stabilization on medication," whereas that goal of "the nonpregnant opioid withdrawal protocols . . . is management of the withdrawal *to ameliorate, but not eliminate*, withdrawal[.]" PSOF ¶113. (emphasis added). It is no surprise, then, that HCSD staff themselves explained that "one of the common things" they experienced in 2018 was prisoners who "would go through [the] process of detoxing." PSOF ¶114. According to Nurse Williams, "we pretty much deal with a lot of it every day . . . people coming in on withdrawal." PSOF ¶115.

As Dr. Berk explains, exposing staff to a large number of people experiencing withdrawal symptoms "may desensitize staff to these withdrawal symptoms" and "can lead to complacency among medical and security staff" who may then "ignore or fail to collect information that shows or suggests an additional or alternative illness or disease." PSOF ¶116.[10] The sworn declarations

---

[10] The risk of such desensitization is heightened where, as here, the institution fails to fully investigate allegations that staff either failed to provide medical care to people experiencing withdrawal or made derogatory statements about people's substance use disorder. *See., e.g.,* Halstead Decl. Exs. 35 ("HCSD 5107"); 32 (Reale Dep. 42:15-43:12) (in response to complaint from prisoner who was on Librium that she was "delirious, slurred speech, dizzy, fell, hit head on door, call for help" and "begged for MA throughout night, was refused," HCSD's 30(b)(6) witnesses admit that it did not investigate allegation that she asked for and was refused medical care during the night); 34 ("HCSD 5173"); 32 (Reale 45:8-47:1(in response to complaint from prisoner that a nurse "yelled at me to get off the floor, ripped me up by my arm, and proceeded to tell me it was all my fault because I choose to use drugs" in front of her roommate after she had "stood up from bunk & passed out, smashing my head off the wall & floor," HCSD's 30(b)(6)

of women incarcerated at the same time of Ms. Linsenmeir further support the conclusion that this is exactly what occurred here, as staff members told Ms. Linsenmeir in response to her medical complaints that "it was her own fault she was there," "she shouldn't do drugs," and "this is what you do to yourself, this is what happens." PSOF ¶75. A prisoner incarcerated at the WCC after Ms. Linsenmeir died had much the same experience: she ultimately had to be hospitalized for a life-threatening medical condition, because HCSD staff simply assumed she was "detoxing," ignored her requests for help, and refused her treatment. *See* Halstead Decl. Ex. 38, ¶¶6-16.[11] Against this backdrop, a jury could readily find that HCSD's denial of medical care for Ms. Linsenmeir's serious medical needs was "so unreasonable as to constitute evidence of discrimination under the ADA." *Smith*, 376 F. Supp. 3d at 159.

       *C.*     *No other grounds warrant summary judgment against Plaintiff's ADA claim.*

       i.     <u>*Sovereign immunity does not bar the Plaintiff's ADA claim.*</u>

       The HCSD Defendants argue that sovereign immunity bars the Plaintiff's ADA claim. HCSD 29-33. It does not.

       Title II of the Americans with Disabilities Act validly abrogates states' Eleventh Amendment immunity both as to "state conduct that actually violates the Constitution," *Toledo v.*

---

witnesses admit that it did not speak to roommate or investigate statement that it was her fault for using drugs); 37 ("HCSD 5184"); 32 (Reale Dep. 48:21-55:8) (in response to complaint from prisoner that nurse told her "the problem with you girls that are addicted want us to fix your problem" and said to another staff member "how I played the addict card trying to get stuff from her to solve my problems," HCSD's 30(b)(6) witnesses admit that investigation was limited to speaking to the nurse who denied making that statement).

[11] Another prisoner incarcerated at the WCC before Ms. Linsenmeir in 2016 or 2017 alleged that Nurse Couture called her a "junkie." Halstead Decl. Ex. 2 (Couture Dep. 139:8-16). Nurse Couture stated that the Health Tracks system did not reflect that she had an encounter with that person, and that she "had to write an incident report, [] discussed it with my supervisor, and [] never heard anything more about it." *Id*. (Couture Dep. 139:8-12, 139:24-140:3).

