# EXHIBIT A

# Dr. Justin Berk  - Expert Report
# November 11, 2023

I.  **Credentials**

My name is Dr. Justin Berk, MD MPH MBA. I am an addiction medicine physician with substantial background in the medical care of incarcerated individuals. I graduated from Yale University and obtained my Master's of Public Health from the Yale School of Public Health. I received my Master's of Business Administration from Texas Tech University Rawls College of Business and my Doctor of Medicine from Texas Tech University Health Sciences Center. I completed my medical internship and residency training at the Johns Hopkins Hospital Combined Medicine-Pediatrics Urban Health Residency Program, which provided specialized training in carceral medicine and addiction medicine. This included training in jail and prison settings along with clinical work with incarcerated and formerly incarcerated individuals. This training involved outpatient and inpatient treatment of individuals with alcohol use disorder (AUD), opioid use disorder (OUD), injection drug use, and other substance use disorders. I am board-certified in internal medicine, pediatrics, and addiction medicine.

I have served as a staff physician for the Rhode Island Department of Corrections since 2019 and served as the Medical Director for the Rhode Island Department of Corrections from 2020 to 2022, where I oversaw all health care delivery for over 2,000 incarcerated individuals statewide, a large number of whom suffered from OUD and AUD. My responsibilities included oversight for our comprehensive addiction treatment programs, which involved screening and treatment for alcohol and opioid withdrawal. Thus, I have extensive first-hand experience with health care in the jail setting generally, and with providing health care to people with OUD and AUD in the jail setting specifically. In my clinical experience, I have cared for hundreds of patients with alcohol use disorder and opioid use disorder and 10-20 patients with infective endocarditis.

I hold a Certified Correctional Health Professional-Physician (CCHP-P) certification from the National Commission on Correctional Health Care (NCCHC) and serve on the organization's CCHP-P certification sub-committee.

As an Assistant Professor at Alpert Medical School at Brown University, I oversee clinical education for medical trainees, research in correctional health funded by the National Institutes of Health, and clinical care for patients with addiction. I have contributed to nearly 50 peer-reviewed publications on topics related to clinical medicine, addiction, and correctional healthcare. I am the author of the book chapter, "Health and Incarceration" in the *Oxford Research Encyclopedia of Criminology and Criminal Justice*. Some of my other notable publications include *"Post-incarceration outcomes of a comprehensive statewide correctional MOUD program: a retrospective cohort study," "Injecting opioid use disorder treatment in jails and prisons: The potential of extended-release buprenorphine in the carceral setting," "Use of long-acting injectable buprenorphine in the correctional setting,"* and *"'It's probably going to save my life;' attitudes towards treatment among people incarcerated in the era of fentanyl."* I am a Fellow in the American College of Physicians (FACP) and a Fellow in the American Society of Addiction Medicine (FASAM). I serve on the Board of Directors for the Academic Consortium for Criminal Justice Health (ACCJH). I have spoken to large audiences at national conferences regarding treatment of addiction in carceral settings.

2

A copy of my current curriculum vitae is attached as Exhibit A, which includes a list of my publications and conference presentations, along with a copy of my Google Scholar Page.

## II. Documents Reviewed

I have considered the materials listed in Exhibit B in forming my opinions. Counsel did not provide me with any other facts or assumptions beyond what is in those materials.

## III. Introduction

This report contains opinions that I am prepared to provide in this case through expert testimony or other means, and explanations of the basis and reasons for them. Among other things, these opinions concern the dangers of alcohol withdrawal and the medical standard of care for treating alcohol withdrawal. These opinions also concern the alcohol withdrawal protocol at the Hampden County Sheriff's Department's Western Massachusetts Regional Women's Correctional Center (WCC) in September and October 2018, as well as the treatment Ms. Madelyn Linsenmeir received for alcohol withdrawal at the WCC in September and October 2018.

In summary, and as further described and explained below, it is my opinion that the WCC's 2018 alcohol withdrawal protocol in place in September and October 2018—which did not require any monitoring of either patient vitals or the severity of withdrawal symptoms after the initial screening—had no medical justification and fell beneath the floor of the bare minimum community medical standards of care for alcohol withdrawal.

At a minimum, after the initial screening, the WCC's alcohol withdrawal protocol should have required either daily monitoring of basic vital signs (including heart rate, blood pressure, temperature and respiratory rate) and/or repeated monitoring of withdrawal symptoms (through tools like Clinical Institute Withdrawal Assessment (CIWA), described herein) for the later of either 24-36 hours or a clinically significant improvement in CIWA score in order to be consistent with medical standards of care.