*Sanchez*, 454 F.3d 24, 31 (1st Cir. 2006) (citing *United States v. Georgia,* 546 U.S. 151 (2006)), and as to "some classes of state conduct that do not facially violate the Constitution but are prohibited by Title II in order to 'prevent and deter unconstitutional conduct,' *id.* (citing *Tennessee v. Lane*, 541 U.S. 509, 518 (2004)). Accordingly, to determine whether the Estate may sue HCSD for damages, this Court must decide "'(1) which aspects of the state's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.'" *Id.* (citing *Georgia*, 126 S.Ct. at 882)

The Court should conclude its inquiry at the second step, as it did in its denial of the HCSD's motion to dismiss. May 5, 2021 Order (D.E. 33) ("The court disagrees with HCSD Defendants' first two arguments and, therefore, does not consider the third."). As discussed above and below, the record viewed in the Estate's favor establishes that the HCSD's denial of medical care to Ms. Linsenmeir violated the ADA, and that the denial of medical care to Ms. Linsenmeir violated the Fourteenth Amendment. *See supra,* 14-26; *infra* 26-30. Because Defendants' conduct violated both Title II and the Constitution, the ADA's abrogation of sovereign immunity is valid. *Georgia*, 546 U.S. at 159.

Even if the Court reaches the third step, it should rule that Congress validly abrogated sovereign immunity as to the misconduct at issue. In making this determination, the Court must consider "(1) the constitutional right or rights that Congress sought to protect when it enacted the statute; (2) whether there was a history of constitutional violations to support Congress's determination that prophylactic legislation was necessary; and (3) whether the statute is a

congruent and proportional response to the history and pattern of constitutional violations." *Toledo*, 454 F.3d at 34–35.

Here, the HCSD does not dispute that the first two prongs have been met. HCSD. Mem. at 32. Nor could it. Congress included the constitutional rights of prisoners in the scope of Title II's protections. *See Lane,* 541 U.S. at 525 & n.11; *Georgia*, 546 U.S. at 161 (Stevens, J., concurring). And for good reason: the extensive history of unconstitutional actions in the penal system justified prophylactic legislation to protect prisoners' rights.[12] The history of the denial of medical care to disabled prisoners is particularly extensive. *Georgia*, 546 U.S. at 162 (Stevens, J., concurring) ("[C]ases involving inadequate medical care and inhumane conditions of confinement have perhaps been [the] most numerous.").

"The only question that remains is whether Title II is an appropriate response to this history and pattern of unequal treatment." *Lane,* 541 U.S. at 530. Given the extensive record of constitutional violations in the penal context—and in regard to medical care in particular—the ADA's protection against discriminatory denial of medical services is a congruent and proportional response. Congress was entitled to enact legislation to ensure that disabled prisoners would not be denied medical care because of their disabilities. It was reasonable to conclude that

---

[12] *See e.g., Lane*, 541 U.S. at 525 (noting the "pattern of unequal treatment in the administration of a wide range of public services, programs, and activities, including the penal system"); *Georgia*, 546 U.S. at 162 (Stevens, *J.,* concurring) (noting the large "record of mistreatment of prison inmates that Congress reviewed in its deliberations preceding the enactment of Title II"); *Cox v. Massachusetts Dep't of Correction*, No. CV 13-10379-FDS, 2018 WL 1586019, at *12 (D. Mass. Mar. 31, 2018).For a survey of this history, *see* Brief of the United States as Intervenor, *Hale v. King,* 07-60997 (5th Cir., filed Apr. 9, 2010), at 18-30, available at https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/hale.pdf. The U.S. Department of Justice takes the position that Title II validly abrogates states' Eleventh Amendment immunity in the prison context, *see id.* at 3-4, including as to conduct that does not violate the Constitution. *Id.* at 30-37.