Similarly, it is my expert opinion that the WCC's failure to take Ms. Linsenmeir's vitals or assess the severity of her withdrawal symptoms for nearly four days, after WCC staff determined she was experiencing alcohol and opioid withdrawal and prescribed chlordiazepoxide (Librium) for alcohol withdrawal, fell beneath the floor of the bare minimum community medical standards of care for alcohol withdrawal. Based on the complete body of information I have reviewed, there was no evidence of medical justification for the failure to monitor Ms. Linsenmeir during this time, and the failure to do so constituted unjustified disregard for known, severe risks, and was unreasonable.

In the body of this report, I will sometimes refer to community medical standards, also referred to as the standard of care. While there are many ways to practice medicine, community medical standards or the standard of care represent the methods most doctors agree upon. These are consistent with the minimum care that a person is likely to receive in a community health center or similar health setting, recognizing that incarcerated individuals are not entitled to the most sophisticated care, but to adequate medical care. It must be noted that these standards represent minimum standards and do not set the

3

standard for good or excellent care but merely minimal acceptable care. My use of the phrase "standard of care" in this report refers to the standard for medical care, not standards of care for other aspects of carceral operations or administration.

There is no separate, lesser, or unequal standard of care for incarcerated individuals; there are merely logistical challenges and reasonable accommodations and modifications of standard medical approaches that are a direct result of the restraints of confinement. But those exceptions and accommodations to security needs should be minimal, rarely interrupt, and never prevent, essential healthcare delivery. To the extent that providing medical care in a correctional setting raises some unique challenges, I draw on my knowledge of standards and practices as a physician experienced in correctional healthcare for 4 years and familiar with standards of the field.

### IV. Alcohol Withdrawal is Medically Dangerous and Can Lead to Death

Alcohol withdrawal is medically dangerous. Although some patients may never experience symptoms or have mild symptoms such as insomnia, many patients may develop a more severe withdrawal syndrome including "delirium tremens" (DTs), a serious complication associated with tachycardia (elevated heart rate), agitation, fever, and hypertension.[1] Severe alcohol withdrawal can also lead to hallucinations, delirium, seizures, and death. Because the onset of more severe symptoms often occurs days after the initial abstinence from alcohol, a medical professional cannot determine with certainty at the outset of withdrawal whether a patient will develop these dangerous symptoms.

Severe alcohol withdrawal is a common life-threatening illnesses and is a common diagnoses in intensive care units (ICUs), the hospital setting for the most seriously ill and injured patients in hospitals.[2] Because the severity of alcohol withdrawal can change quickly, alcohol withdrawal syndrome can be deadly without frequent monitoring. Without treatment, the death rate of delirium tremens can be over 1 in 3.[3]  With appropriate identification, treatment, and monitoring, the mortality rate can be under 5%.[4]

One of the greatest threats of alcohol withdrawal and opioid withdrawal is that it can mimic other pathologies that need urgent attention. This includes psychiatric emergencies, dehydration, infections including endocarditis, cardiac issues, electrolyte abnormalities, gastrointestinal bleeding, and traumatic injury.[5] In particular, patients with a history of injection drug use are at higher risk for infections, including life-

---

[1] Am. Soc'y of Addiction Med. (2020). The ASAM Clinical Practice Guideline on Alcohol Withdrawal Management [hereinafter "ASAM Guideline"]. *J. of Addiction Med.* 2020 May/June; 14 (3S Supp. 1): 1-72, 5, 16. doi: 10.1097/ADM.0000000000000668.
[2] Marik, P. &, Mohedin, B. (1996). Alcohol-related admissions to an inner city hospital intensive care unit. *Alcohol & Alcoholism.* July 31(4): 393-396, 395. doi:10.1093/oxfordjournals.alcalc.a008168.
[3] Rahman, A. & Paul, M. (last updated Aug. 14, 2023). Delirium Tremens. *StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing.* PMID: 29489272.
[4] Yost, D.A. (1996). Alcohol withdrawal syndrome. *Am. Family Physician.* Aug. 54(2): 657-664,-669. PMID: 8701843.
[5] ASAM Guideline at 21 ("While withdrawal severity assessment scales such as the Clinical Instrument Withdrawal Assessment for Alcohol, Revised (CIWA-Ar) score many of the signs and symptoms listed in the DSM-5 Criteria, these scales are nonspecific regarding the etiology of signs and symptoms and high scores may be the result of the presence of other conditions (e.g., dehydration, fever from infection, Graves' Disease). Alcohol withdrawal severity assessment scales are designed to assess the signs and symptoms of withdrawal only once a diagnosis has been established.").

threatening complications like sepsis and infective endocarditis. The need to identify other dangerous underlying conditions is another reason why it is important to maintain the community medical standard for the frequency of monitoring.