prohibiting the discriminatory denial of medical services was necessary to protect the constitutional right to adequate medical care. The ADA's requirement that medical services be provided in a non-discriminatory manner does not greatly exceed the constitutional requirements; like the Constitution, the ADA requires intentional misconduct and does not prohibit "mere" medical malpractice, as Defendants rightly note. HCSD Mem at 33. While there may be conduct that discriminatorily denies medical care to prisoners but does not violate the Constitution, prohibiting such conduct is not "so out of proportion to supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *Toledo*, 454 F.3d at 39. Accordingly, if it reaches this question, this Court should rule that "in the context of access to medical care, Congress's proscription of conduct under the ADA bears congruence and proportionality to the requirements of the Eighth Amendment, and abrogation of sovereign immunity is accordingly warranted as to this claim." *Cox,* 2018 WL 1586019, at \*13.

ii.      *A Showing of Deliberate Indifference Entitles the Plaintiff to Damages under the ADA.*

The HCSD Defendants note that whether "a showing of deliberate indifference is enough to support recovery under of money damages under Title II," is an open question in this Circuit. HCSD. Mem. at 27 (quoting *Gray v. Cummings,* 917 F.3d 1, 17 (1st Cir. 2019)). This Court should follow the great weight of authority and hold that deliberate indifference is the appropriate standard. See *Lewis v. Spurwink Servs., Inc.*, No. 2:22-CV-00054-NT, 2022 WL 17454078, at \*6 (D. Me. Dec. 6, 2022) (collecting cases); *Basta v. Novant Health Inc.*, 56 F.4th 307, 316 (4th Cir. 2022).

This standard is "better suited to the remedial goals of the ... ADA than is the discriminatory animus alternative." *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 264 (3d Cir. 2013). This is because "Title II was modeled after section 504, which was meant to combat

discrimination that is 'most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect.'" *Lacy v. Cook Cnty., Illinois*, 897 F.3d 847, 863 (7th Cir. 2018) (citing *Alexander v. Choate*, 469 U.S. 287, 295 (1985)); *id.* ("Even absent animus-based prejudice, people with disabilities may be deprived of opportunities which the ADA aims to protect.") (cleaned up). Because the animus standard would frustrate the purpose of the ADA, the Court should adopt the deliberate indifference standard.

Deliberate indifference requires that "the defendant knew that an ADA-protected right was likely to be abridged, yet neglected to take available preventative action notwithstanding such knowledge." *Gray,* 917 F.3d at 18. As discussed above and below, the Estate has satisfied this standard. *See infra* 14-29; *supra* 29-30. Even if animus were required, the record supports such a finding in light of direct evidence of ill-will toward Ms. Linsenmeir because of her substance use disorders. PSOF ¶75; *see supra* 29-30.

iii.   *On this record, HCSD can be held liable for money damages under Title II.*

Finally, HCSD Defendants note that whether a public entity can be held liable for money damages under the ADA on a theory of vicarious liability remains an open question in this Circuit. HCSD Mem. at 27. This should not bar recovery for money damages in this case for at least two reasons.

First, as articulated above, the Estate's ADA claim is based on a denial of medical care for Ms. Linsenmeir's serious medical needs on the basis of her substance use disorders throughout the entire facility. *See supra.* This was not an instance where one or two employees failed to respond. None of the HCSD staff who interacted with Ms. Linsenmeir for the nearly four days after her initial medical intake provided any medical evaluation or treatment for her serious medical needs; indeed, no one even took her vitals or evaluated her withdrawal symptom severity during this time.

What is more, the HCSD's failure to conduct a differential diagnosis or monitor Ms. Linsenmeir's

vital symptoms reflected the training and official policies of the HCSD at the time. PSOF ¶¶30-

31, 109. These widespread failures can properly be construed as failures of the HCSD itself without

resort to vicarious liability. *Cf. Cox v Dep't of Corr.*, No. CV 13-10379, 2018 WL 1586019, at *8

(D. Mass. Mar. 31, 2018) (upholding jury verdict of damages under the ADA against the DOC for

denial of adequate access to medical care based on the actions of numerous staff members without

mentioning vicarious liability).