In the absence of such practices, staff can mistakenly assume that symptoms suffered by an individual with a substance use disorder are attributable solely to withdrawal, and can ignore or fail to collect information that shows or suggests an additional or alternative illness or disease.[6] It is medically unreasonable to attribute an individual's symptoms solely to a withdrawal syndrome without considering a differential diagnosis. Forcing withdrawal syndromes by undertreating patients can lead to complacency among medical and security staff. For example, jails and prisons that do not provide access to medication for opioid use disorder to people in their custody with OUD will trigger withdrawal symptoms in a large number of people, which may desensitize their staff to these withdrawal symptoms. In such an environment, the risk of failing to consider alternative diagnosis is especially high and dangerous.

In U.S. jails, alcohol was involved in 76% of withdrawal-related deaths.[7] Drugs and alcohol are the third leading cause of death in US jails.[8] In many states in the United States, a large proportion of incarcerated individuals have a substance use disorder, including AUD. As Medical Director at the Rhode Island Department of Corrections, this was one of my most pressing concerns for our awaiting trial population because the dangers of alcohol withdrawal are most acute in the initial period of abstinence from alcohol, and because people experiencing alcohol withdrawal can progress from normal vital signs to becoming very sick quite quickly.[9]

## V.     Minimum Community Medical Standards for Treatment of Alcohol Withdrawal

There are several well-established minimum requirements for the medically reasonable treatment of alcohol withdrawal. My expert opinion on these requirements is based on my training, my years of experience treating people with AUD both inside and outside of the carceral setting, as well as several published guidelines, including the American Society for Addiction Medicine (ASAM) Clinical Practice Guideline on Alcohol Withdrawal Management[10] and the U.S. Department of Justice Guidelines for Managing Substance Withdrawal in Jails.[11] While these guidelines were published in 2020 and 2023,

---

[6] *Id.* at 22 ("While making appropriate differential diagnosis is critical, it should be noted that alcohol withdrawal is often seen in conjunction with other health conditions, including mental health disorders, substance-related disorders, or simultaneous withdrawal from other substances besides alcohol. Therefore, clinicians should not discount the possibility of co-occurring conditions once a diagnosis of alcohol withdrawal has been made.").
[7] Fiscella, K. et al. (2020). Drug- and Alcohol-Associated Deaths in U.S. Jails. *J. of Corr. Health Care.* Apr. 26(2): 183-193, 188. doi: 10.1177/1078345820917356.
[8] *Id.* at 183.
[9] ASAM Guideline at 24 ("However, signs and symptoms can escalate quickly, and the trajectory of alcohol withdrawal can vary considerably among patients.").
[10] *See* note 1, *supra.*
[11] Bureau of Just. Assistance & Nat'l Inst. of Corr., *Guidelines for Managing Substance Withdrawal in Jails: A Tool for Local Government Officials, Jail Administrators, Correctional Officers, and Health Care Professionals* [hereinafter "DOJ Guidelines"] (2023), available at https://www.cossup.org/Content/Documents/JailResources/Guidelines_for_Managing_Substance_Withdrawal_in_Jail

5

respectively, they reflect the minimum medically reasonable protocols to treat people experiencing alcohol withdrawal in 2018. In my expert opinion, regardless of the location of the treatment, the primary components of the community medical standard to treat alcohol withdrawal—which I describe in more detail below—must include:

1. **Screening** for possible alcohol withdrawal and/or complications;
2. **Assessing** severity of alcohol withdrawal symptoms through objective tools such as the CIWA;
3. **Diagnosis**, including ruling out other serious illnesses that mimic the signs and symptoms of alcohol withdrawal;
4. **Treatment** with pharmacotherapy to address symptoms of alcohol withdrawal, typically with benzodiazepines, under certain circumstances; and
5. **Continued monitoring** of vital signs and alcohol withdrawal symptoms.[12]

A medically reasonable protocol must **screen** for the risk of alcohol withdrawal by taking a patient's history of past experiences with alcohol withdrawal including previous alcohol-related seizures, hallucinations, and hospitalizations.[13] This is important because the greatest predictor of severe alcohol withdrawal is a previous episode of severe alcohol withdrawal.[14] This initial screening process can help triage the risk of severe alcohol withdrawal. In the Rhode Island Department of Corrections, our initial intake required screening all incoming individuals for their risk of alcohol withdrawal, including by identifying individuals' current alcohol consumption rate and prior experiences of alcohol withdrawal.