Second, if this Court chooses to squarely address the question of respondeat superior under

the ADA, it should join the weight of circuit authority in concluding that it is a viable basis for

liability under the ADA. *See Lund v. Cowan*, 5 F.4th 964, 972 (9th Cir. 2021); *Duvall v. Cnty of*

*Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001), *as amended on denial of reh'g* (Oct. 11, 2001);

*Delano-Pyle v. Victoria Cnty., Tex.*, 302 F.3d 567, 574-575 (5th Cir. 2002); *DeVito v. Chicago*

*Park Dis.,* 83 F.3d 878, 881 (7th Cir. 1996); *Rosen v. Montgomery Cnty. Maryland*, 121 F.3d 154,

157 n.3 (4th Cir. 1997).[13] Such a holding, which is in keeping with basic agency principles that

routinely apply to civil rights statutes, matches the purposes of the ADA to erect an outright

prohibition on disability discrimination. *See* 20 U.S.C. § 1681; *see also Meyer v. Holley*, 537 U.S.

280, 285 (2003) (applying vicarious liability to the Fair Housing Act); *Burlington Indus., Inc. v.*

*Ellerth*, 524 U.S. 742 (1998) (applying vicarious liability under Titel VII the Civil Rights Act). In

light of these cases, "and in the absence of any Tenth Circuit decision to the contrary," the District

---

[13] *But see Ingram v. Kubik*, 30 F.4[th] 1241, 1257 (11th Cir. 2022); *Jones v. City of City of Detroit,*
*Michigan*, 20 F.4[th] 1117, 1118 (6th Cir. 2021). As Judge Nelson Moore persuasively describes in
her *Jones* dissent, the Eleventh and Sixth Circuit's reliance on the U.S. Supreme Court's Title IX
decision in *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998) to reject
vicarious liability within the context of the ADA is misplaced for numerous reasons. *See Jones*,
20 F.4[th] at 124-127 (Moore, J. dissenting).

of Colorado recently applied vicarious liability to ADA claims. *See M.P. by & through Jared P. v. Jones*, No.22-cv-002200, 2023 WL 5938915, at *15 (D. Colo. Sept. 12, 2023). If it reaches this question, this Court should do the same.

II.     **Genuine disputes of material fact preclude summary judgment on the Estate's §1983 claims against the Individual Defendants.**

   A.     *The Individual Defendants deprived Ms. Linsenmeir of her Fourteenth Amendment right to adequate medical care*

Because she was a pretrial detainee, Ms. Linsenmeir's §1983 claim for denial of medical care arises under the Fourteenth Amendment, which provides "at least" as much protection as the Eighth Amendment. *See Ruiz-Rosa v. Rullan*, 485 F.3d 150, 155 (1st Cir. 2007). Numerous courts have held that it provides even greater protection. *See, e.g.*, *Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023) (citing cases). As discussed in the Estate's Opposition to the Municipal Defendants' Motion for Summary Judgment, these courts have applied the Supreme Court's ruling in *Kingsley v. Hendrickson,* 576 U.S. 389 (2015)—which held that pretrial detainees need only show that a defendants' use of force was "objectively unreasonable" to establish a constitutional violation— to pretrial detainees' claims of inadequate medical care. *See Short*, 87 F.4[th] at 605; *see also* (D.E. 178 ("Pl. Opp. To Municipal Defs. Mot. Summ. J.") at 12-14. The Estate respectfully refers the Court to that portion of the Estate's brief and incorporates it here, and submits that the Court should adopt this standard. As with the Estate's claims against the Municipal Defendants, however, the Estate's claims against Officer Barrett and Nurse Couture also satisfy the subjective, deliberate indifference standard, so the Estate will apply this standard in discussing these claims.

Under this standard, officers violate the Constitution when they show "deliberate indifference to [a prisoner's] serious medical needs." *See Ruiz-Rosa*, 485 F.3d at 156. To make this showing, the plaintiff must satisfy "(1) an objective prong that requires proof of a serious

medical need, and (2) a subjective prong that mandates a showing of prison administrators'
deliberate indifference to that need." *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014). The
second prong requires that a prison official "must both be aware of facts from which the inference
could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."
*Ruiz-Rosa*, 485 F.3d at 156 (citation and quotation marks omitted).