A medically reasonable protocol must **assess** the severity of the symptoms of withdrawal for anyone suspected to be at risk alcohol withdrawal.[15] This is required not just at the initial interaction with a patient, but as described below, must be repeatedly reassessed. Notably, while this assessment is a necessary component of community medical standard for treatment of alcohol withdrawal, it is not sufficient on its own and cannot replace the other elements of a medically reasonable protocol.

The CIWA scale is the most widely used tool to assess severity of symptoms. The CIWA assesses ten symptoms: nausea and vomiting, tremor, auditory and visual disturbances, tactile disturbances, agitation, sweating, anxiety, headache, and disorientation. Each symptom is scored based on its severity, with a total score guiding the intensity of treatment. The CIWA score provides an efficient (<5 mins) and objective means of assessing alcohol withdrawal that can then be utilized in treatment protocols. Higher scores demonstrate higher levels of withdrawal, potentially needing more aggressive

---

s_6-6-23_508.pdf. These guidelines were endorsed by the American Correctional Association (ACA); ASAM; the American Jail Association (AJA); the Major County Sheriffs of America (MCSA); the National Association of Counties (NACo); the National Commission on Correctional Health Care (NCCHC); the National Sheriffs' Association (NSA), but not the NSA Board of Directors; and the Small & Rural Enforcement Executives Association (SRLEEA). *Id.* at i.

[12] ASAM Guideline at, 4-11; DOJ Guidelines at 5-10, 26-30.
[13] ASAM Guideline at 45; DOJ Guidelines at 25.
[14] Sarkar, S. et al. (2017). Risk factors for the development of delirium in alcohol dependence syndrome: Clinical and neurobiological implications. *Indian J. of Psychiatry*. July-Sept. 59(3): 300-305, 303. doi: 10.4103/psychiatry.IndianJPsychiatry_67_17.
[15] ASAM Guideline at 5; DOJ Guidelines at 5, 26-27.

treatments including increased doses of benzodiazepines or transfer to a higher level of care (e.g., an ICU). Many hospitals use CIWA scores to trigger when to dose benzodiazepines for alcohol withdrawal treatment. The Rhode Island Department of Corrections assesses the severity of withdrawal symptoms using the CIWA for any individual whose screening indicated a potential risk of alcohol withdrawal.

A medically reasonable protocol must ensure an appropriate diagnosis which includes **ruling out other serious illnesses** that can mimic the signs and symptoms of alcohol withdrawal.[16] A core tenet of addiction medicine is to not assume symptom presentation is always due to intoxication or withdrawal syndromes. Indeed, the definitive diagnosis of "alcohol withdrawal syndrome" is based on the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-V).[17] As noted by the DSM-V, numerous medical conditions can mimic alcohol withdrawal.[18] When patients present with some symptoms consistent with alcohol withdrawal, they may also present other symptoms that are unlikely to be caused by alcohol withdrawal or are otherwise suggestive of an alternative illness. As a result, the DSM-V diagnostic criteria for alcohol withdrawal explicitly includes ruling out other medical causes of any symptoms.[19] Health care providers at the Rhode Island Department of Corrections incorporate this into their assessment of people at risk for alcohol withdrawal. This is critical because concurrent medical conditions "may (a) complicate the course of alcohol withdrawal and/or (b) necessitate their own treatment interventions."[20]

A medically reasonable protocol must provide **treatment with** pharmacotherapy to help address the symptoms of alcohol withdrawal and prevent progression of withdrawal under appropriate circumstances.[21] Benzodiazepines (e.g., chlordiazepoxide, which could be