        B.       *Ms. Linsenmeir suffered a serious medical need.*

A medical need is serious when it is "'so obvious that even a lay person would easily
recognize the necessity for a doctor's attention.'" *Brison v. Wellpath, LLC*, 662 F. Supp. 3d 67,
72–73 (D. Mass. 2023) (quoting *Leavitt v. Corr. Med. Servs. Inc.*, 645 F.3d 484, 497 (1st Cir.
2011)). A "significant risk of future harm" is also sufficient to demonstrate a serious medical need.
*Perry v. Roy*, 782 F.3d 73, 79 (1st Cir. 2015). "The 'seriousness' of an inmate's needs may also
be determined by reference to the effect of the delay of treatment." *Leavitt*, 645 F.3d at 497–98;
*see, e.g.*, *Perry*, 782 F.3d at 79.

Here, HCSD Defendants concede that a reasonable jury could conclude that Ms.
Linsenmeir's chest pain complaints while in HCSD custody constitute a serious medical need.
HCSD Mem. at 9. They are correct. Chest pain is a quintessential example of a condition that even
a lay person can recognize requires a doctor's attention. *See, e.g., Mata v. Saiz*, 427 F.3d 745, 754
(10th Cir. 2005) ("severe chest pain, a symptom consistent with a heart attack, is a serious medical
condition under the objective prong of the Eighth Amendment's deliberate indifference
standard").[14] Further, the record shows that chest pain presents a significant risk of future harm,

---

[14] *See also Gladu v. Correct Care Sols.*, No. 2:17-cv-00504-JAW, 2019 WL 5423019, at *11 (D.
Me. Oct. 23, 2019) ("a layperson is highly likely to recognize the need for medical attention when
a person complains of severe, radiating chest pain, because this symptom is a well-known sign of
a heart attack or underlying cardiac condition.").

and that delays in treating chest pain present a significant risk of death or serious injury. PSOF ¶117.

Finally, Ms. Linsenmeir's alcohol withdrawal represented another serious medical need during her time in HCSD custody. "Alcohol withdrawal is medically dangerous" and "can be deadly without frequent monitoring." PSOF ¶118. HCSD Defendants were well aware of this danger; Nurse Couture herself testified that alcohol detoxification was "serious" and had "deadly" symptoms. PSOF ¶97. The medication prescribed for Ms. Linsenmeir's withdrawal, Librium, itself carries the significant risks of drowsiness, sedation and discoordination. PSOF ¶102, 103.

C.     *A reasonable jury could conclude that the Individual Defendants were deliberately indifferent to Ms. Linsenmeir's serious medical needs.*

The Individual Defendants were deliberately indifferent to Ms. Linsenmeir's serious medical needs.[15] "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). The "[e]xistence of deliberate indifference usually presents a jury question," *Leavitt*, 645 F.3d at 496 (citation omitted), and does so in this case.

With respect to Officer Barrett, HCSD Defendants concede that a reasonable jury could conclude that Officer Barrett's positive notation of pain in the "torso (chest/back)" on Ms. Linsenmeir's WCC intake form was prompted by Ms. Linsenmeir complaining of chest pain. HCSD Mem. at 9; PSOF ¶12. The HCSD Defendants argue that there was nothing about Ms. Linsenmeir's "demeanor" during her intake video that would suggest she was suffering from a

_____

[15] This analysis necessarily demonstrates that the Individual Defendants' non-response to Ms. Linsenmeir's serious medical needs was also objectively unreasonable under the *Kingsley* standard for Fourteenth Amendment due process claims.

serious medical need. HCSD Mem. at 10. That is both incorrect— Officer Barrett herself testified

when Ms. Linsenmeir first arrived at the WCC, "she had looked like she . . . was uncomfortable

when she was walking" and did not have a "normal gait", *see* Halstead Decl. Ex. 1 (Barrett Dep.