---

[16] DOJ Guidelines at 26; ASAM Guideline at 4-5.
[17] Am. Psychiatric Ass'n. *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013). https://doi.org/10.1176/appi.books.9780890425596.
[18] ASAM Guideline at 22. ("For example, the DSM 5 notes that medical conditions including hypoglycemia and diabetic ketoacidosis both can mimic alcohol withdrawal, and an essential tremor may mimic tremors associated with alcohol withdrawal.").
[19] The relevant DSM-V diagnostic criteria are reproduced below:

| Table 1. DSM-5 Diagnostic Criteria for Alcohol Withdrawal Syndrome | |
|---|---|
| A | Cessation of (or reduction in) alcohol use that has been heavy and prolonged |
| B | Two (or more) of the following, developing within several hours to a few days after the cessation of (or reduction in) alcohol use described in Criterion A:<br>1. Autonomic hyperactivity (e.g., sweating or pulse rate greater than 100 beats per minute)<br>2. Increased hand tremor<br>3. Insomnia.<br>4. Nausea or vomiting<br>5. Transient visual, tactile, or auditory hallucinations or illusions.<br>6. Psychomotor agitation.<br>7. Anxiety.<br>8. Generalized tonic-clonic seizures |
| C | The signs or symptoms in Criterion B cause clinically significant distress or impairment in social, occupational, or other important areas of functioning |
| D | **The signs or symptoms are not attributable to another medical condition** and are not better explained by another mental disorder, including intoxication or withdrawal from another substance |

*See* Am. Pyschiatric Ass'n, *supra* note 17.
[20] ASAM Guideline at 27.
[21] ASAM Guideline at 10-11; DOJ Guidelines at 30.

prescribed under the brand name "Librium" in 2018), are the first-line treatment for alcohol withdrawal.[22] Patients experiencing moderate or several alcohol withdrawal—i.e., patients with CIWA scores of 10 or above—should receive pharmacotherapy.[23] Patients experiencing mild alcohol withdrawal—i.e., patients with CIWA scores below 10—may still be provided pharmacotherapy.[24] Patients who receive pharmacotherapy require consistent monitoring of vitals and symptoms to determine whether there are signs of over-sedation or respiratory depression,[25] as well as to determine if the treatment is succeeding or if the condition is worsening. For example, at the Rhode Island Department of Corrections, for mild alcohol withdrawal (CIWA <10), we would prescribe 50mg of Librium and continue medications with another benzodiazepine (Ativan) based on subsequent CIWA scores.

Finally, regardless of whether a patient is provided with pharmacotherapy, a medically reasonable protocol must provide **continued monitoring** of the patient's vitals (including heart rate, blood pressure, temperature, and respiratory rate) and/or symptom severity (through tools like CIWA). This is critical because while the symptoms of alcohol withdrawal can begin within 6-24 hours of the last alcohol consumption, more severe indicators start later,and may emerge 72-96 hours after the last drink.[26] Thus, even if initial vital signs are relatively normal on the first recording, community medical standards dictate that it is important to continue to monitor vitals and symptoms in the early, high-risk period of alcohol withdrawal.[27] Early identification and treatment is vital in reducing the risk of progressing to severe alcohol withdrawal syndrome,[28] or leaving other serious medical issues untreated. For example, tachycardia (elevated heart rate), hypertension (elevated blood pressure), fever (elevated body temperature), and tachypnea (elevated respiratory rate) may indicate worsening severity of withdrawal, but they also suggest the presence of concurrent medical issues, such as infection, that require further treatment.

A health care professional must conduct the monitoring of vitals and/or symptom severity for a patient at risk of alcohol withdrawal syndrome. A correctional officer, who is not medically trained, cannot substitute for an assessment by a health care professional.

While there is some variation in the frequency of the medically necessary monitoring of vitals and withdrawal symptoms based on the severity of the withdrawal and the location of the treatment, *any* medically reasonable protocol—regardless of the severity of the withdrawal or the location of the treatment— requires at a minimum *some* continued monitoring of vitals and/or withdrawal symptoms after the initial screening.

For example, the ASAM guidelines recommend that the vitals and symptoms of patients with moderate or severe withdrawal *or* patients on pharmacotherapy who are receiving

---

[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] ASAM Guideline at11.
[26] DOJ Guidelines at 26.
[27] *Id.* at9 ("Individuals who screen positive for substance withdrawal risk, even if they appear well, should be monitored for the emergence of withdrawal indicators.").
[28] Saitz, R. (1998). Introduction to alcohol withdrawal. *Alcohol Health Rsch. World.* 22(1): 5-12, 7-12. PMID: 15706727.