47:1–47:13, 42:9–42:17), and irrelevant given Ms. Linsenmeir's explicit complaints of chest pain

during that same interaction, which the HCSD Defendants admit a jury could reasonably conclude

"constituted a serious medical need," HCSD Mem. at 9.

In the face of this serious medical need, Officer Barrett did not seek medical assistance,

ask Ms. Linsenmeir follow-up questions, or call medical to alert them to this issue. PSOF ¶¶14-

15. She simply entered the information into JMS, even though there was no practice for medical

staff to check JMS, PSOF ¶6, and the practice was instead for intake officers to call medical "if

someone comes in complaining of a medical concern." PSOF ¶7. As HCSD's 30(b)(6) witness for

intake testified, "in an instance where someone's expressing that they're having chest pains or

something that requires urgent care then [] the practice would be to alert your supervisor and to

alert medical." Halstead Decl. Ex. 36 (Calderigi Dep. 41:16-42:4). A reasonable jury could find

deliberate indifference through Officer Barrett's decision to eschew the method that would have

brought Ms. Linsenmeir's serious medical need to the attention of medical staff in favor of a

method that had no chance of doing so.

As to Nurse Couture, the HCSD Defendants concede that a jury could conclude that Nurse

Couture was informed of Ms. Linsenmeir's collapse in the stairwell immediately prior to her visit

to medical on October 2. HCSD Mem. at 11. However, the HCSD Defendants' argument that

Nurse Couture nevertheless could not have known of Ms. Linsenmeir's serious medical need

because the officer's report of the collapse "would have been very brief" and "far from an

impassioned account," and because "there is nothing about [Ms. Linsenmier's] demeanor" during

the video of her interaction with Nurse Couture "to suggest that she is communicating a serious medical need," HCSD Mem. 11-12, ignores key pieces of the record and erroneously fails to look at the evidence in the light most favorable to the Estate.

Viewed under the proper standard, the record demonstrates that Ms. Linsenmeir was unable to sit up straight and looked unwell throughout her conversation with Nurse Couture, and that her face was in pain as she was unable to walk in a straight line when she left medical. PSOF ¶¶44, 70-71. A jury could reasonably infer from the length of the conversation—which lasted more than five minutes—and the gesture that Nurse Couture makes towards her chest at 5:18:30 p.m. on the video, *see infra* Fig. 5—that Ms. Linsenmeir reported her chest pain and other serious symptoms to Nurse Couture during this conversation, as she had done to other staff on multiple occasions. PSOF ¶¶13, 68, 93. What is more, Nurse Couture was aware that Ms. Linsenmeir was on Librium for alcohol withdrawal (she herself had prescribed it), which carries significant risks of drowsiness, sedation and discoordination. PSOF ¶¶102-103.

Yet armed with this information, Nurse Couture did nothing other than conduct a routine urine test for STDs. She did not take Ms. Linsenmeir's vital signs, conduct any form of physical examination, or refer Ms. Linsenmeir to a doctor inside or outside the facility. She did not even document any aspect of her lengthy encounter with Ms. Linsenmeir, even though she testified it was important to document every encounter with a patient in writing because "it's required by our procedures and it gives a complete picture of your encounter with the patient." Halstead Declaration Ex. 2 (Couture Dep. 18:3-5; 19:5-9); 24 Williams Dep. 192:24-193:5). (HCSD 30(b)(6) witness for nursing protocols agreeing that in 2018 it was WCC policy to document anytime a patient met with a medical provider and told them a symptom they were having).

Nurse Couture's inaction was not a "choice of one treatment over another," but a complete disregard of Ms. Linsenmeir's manifest needs. *Feeney v. Corr. Med. Servs., Inc.,* 464 F.3d 158, 163 (1st Cir. 2006) (internal citations omitted).[16] As Drs. Kimmel and Berk make clear, Nurse Couture's failure to seek or provide medical attention for Ms. Linsenmeir on October 2 had no medical justification, in light of Ms. Linsenmeir's collapse, complaints and presentation, and especially because of her alcohol withdrawal and Librium prescription. PSOF ¶¶ 12, 15, 26, 48, 58, 90. A reasonable jury could therefore find that Nurse Couture was deliberately indifferent to Ms. Linsenmeir's serious medical needs. *Cf. Mata v. Saiz*, 427 F.3d 745, 756–759 (10th Cir. 2005) (denying summary judgment for defendant nurse who failed to refer incarcerated person suffering from severe chest pain to a doctor).