inpatient treatment should be monitored every 1-4 hours until their symptoms receive a CIWA score below 10 for 24 hours, at which point the frequency of the monitoring can decrease to every 4-8 hours for 24 hours.[29] The ASAM Guidelines recommend observation of vitals and symptoms for up to 36 hours for patients who experience minimal symptoms of withdrawal and who are not on pharmacotherapy.[30] For those patients who are receiving treatment for alcohol withdrawal in an outpatient setting, the ASAM guidelines still recommend daily monitoring for up to five days.[31]

Even in a jail setting, at a minimum "[a]ll patients undergoing withdrawal from any substance should" still "be monitored regularly for changes in condition."[32] The Department of Justice Guidelines recommend that the vitals and symptoms of a patient whose screening indicate a potential risk of withdrawal be monitored ***"at least* every 8 hours until the score remains below 10 for 24 hours."** [33](emphasis in original). "More frequent monitoring should be conducted if clinically indicated."[34] In my experience overseeing the care of patients experiencing withdrawal, instances in which more frequent monitoring is clinically indicated include, but are not limited to, if someone's CIWA score begins to increase (even if it remains below 10), if someone develops new concerning symptoms, if someone has new vital sign abnormalities, if someone has side effects to the prescribed medication (including but not limited to disorientation, decreased respiratory rate) or other major changes to their health including new symptoms or difficulty with ambulating or other activities of daily living. A key purpose of monitoring is to determine if someone's medical condition is deteriorating over time, as this could indicate worsening alcohol withdrawal syndrome and/or the presence of another acute illness that warrants further assessment. As a result, it would fall beneath the floor of the community medical standard to ignore indications that a person's health is trending in the wrong direction.

During my time as medical director at the Rhode Island Department of Corrections, our protocol had nurses check CIWA scores of patients whose screening indicated a potential risk of withdrawal 3 times a day until the patient's CIWA score remained below 10 for 48 hours. In my experience overseeing the care of patients experiencing withdrawal, many patients who demonstrate normal vital signs or CIWA scores during their first 24 hours of incarceration can still later develop severe alcohol withdrawal that necessitated transport for hospitalization.

The availability of a sick call procedure where a patient can voluntarily request medical attention cannot replace regularly scheduled monitoring of vitals and/or symptom severity for a patient at risk of alcohol withdrawal syndrome. It is medically inappropriate to place the onus for the standard of care on a patient who is at risk of alcohol withdrawal syndrome.

---

[29] ASAM Guideline at 9.
[30] ASAM Guideline at 9.
[31] ASAM Guideline at 7.
[32] DOJ Guidelines at 15. *See also* Nat'l Comm'n for Corr. Healthcare, *Standards for Health Services in Jails* (2018), Jail Health Standard J-F-04 "Medically Supervised Withdrawal and Treatment," at 118-119 ("Individuals showing signs of intoxication or withdrawal are monitored by qualified health care professionals using approved protocols as clinically indicated until symptoms have resolved.").
[33] DOJ Guidelines at 28.
[34] *Id.*

9

VI. **The WCC's alcohol withdrawal protocol in 2018, and its course of interactions with Madelyn Linsenmeir, did not meet the minimum community medical standards.**[35]

I have reviewed the WCC alcohol withdrawal protocols that were in place in 2018. **P & P, 4.2.11 (4/2018) HCSD 3013-3020; P & P 4.2.12 (4/2018) HCSD 3021-3029; Nursing Protocol, Withdrawal: Alcohol, Barbiturates, Benzodiazepines, and Some Other Sedative Drugs (8/2/17) HCSD 5221-5241.** It is my expert opinion that the alcohol withdrawal protocols that were in place in 2018 at the WCC did not meet the minimum community medical standards and fell beneath the floor of medical reasonableness.