> **D.      The Individual Defendants are not entitled to qualified immunity.**

Officer Barrett and Nurse Couture are not protected by qualified immunity because "they violated a federal statutory or constitutional right, and the unlawfulness of their conduct was clearly established at the time." *Lachance v. Town of Charlton*, 990 F.3d 14, 20 (1st Cir. 2021) (quoting *Irish v. Fowler*, 979 F.3d 65, 76 (1st Cir. 2020)) (internal quotation marks omitted). The "clearly established" analysis has two sub-parts. *Alfano v. Lynch*, 847 F.3d 71, 75 (1st Cir. 2017). The first typically "requires the plaintiff to identify either controlling authority or a consensus of cases of persuasive authority sufficient to send a clear signal to a reasonable official that certain conduct falls short of the constitutional norm." *Id.* (citations omitted). The second "asks whether an objectively reasonable official in the defendant's position would have known that his conduct

---

[16] The urine test was plainly "so clearly inadequate" with respect to responding to Ms. Linsenmeir's collapse "as to amount to a refusal to provide essential care." *Feeney*, 464 F.3d at 163.

violated that rule of law." *Id*. (cleaned up). The "salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional." *Glik v. Cunniffe*, 655 F.3d 78, 81 (1st Cir. 2011) (citation omitted).

The HCSD Defendants concede that "it is clearly established … that jail officials violate the due process rights of their detainees if they exhibit deliberate indifference to the medical needs of the detainees." HCSD. Mem. at 14 (quoting *Penn v. Escorsio*, 764 F.3d 102, 110 (1st Cir. 2014)); see also *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 75 (1st Cir. 2016) ("[T]he law on denial of medical care has long been clear in the First Circuit.").

Instead, the HCSD Defendants focus on the second part of the "clearly established" inquiry, stating that the facts of this case do not show that any reasonable individual in Barrett's or Couture's positions would have known her conduct violated the law. HCSD Mem. at 13-17. The HCSD Defendants' arguments are unpersuasive. As to Officer Barrett, any reasonable officer would have known that a complaint of chest pain signifies a potentially fatal condition that must be addressed immediately. No reasonable officer would have failed to follow up on Ms. Linsenmeir's complaint or failed to tell medical staff about it. As to Nurse Couture, any reasonable nurse would have been aware that a young woman's inability to climb a flight of stairs without collapsing indicated a potentially serious condition and required an immediate physical evaluation. The gravity of the situation and need for medical attention would have been still more apparent to any reasonable nurse given that Ms. Linsenmeir was undergoing alcohol withdrawal and taking Librium, as Nurse Couture knew. The HCSD Defendants' arguments to the contrary simply highlight disputed questions of fact that a jury must resolve. *Suboh v. Dist. Attorney's Off. of Suffolk Dist.*, 298 F.3d 81, 90 (1st Cir. 2002) (noting that disputed facts underlying reasonableness inquiry at last step of qualified immunity must be decided by jury).

III.     ***Genuine disputes of material fact preclude summary judgment against the Estate's wrongful death claim against the Individual Defendants.***

The factual allegations which the Court found "plausibly suggest intentional conduct" have since been borne out by discovery, which now dictates against summary judgment on the Estate's wrongful death claims. May 5, 2021 Order (D.E. 33). Although it was the practice during intake for the booking officer to call medical staff to communicate medical issues about the incoming prisoners, Officer Barrett did not call medical to secure any medical evaluation or treatment for Ms. Linsenmeir's report of chest pain. PSOF ¶15. And, contrary to her deposition testimony, Officer Barrett actually went with Ms. Linsenmeir to medical at the time of her intake, and still didn't tell anyone that Ms. Linsenmeir had reported chest pain. PSOF ¶¶17, 18. And when Officer Barrett drafted her incident report, she went out of her way to state that Ms. Linsenmeir did not ask to go to the hospital, but entirely omitted Ms. Linsenmeir's report of pain. PSOF ¶19. A jury could rationally infer that Officer Barret knew Ms. Linsenmeir had chest pain, made an intentional choice not to report it to medical staff who could provide evaluation and treatment, and later omitted from her incident report conduct that she knew was wrong.