The WCC's alcohol withdrawal protocols that were in place in 2018 required staff to screen for potential alcohol withdrawal, assess the severity of alcohol withdrawal symptoms using the CIWA, conduct a physical assessment of the patient, and provide Librium if prescribed by a nurse practitioner or doctor. **P & P, 4.2.11 (4/2018) HCSD 3017; Nursing Protocol, Withdrawal: Alcohol, Barbiturates, Benzodiazepines, and Some Other Sedative Drugs (8/2/17) HCSD 5221-5222.** However, the alcohol withdrawal protocols that were in place in 2018 at the WCC did not require *any* continued monitoring of a patient's vital signs or severity of withdrawal symptoms after the initial screening. **P & P, 4.2.11 (4/2018) HCSD 3013-3020; P & P 4.2.12 (4/2018) HCSD 3021-3029; Nursing Protocol, Withdrawal: Alcohol, Barbiturates, Benzodiazepines, and Some Other Sedative Drugs (8/2/17) HCSD 5221-5241; Keisha Williams Depo. pgs 60, 81-86.** The biggest failure of the WCC's alcohol withdrawal policy in place in 2018 was this lack of monitoring. This critical failure has no medical justification, especially as the WCC's own protocols at the time correctly recognized that the onset of withdrawal-induced seizures could be "6-48 hours after last drink," the onset of withdrawal induced hallucinosis could be "12-48 hours after last drink," and the onset of delirium tremens could be "48-96 hours after last drink." **Nursing Protocol, Withdrawal: Alcohol, Barbiturates, Benzodiazepines, and Some Other Sedative Drugs (8/2/17), HCSD 5221.** Such continued monitoring is not only necessary, but possible, in a carceral setting, as demonstrated by the DOJ's Guidelines and my own experience at the Rhode Island Department of Corrections, as well as the WCC's new policy implemented in August 2022, which requires the monitoring of the vital signs and symptoms of any prisoner at risk of alcohol withdrawal (a) every 8 hours for the first 24 hours; (b) once the CIWA score is at 9 or below, every 12 hours for 24 hours, and (c) once the CIWA score is at 5 or below, daily for two days. **Wellness Assessment Check 8-26-22, HCSD 6511; Keisha Williams Depo. 55-65.**

I have reviewed records, videos and other information pertaining to Madelyn Linsenmeir from her time at the WCC in 2018. It is my expert opinion that the WCC's course of interactions with Ms. Linsenmeir relating to her substance use disorders and withdrawal did not meet the minimum community medical standards and constituted disregard of known, severe medical risks.

---

[35] The citations to the record included in this report are illustrative, but not exhaustive, and in presenting my opinion I may reference any materials that I have reviewed to this point or will otherwise receive during the course of my engagement.

10

During Ms. Linsenmeir's initial screening on September 30, 2018, medical staff asked about her current consumption of alcohol and opioids, **WCC Medical Records wo Metadata, HCSD 750-751,** assessed the severity of her symptoms using the CIWA and COWS tools, *id.* **HCSD 752-753,** and measured her vitals, *id.* **HCSD 755.** In addition, the records indicate that Ms. Linsenmeir was prescribed Librium as a part of her withdrawal treatment. *Id.* **HCSD 757; Patient Dispense List HCSD 4483.** However, there is no evidence that medical staff inquired into Ms. Linsenmeir's history of past experiences with alcohol withdrawal including previous alcohol-related seizures, hallucinations, and hospitalizations, **WCC Medical Records wo Metadata, HCSD 747-766; Jennifer Wisnaskas Depo. pgs. 54-58, 70-87; Maureen Couture Depo. pgs. 30-31, 37-42, 54-66,** which is critical to assessing the risk of severe alcohol withdrawal. This failure had no medical justification, did not meet the minimum community medical standards, was medically unreasonable, and constituted disregard of known, severe medical risks.

Finally, there is no evidence that any WCC staff member ever evaluated Ms. Linsenmeir's vital signs or the severity of symptoms in the nearly four days between her initial intake on September 30, 2018 and the morning of October 4, 2018 when she was found on the floor of her cell. The daily medical records for October 1, October 2, and October 3 are all blank, as is the initial October 4 daily medical record, and lack any record of Ms. Linsenmeir's vital signs or symptom severity, **WCC Medical Records wo Metadata, HCSD 758, 760, 761, 763**. The nurse conducting the daily medical rounds on October 2, 3 and in the early morning of October 4 stated that she did not walk past or look inside Ms. Linsenmeir's cell on October 2 or October 4, **Joan Walden Depo. pgs. 68-74, 75-80**—which is reflected in the video, **1A Get Supper Then to Bed for Night, 10/1/18 Video; Second and Third and Day Shift Until Ambulance Video**—and the video of daily medical rounds on October 3 depicts that same nurse looking into the cell without any evidence of any further interaction, **Locked in for Night to Morning 10/3/18 Video; Joan Walden Depo. pgs 65-67.** No medical staff otherwise mentioned monitoring Ms. Linsenemeir's vital signs or symptom severity during this time, **Jennifer Wisnaskas Depo. pg. 90; Maureen Couture Depo. pgs. 88-93, 117-135.**