Similarly, a jury could conclude that, on October 2, Nurse Couture was aware that Ms. Linsenmeir had collapsed while trying to ascend a single flight of stairs, was informed in her lengthy conversation with Ms. Linsenmeir that Ms. Linsenmeir was experiencing chest pain, and also knew that Ms. Linsenmeir was in the middle of a dangerous withdrawal process for which she was receiving medication with serious side effects. PSOF ¶¶58-62, 113.  Yet, Nurse Couture took no action to provide Ms. Linsenmeir any medical evaluation or treatment. PSOF ¶62-64, 68-69. The Estate's experts will testify that the failure to provide Ms. Linsenmeir with any medical evaluation or treatment on October 2 had no medical justification and ignored obviously serious risks to Ms. Linsenmeir's health. PSOF ¶95. And, despite knowing that she was required to

38

document her conversation with Ms. Linsenmeir, Nurse Couture made no record of it or the underlying events that prompted them to speak. PSOF ¶63-65. A jury could reasonably concluded that Nurse Couture intentionally chose to deny care for a serious condition.

Accordingly, a genuine dispute exists as to whether Nurse Couture caused Ms. Linsenmeir's death by intentional conduct, and summary judgment should be denied. *See Stepanischen v. Merchants Despatch Transp. Co.*, 722 F.2d 922, 928 (1st Cir. 1983) (courts are "particularly cautious" when asked to grant summary judgment on issues of intent). For the same reason, the Individual Defendants are not entitled to common law immunity. Massachusetts government officials enjoy common law immunity only where they have "acted in good faith, without malice, and without corruption." *Nelson v. Salem State Coll.*, 446 Mass. 525, 537 (2006). Ample evidence shows that the Individual Defendants acted in bad faith by intentionally denying Ms. Linsenmeir obviously necessary medical evaluation and treatment and by taking steps to conceal their unlawful conduct. *See Deluca v. Merner*, 322 F. Supp. 3d 201, 204 n.1 (D. Mass. 2018) (denying common law immunity at summary judgment where a reasonable juror could infer bad faith). Summary judgment on the wrongful death claims should therefore be denied.

## CONCLUSION

For the foregoing reasons, the Estate respectfully requests that the Court deny the HCSD Defendants' Motion for Summary Judgment in its entirety.

Respectfully Submitted,

MAURA O'NEILL, as administrator of the
Estate of Madelyn E. Linsenmeir,

By her attorneys,

/s/ Julius A. Halstead

Jessie J. Rossman (BBO # 670685)
Daniel L. McFadden (BBO # 676612)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170

David Milton (BBO # 668908)
PRISONERS' LEGAL SERVICES
OF MASSACHUSETTS
50 Federal Street
Boston, MA 02110
(617) 482-2773

Martin M. Fantozzi (BBO # 554651)
Richard J. Rosensweig (BBO # 639547)
Julius A. Halstead (BBO # 705428)
Kiman Kaur (BBO # 709943)
GOULSTON & STORRS PC
400 Atlantic Avenue
Boston, MA 02110
jhalstead@goulstonstorrs.com
(617) 574-2213

Dated: February 15, 2024

## CERTIFICATE OF SERVICE

I hereby certify that, on February 15, 2024, I served the foregoing document on all parties by filing it via the Court's CM/ECF system and that a copy will be sent via the CM/ECF system electronically to all counsel of record.

*/s Julius A. Halstead*
Julius A. Halstead, Esq