Instead, it appears the first time the staff took Ms. Linsenmeir's vitals after her initial intake was later in the morning of October 4, 2018, when she was found unresponsive in her cell, **WCC Medical Records wo Metadata, HCSD 764-765.** For a period of roughly four days after Ms. Linsenmeir's intake, the only documented medical care provided to her other than prescribed medication was a routine tuberculosis test and a routine sexually transmitted infection screening. **Patient Dispense List, HCSD 4483; WCC Medical Records wo Metadata, HCSD 759, 762.** That course of interaction is manifestly insufficient under the prevailing community medical standards, has no conceivable medical justification, and disregards known, potentially severe risks presented by Ms. Linsenmeir's diagnosed withdrawal.

Simply put, failing to monitor the vital signs and symptom severity of a patient with presumed alcohol syndrome for four days falls below the bare minimum community medical standard that would apply in any setting. At the Rhode Island Department of Corrections, in accordance with community medical standards, we never would have failed to monitor the vitals or symptom severity of a patient with presumed alcohol withdrawal syndrome for four days. Given that the WCC had diagnosed Ms. Linsenmeir with alcohol

11

withdrawal and prescribed her Librium for that condition, it was medically unreasonable to not check her vital signs or symptom severity at any point after intake. On my review of the records provided to me, there is no evidence that would justify this failure to monitor.

In and of itself, the WCC's failure to monitor Ms. Linsenmeir's vital signs and symptom severity for nearly four days after her intake was medically unjustified, disregarded known risks, and fell below the bare minimum community medical standard that would apply in any setting. Additionally, there is other information that confirms the insufficiency of the WCC's actions in Madelyn's particular case.  For example, the WCC's records document that Ms. Linsenmeir reported pain in her "Torso (Chest, Back)" upon intake. **Jail Management System HCSD 3520.** There is no evidence that medical staff conducted a differential diagnosis to determine the basis for Ms. Linsenmeir's report of pain in her chest or back. **WCC Medical Records wo Metadata, HCSD 747-766; Jennifer Wisnaskas Depo. pgs. 51-52, 54-58, 70-87; Maureen Couture Depo. pgs. 27-28, 30-31, 37-42, 54-66.** Additionally, I have reviewed video of Ms. Linsenmeir using a wheelchair after her tuberculosis screening in medical on October 1, **Leaving Medical After Court 10.1.18 Video; Samantha Ferriter Depo. pgs. 48, 67-68,** as well as video of Ms. Linsenmeir falling while climbing a set of stairs on October 2 on her way to medical on October 2, **Medical on 10.2.18 Video; Going to Stairs 10.2.18 Video; South Stairs to Med on 10.2.18 Video; Maureen Couture Depo. pgs. 100, 120.** I also reviewed a log stating "medical called for inmate m. linsenmeir" on October 1 at 6:15 pm, along with a note "she'll be okay," without further explanation or documentation that vitals or symptom severity were measured or any other examination performed, **Officer Shift Report, HCSD 138-150; Keisha Williams Depo. pgs. 182-193.** I have also reviewed a declaration from one of Ms. Linsenmeir's cellmates during her time at the WCC, where she states that she heard Ms. Linsenmeir complain to WCC staff members that her chest and head hurt, **2023.06.16 Declaration of Haylee Champagne,** and the deposition testimony of another one of Ms. Linsenmeir's cellmates during her time at the WCC who testified that Ms. Linsenmeir could not get out of bed and had to crawl to use the bathroom, **Sandi Daily Deo. pg. 45.** Although the WCC's actions would have been medically unjustified and insufficient even in the absence of such information, this information presents further clinical indications that Ms. Linsenmeir's condition was deteriorating, and that she required medical assessment and care. Accordingly, while not necessary to my conclusions regarding the WCC's action, this information provides additional support for my opinions.

As infective endocarditis progresses, patients will experience elevated heart rates and become febrile. Based on my experience, it is my opinion that Ms. Linsenmeir's vitals would have continued to deteriorate over the course of her time at the WCC. As a result, had she received regular monitoring, her underlying pathology of infective endocarditis could have been identified in time to save her life.

**Compensation**

I provided my services pro bono for this report, and will provide pro bono services if I am called to testify at a deposition or in court. I have been engaged as an expert in other cases, but have never testified at trial or deposition.

Sincerely,

*Justin Berk, MD*

Justin Berk, MD MBA MPH

Dated:    November 11, 2023