# EXHIBIT B

Page 1

```
            UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS


MAURA O'NEILL, as Administrator of
the Estate of Madelyn E. Linsenmeir

  V.                  No. 20-30036-MGM

CITY OF SPRINGFIELD, MOISES
ZANAZANIAN, REMINGTON MCNABB,
SHEILA RODRIGUEZ, HAMPDEN COUNTY
SHERIFF'S DEPARTMENT, EILEEN
BARRETT and MAUREEN COUTURE



DEPOSITION OF: JUSTIN BERK, M.D., taken before
Sarah L. Mubarek, Notary Public, pursuant to Rule 30
of the Federal Rules of Civil Procedure, via
videoconference, on March 29, 2024, commencing at
8:03 a.m.



APPEARANCES:
(Please see page 2)









              Sarah L. Mubarek, RPR
                 Philbin & Associates
          75 Market Place, Springfield, MA 01103
```

Page 2

```
REMOTE APPEARANCES:

For the Plaintiff:
American Civil Liberties Union Foundation of
Massachusetts, Once Center Plaza, Suite 850, Boston,
Massachusetts 02108.
BY: DANIEL L. MCFADDEN, ESQUIRE

Goulston & Storrs, P.C., 400 Atlantic Avenue,
Boston, Massachusetts 02110.
BY: JULIUS A. HALSTEAD, ESQUIRE

For the Defendants:
Reardon, Joyce & Akerson, P.C., 4 Lancaster Terrace,
Worcester, Massachusetts 01606, for Moises
Zanazanian.
BY: JOHN K. VIGLIOTTI, ESQUIRE

Egan, Flanagan & Cohen, P.C., 67 Market Street,
Springfield, Massachusetts 01102, for Hampden County
Sheriff's Department.
BY: THOMAS E. DAY, ESQUIRE

Also Present: Maura O'Neill and Noah Berthiaume
```

Page 3

```
                    I N D E X

WITNESS:         EXAMINATION              PAGE

JUSTIN BERK      Direct by Mr. Day        6



EXHIBITS       DESCRIPTION                PAGE

Deposition 1   Berk Expert Report         49
Deposition 2   RI DOC Alcohol Withdrawal  104
               Protocol
Deposition 3   Linsenmeir Intake Health   164
               History
Deposition 4   WCC Alcohol Withdrawal     181
               Protocol

(Exhibits retained by Mr. Day.)
```

Page 4

```
              S T I P U L A T I O N S


    It is agreed by and between the parties that
all objections, except objections as to the form of
the question, are reserved to be raised at the time
of trial for the first time.

    It is further agreed by and between the
parties that all motions to strike unresponsive
answers are also reserved to be raised at the time
of trial for the first time.

    It is further agreed that the deponent will
reserve the right to read and sign the deposition
and the sealing of said deposition will be waived.

    It is further agreed by and between the
parties that notification to all parties of the
receipt of the original deposition transcript is
also hereby waived.



                     *****
```

241

1 report.
2  Q. And you're not rendering an opinion that
3 any of the treatment with regard to opioid
4 withdrawal at the WCC at the time that Madelyn
5 Linsenmeir was there was improper?
6  A. I was not asked to provide an opinion on
7 that.
8  Q. Okay. And you're not rendering an
9 opinion that outside of the opioid policies,
10 procedures and protocols, that there were other
11 substance abuse protocols that should have been in
12 place that were not, is that correct?
13  A. I think that that's right. I wasn't
14 asked to render an opinion on that, have not
15 rendered an opinion on that in the expert report.
16    MR. DAY: If we can go off the record
17 for just a couple of minutes, I think I can wrap up
18 fairly quickly. My goal is to get you out of here
19 by 5:00, Doctor.
20    MR. MCFADDEN: All right. Why don't
21 we come back in five.
22    MR. DAY: Sounds good.
23    (Brief recess is taken.)
24  Q. Again, I apologize. I'm going to jump

242

1 around a little bit. In your report on page 12, you
2 said, "As infective endocarditis progresses,
3 patients will experience elevated heart rates and
4 become febrile," correct?
5  A. That's correct.
6  Q. And are you an expert with regard to the
7 treatment of endocarditis?
8    MR. MCFADDEN: Objection.
9  A. I have treated endocarditis. I have
10 knowledge of infective endocarditis. I would
11 consider myself a medical expert, but not an
12 infectious disease expert certainly, no.
13  Q. But you would consider yourself a medical
14 expert with regard to the disease infective
15 endocarditis?
16  A. I think part of my medical training and
17 clinical practice is being able to identify and even
18 initiate treatment of infective endocarditis.
19  Q. As an internist?
20  A. That's right.
21  Q. And you're not an infectious disease
22 specialist, correct?
23  A. I am not an infectious disease
24 specialist.

243

1  Q. And when you say initiate treatment for
2 infective endocarditis, if you have a patient with
3 infective endocarditis, are you typically going to
4 be the doctor that handles the treatment of that
5 patient from beginning to end?
6  A. If I am taking care of a patient with
7 infective endocarditis in a hospital setting, I
8 would be, as the hospitalist, the person arranging
9 the treatment, starting the treatment, taking
10 recommendations from the infectious disease
11 specialist. I would consult infectious diseases,
12 but yes, would start treatment.
13  Q. In your career, how many patients have
14 you provided treatment for with infective
15 endocarditis?
16  A. I think it's a little tough to say, but
17 I'd say over the past eight years, probably between
18 10 and 20 patients.
19  Q. And in any of those situations, were you
20 the only doctor providing treatment to those
21 patients for their infective endocarditis?
22  A. No.
23  Q. So fair to say in every one of those
24 situations, you had a specialist in infective

244

1 endocarditis who was also providing treatment?
2  A. I would say specialists in infectious
3 disease, yes. I always had a consulting specialist
4 in infectious disease.
5  Q. Is it fair to say you would never be the
6 sole doctor treating somebody with infective
7 endocarditis? You would always bring in a
8 specialist?
9  A. I think that is a fair assessment to
10 make, yes.
11  Q. And you state in your report, "Based on
12 my experiences, it is my opinion that
13 Ms. Linsenmeir's vitals would have continued to
14 deteriorate over the course of her time at the WCC."
15 Do you see that?
16  A. Yes.
17  Q. And what experience is that based on?
18  A. Knowledge of the progression of infective
19 endocarditis, both through clinical experience, but
20 also knowledge of the progression of diseases like
21 infective endocarditis.
22  Q. And what particular vitals would have
23 deteriorated?
24  A. I think she would most likely be febrile

245

1  and tachycardic or have an elevated heart rate.
2       Q.    Did you see any evidence in the records
3  that she was febrile while she was at the WCC?
4       A.    Again, I think there was a lack of
5  evidence. There was no temperature taken. There
6  was no heart rate taken. I think at the time that
7  EMS was called, she was diaphoretic and febrile, if
8  I remember right. But there was no objective
9  evidence collected regarding her vital signs during
10 the four days she was there.
11      Q.    Did you review the medical records of the
12 EMS providers in drafting your opinion, and in
13 particular this opinion in the final paragraph of
14 page 12?
15      A.    I feel confident that opinion in the last
16 paragraph was not -- did not need to be based on the
17 EMS reports, and that did not inform my opinion that
18 she had infective endocarditis, and I think would
19 have had worsening symptoms had anyone taken her
20 vitals. She would have had worsening vital signs if
21 anyone had taken her vitals.
22      Q.    But you didn't review the EMS records in
23 arriving at that opinion?
24            MR. MCFADDEN: Objection.

246

1       A.    The EMS records were not directly
2  informing that opinion.
3       Q.    But my question was a little bit
4  different than that, Doctor. My question is you
5  didn't review -- did you review the EMS records in
6  forming that opinion?
7       A.    Whatever I reviewed is in Exhibit B. If
8  it's not listed in Exhibit B, then I did not review
9  it.
10      Q.    Okay. In the last sentence you state,
11 "As a result, had she received regular monitoring,
12 her underlying pathology of infective endocarditis
13 could have been identified in time to save her
14 life." Are you providing an expert opinion there or
15 is that just conjecture on your part?
16      A.    I would say I have a medical expert
17 opinion that an individual with a severe infection
18 like infective endocarditis is going to have
19 clinical deterioration, as she did up until her
20 death, and if you can identify it and treat it
21 earlier, the likelihood of survival is far greater
22 than without treatment, and that's based on my
23 medical expertise. So I think that would be a
24 medical opinion.

247

1       Q.    Okay. And so is that what your medical
2  opinion actually is?
3       A.    Yes, as I put in the report.
4       Q.    But what you just said, Doctor, is in a
5  significant way different from that final sentence
6  of your report. The final sentence of your report
7  is specific to Madelyn Linsenmeir, correct? It's
8  referring to saving her life, right?
9       A.    That's correct.
10      Q.    And what you just said, if I'm
11 understanding you correctly, is that if you identify
12 the symptoms of infective endocarditis and initiate
13 treatment earlier, the chances of survival are far
14 greater, correct?
15      A.    That's right, and that would apply to
16 her.
17      Q.    That's a general statement that's not
18 specific to Madelyn Linsenmeir, correct?
19            MR. MCFADDEN: Objection.
20      A.    I would say it applies to her. I would
21 apply it to her, as I did in my report.
22      Q.    So how much earlier?
23      A.    I think that is a tough estimate to give,
24 and I would not want to guess.

248

1       Q.    And is it fair to say that you're not
2  qualified to provide an opinion as to how much
3  earlier would have saved Madelyn Linsenmeir's life?
4       A.    I would say it is within my scope of
5  expertise to say if you treat infective endocarditis
6  earlier, the morality rate is better. I would teach
7  that to medical students on rounds and feel
8  comfortable with that statement. To say at what day
9  does the mortality drop from a certain level to
10 another is outside of my scope of expertise.
11      Q.    Okay. That is what you're saying in that
12 final sentence though, right? You're not saying --
13 I mean, it seems like you're saying two very
14 different things. One of the things you're saying
15 is if you catch the infection earlier, the chances
16 of survival are greater. I don't think anybody
17 would disagree with you on that. But that's what
18 just said to me, right?
19      A.    Yes.
20      Q.    Okay. But then in this final sentence,
21 you're saying something very different. You're
22 talking about Madelyn Linsenmeir's situation
23 specifically, and you're saying that if she had
24 received regular monitoring of her alcohol

249

1 withdrawal, her infective endocarditis would have
2 been identified in time to save her life, right?
3 That's what you're saying there?
4  A.  I'm saying it could have, certainly. The
5 matter of days I feel confident saying can be
6 significant. If a person is going to the hospital
7 when they're in critical illness, they're not going
8 to be doing as well as if they go to the hospital
9 before they're in critical illness. I feel
10 comfortable saying that. While specific hours might
11 be tough, certainly I feel comfortable and it's
12 within the scope of my expertise to say if someone
13 was treated days before, they would do better and
14 have a higher likelihood of survival.
15  Q.  Okay. So is what you're trying to say
16 there in this last paragraph, that if Madelyn had
17 been -- if her infective endocarditis had been
18 identified earlier, she would have had a higher
19 likelihood of survival?
20  A.  That's right. A substantially higher
21 likelihood of survival, that's right.
22  Q.  Okay. But you're not saying that if
23 Madelyn's infective endocarditis were identified
24 sooner in her stay at the WCC, she would have more

250

1 likely than not survived? That's not what you're
2 saying, right?
3       MR. MCFADDEN: Objection.
4  A.  I would not be able to give the exact
5 mortality benefits or exact morality rates if it was
6 one day or two days prior. If she was identified as
7 having a significant illness before she was
8 critically ill, I can say more likely than not, her
9 treatment would be successful, and that there is a
10 good chance that she would have a higher likelihood
11 of mortality.
12       We certainly cannot predict who lives or
13 dies in medicine with extreme certainty, but it is
14 very clear that earlier treatment of infective
15 endocarditis has improved outcomes, and that does
16 not require an infectious disease fellowship to
17 understand.
18  Q.  And I don't have any problem with that.
19 However, what I have a problem with is that is
20 definitely not what you're saying in this last
21 paragraph.
22       MR. MCFADDEN: Objection.
23  Q.  Do you agree with me?
24  A.  I would stand by what I say in the

251

1 report. "As a result, had she had regular
2 monitoring, her underlying pathology of infective
3 endocarditis could have been identified in time to
4 save her life."
5  Q.  When you say, "Could have been identified
6 in time to save her life," that includes the
7 possibility that it might not have been identified
8 in time to save her life as well, correct?
9       MR. MCFADDEN: Objection.
10  A.  I cannot say that --
11  Q.  You're not saying it definitely would
12 have, right?
13  A.  That's right. I wouldn't be able to
14 speak in definite terms.
15  Q.  Okay. So then, and this is very
16 important for an expert opinion, are you providing a
17 likelihood there? Are you saying that -- when you
18 say, "Could have been identified in time to save her
19 life," are you saying that it is more likely than
20 not that she would have survived if she had gotten
21 regular monitoring of her alcohol withdrawal
22 symptoms?
23  A.  I think it's tough to say. I think I
24 can't say with extreme confidence. However, what I

252

1 can say and feel strongly, is that before she was
2 critically ill, if she had access to treatment for
3 infective endocarditis, the survival is much better.
4 More detail probably does require a subspecialist
5 expert, but I feel comfortable with what I've said
6 in the report.
7  Q.  Okay. But you don't have -- and what are
8 you basing what you've said in that last paragraph
9 of the report? Are you basing that on the 10 to 20
10 patients that you've treated with infective
11 endocarditis?
12       MR. MCFADDEN: Objection.
13  A.  I would base it not only on my clinical
14 experience, but in medicine, a large part of the
15 lifelong training is the study of medicine, and
16 education and training, and reading about disease
17 processes and discussing them in academic settings.
18 There are plenty of rare diseases that people don't
19 see often, but have an understanding of because, as
20 physicians, we're doing a lot of training and
21 education and things.
22       So I've seen 10 to 20 infective
23 endocarditis, but have talked about infective
24 endocarditis thousands of times and shared cases

253
1  with others. So I feel comfortable about my basic
2  knowledge of infective endocarditis.
3     Q.  Okay. And do you base your opinion in
4  the final paragraph -- do you have any authority,
5  such as you have in other parts of your opinion, to
6  support that opinion? Do you have any studies, any
7  journal articles, anything like that?
8     A.  I do not in my report or in my deposition
9  now have citations or references for that statement.
10    Q.  Okay. Do you know how long Madelyn had
11 been suffering from infective endocarditis when she
12 arrived, as of the time that she arrived at the WCC?
13    A.  Based on my review of the medical
14 records, I believe she had infective endocarditis
15 the day she arrived at the WCC.
16    Q.  That's based on what medical records?
17    A.  One of the complaints of knee pain, and
18 then ultimately having septic emboli to the knee
19 from infective endocarditis is a good sign that that
20 knee pain was not from a baseball bat, but I think a
21 septic emboli from infective endocarditis.
22    Q.  Are there any other medical records that
23 you're basing that opinion?
24    A.  Truthfully, the major part of my opinion

254
1  was how the alcohol withdrawal monitoring could have
2  helped identify the infective endocarditis. I
3  wasn't asked specifically as an infective
4  endocarditis expert. I would say that's where I --
5  that's the information that informed that opinion.
6  I don't know that there's more.
7        MR. MCFADDEN: Tom, sorry. Can I
8  interject? I think there might have been a
9  misunderstanding on one of the questions. Were you
10 asking how long before Madelyn got to the WCC she
11 had started to have endocarditis?
12       MR. DAY: Yeah, I'm going to follow
13 up on that, Dan.
14       MR. MCFADDEN: I just had that
15 question. I'm sorry.
16       MR. DAY: I appreciate that. I'm
17 going to follow up on that.
18    Q.  Doctor, I understand that you've provided
19 an opinion that Madelyn's alcohol withdrawal should
20 have been regularly monitored, correct?
21    A.  That's correct.
22    Q.  And you believe that's within your area
23 of expertise, right?
24    A.  That's correct.

255
1     Q.  And you also admit that you are not an
2  expert with regard to infective endocarditis, right?
3        MR. MCFADDEN: Objection.
4     A.  I would say that I have some level of
5  expertise, far more than the lay person, in
6  infective endocarditis, but I am not an infectious
7  disease subspecialist.
8     Q.  Okay. And you're also not a lawyer, but
9  you understand that the statement at the end of your
10 report is incredibly significant to this case,
11 correct? You can understand that, right?
12    A.  And I stand by that, yes.
13    Q.  So in that final paragraph, you're making
14 a giant leap from your opinion that the monitoring
15 was not appropriate, to if the monitoring that I
16 would have liked to have seen had been done, Madelyn
17 would have -- Madelyn's infective endocarditis would
18 have been discovered in time to provide her with the
19 treatment that would have saved her life. I mean,
20 that's the leap you're making, correct?
21       MR. MCFADDEN: Objection.
22    A.  I would say that if the standard of care
23 for continued monitoring for alcohol withdrawal were
24 aligned to, I'm putting that context into it, it

256
1  would have given an opportunity to identify a person
2  with a severe illness, who ultimately succumbed and
3  died to that severe illness, and could have not died
4  due to that illness had she had appropriate
5  monitoring.
6     Q.  So it's a possibility that if she had had
7  appropriate monitoring, they might have discovered
8  the infective endocarditis, and it might have been
9  early enough that treatment could have been
10 instituted, and she would not have died from the
11 infective endocarditis. That's what you're saying,
12 right? It's a possibility?
13       MR. MCFADDEN: Objection.
14    A.  I would say it's more likely than not
15 that someone's who's about to die from infective
16 endocarditis is going to demonstrate signs or
17 symptoms of infective endocarditis, which can
18 include fever, can include diaphoresis, can include
19 tachycardia. All of these things would almost
20 certainly draw a red flag if she was receiving
21 continued monitoring for underlying alcohol
22 withdrawal.
23    Q.  Again, I don't want to put too fine a
24 point on this, but this is an incredibly important

257

1  point. You state that her infective endocarditis
2  could have been identified in time to save her life.
3  Are you saying could have been identified to a
4  reasonable degree of medical certainty, more likely
5  than not?
6      MR. MCFADDEN: Objection.
7  A.  I think it's tough for me to say that
8  with complete confidence, though again, I think -- I
9  would bet on it that I think more likely than not,
10 yeah. Look. If a patient has infective
11 endocarditis, they're going to have symptoms that if
12 you're monitoring, you're going to pick up on.
13       If a patient has infective endocarditis
14 and you can get earlier treatment, I don't know that
15 I can say it's more likely than not they're not
16 going to die, but I'd say more likely than not,
17 they're going to have significantly improved
18 outcomes. That I feel confident saying. I think
19 that my report -- we might disagree, but I think my
20 report appropriately captures that.
21 Q.  But you're not saying more likely than
22 not, she would have -- Madelyn Linsenmeir would have
23 survived if she had received regular monitoring of
24 her alcohol withdrawal protocol after her intake at

258

1  the WCC?
2      MR. MCFADDEN: Objection.
3  A.  It's tough for me to say that. I would
4  lean toward, but I would defer to an infectious
5  disease expert I guess. I think more likely than
6  not, her outcome would have been dramatically
7  improved. That I can say with unwavering
8  confidence. I hesitate because you can never say
9  that this person is going to live and this person is
10 not. It makes for very challenging critical care
11 conversations.
12       I did not see what she looked like. I was
13 not there in the hospital. Frankly, I didn't see
14 her in corrections or have any data of how sick she
15 was while she was at the WCC because there was no
16 vital signs, because there was no physician exam.
17 So that is the barrier for me being able to say more
18 likely than not she would survive. There's no
19 evidence for me to understand how critically ill she
20 was during the somewhat black box period that she
21 was at the WCC.
22 Q.  Okay. But before, earlier you told me
23 that she could have been treated at the WCC before
24 she became critically ill, didn't you?

259

1  A.  Yes. I would stand by that.
2  Q.  So when is that? When did she become
3  critically ill?
4  A.  Certainly at or before taken by EMS, and
5  certainly after the day she came into the WCC.
6  Q.  Okay. What is your basis for saying --
7  what do you mean when you say critically ill? What
8  does that mean?
9  A.  Having unstable vital signs is really I
10 think -- they're called vital signs for that reason.
11 I would say one of the biggest things is unstable
12 vital signs.
13 Q.  Do you have any facts, other than the
14 swollen knee, to indicate how long -- well, do you
15 have any facts to indicate how long Madelyn
16 Linsenmeir had been suffering from infective
17 endocarditis as of the moment that she walked into
18 the WCC?
19      MR. MCFADDEN: Tom, do you mean how
20 long before the WCC she had endocarditis?
21      MR. DAY: Right.
22 Q.  Do you have any facts, are you aware of
23 any facts to indicate how long she had been
24 suffering from infective endocarditis prior to

260

1  walking into the WCC?
2  A.  If I recall, there was some text messages
3  before going to the WCC that she feeling ill. But
4  honestly, I went through the records to identify how
5  the continued monitoring for alcohol withdrawal --
6  how her alcohol withdrawal treatment aligned to the
7  standards of care, and if it aligned to the
8  standards of care that an underlying disease process
9  could be identified. That's what's in my medical
10 report.
11 Q.  Okay. And how long prior to going into
12 the WCC were those text messages that indicated that
13 she was feeling ill?
14 A.  I don't recall.
15 Q.  Okay. So at some point prior to going to
16 the WCC, you know that Madelyn Linsenmeir was
17 sending texts indicating that she was feeling ill,
18 correct?
19 A.  That's right.
20 Q.  But in drawing this opinion, in coming to
21 this opinion in the final paragraph of page 12, you
22 had no idea how long before coming into the WCC
23 Madelyn Linsenmeir had been sending text messages
24 saying she was feeling ill?

261

1  MR. MCFADDEN: Objection.
2  A.  I think that's right that I don't know
3  when her symptoms of infective endocarditis first
4  started. I think earlier treatment would be better.
5  Treatment before critically ill is going to be much
6  better than when she's critically ill.
7  Q.  So how long the infective endocarditis
8  had been in her system makes a big difference as to
9  her chances of survival, correct?
10  MR. MCFADDEN: Objection.
11  A.  I think that that is not necessarily true
12  in all cases. I think treatment before critical
13  illness is always important for improved morality
14  outcomes. There are some infective endocarditises
15  that are more subacute. Yeah, I would leave it at
16  that.
17  Q.  What kind of infective endocarditis did
18  she have?
19  A.  I don't know the kind of infective
20  endocarditis that she had in that I did not review
21  the records looking for information about infective
22  endocarditis, but was specifically focused on the
23  alcohol withdrawal protocol, and how monitoring
24  especially could have identified an underlying

262

1  pathology, including something like infective
2  endocarditis.
3  Q.  And when you drafted your opinion, you
4  didn't know what kind of infective endocarditis she
5  had, right?
6  MR. MCFADDEN: Objection.
7  A.  When I drafted my opinion, the opinion is
8  really identifying any other severe pathology. It
9  didn't have to be infective endocarditis. It could
10  have been appendicitis. It could have been sepsis
11  from a urinary tract infection.
12  The ultimate point in the continuing
13  monitoring is you would also certainly see abnormal
14  vital signs or other clinical changes in someone
15  that has a serious underlying pathology. Madelyn
16  did have a serious underlying pathology, and the
17  likelihood of it being caught is zero if you don't
18  do any continued monitoring, and would have been
19  much higher had there been continued monitoring
20  through the alcohol withdrawal protocol.
21  Q.  Okay. But that's not an answer to my
22  question. I apologize if I'm taking you past 5:00,
23  but that's a great reason why right there. My
24  question was simply that when you wrote this final

263

1  paragraph on page 12, you didn't know what kind of
2  infective endocarditis Madelyn had, correct?
3  MR. MCFADDEN: Objection.
4  A.  That is correct.
5  Q.  And when you wrote this final paragraph
6  on page 12, you hadn't reviewed her hospital records
7  to see if there's any indication there as to how far
8  her infective endocarditis had progressed when she
9  came to the hospital, correct?
10  MR. MCFADDEN: Objection.
11  A.  No. I had briefly reviewed the hospital
12  records and the ID note about the infective
13  endocarditis. I don't recall details about the
14  infective endocarditis as that was not the core
15  parts of the report.
16  Q.  But so whatever your review of those
17  hospital records was, you don't remember any facts
18  to indicate how far her infective endocarditis had
19  progressed by the time she got to the hospital,
20  correct?
21  MR. MCFADDEN: Objection.
22  A.  In my review of the medical records, I
23  would say it was very clear she was very critically
24  ill from infective endocarditis.

264

1  Q.  Did you review her autopsy?
2  A.  I believe I reviewed the autopsy because
3  I do remember the septic emboli into the knee as
4  part of the autopsy.
5  Q.  But whatever your review of the autopsy
6  was, it didn't indicate to you what kind of
7  infective endocarditis she had?
8  A.  Is there a specific question? Are you
9  asking me about the organism that caused infective
10  endocarditis, the valve involvement?
11  Q.  What are the different types of infective
12  endocarditis?
13  A.  I mean, there's different valves that can
14  be involved. You can have mitral valve
15  endocarditis. You can have tricuspid valve
16  endocarditis. You can have different pathogens and
17  bacteria that cause endocarditis. You can have
18  complications of endocarditis; for example, septic
19  emboli.
20  Q.  Okay. But for instance, with regard to
21  the valves, however detailed your review of the
22  autopsy was, you didn't learn or at least you don't
23  know now what valves were involved, correct?
24  A.  That's correct. I was not, frankly,

265

1 paying close attention to that because that was not
2 the expert opinion that was being asked of me.
3  Q.  Okay. You mentioned text messages. What
4 do you remember being said in those text messages?
5  A.  I don't recall exactly. I think it was
6 feeling sick, maybe wanting to go to the hospital.
7 A text with the mom, I believe saying, "I need to go
8 to the hospital."
9  Q.  And Madelyn's account of how she was
10 feeling, could that be an indicator of how far her
11 infective endocarditis had progressed?
12  A.  I would not be able to identify the
13 severity of infective endocarditis by a text
14 message, no.
15  Q.  And in the case of these text messages,
16 you don't know even when they were sent in relation
17 to when she got to the WCC, correct?
18      MR. MCFADDEN: Objection.
19  A.  I don't recall when they were sent.
20  Q.  Okay. Is one of the purposes of an
21 alcohol withdrawal protocol to identify infective
22 endocarditis?
23  A.  One of the purposes of an alcohol
24 withdrawal monitoring protocol would be to ensure

266

1 that the alcohol withdrawal is getting better,
2 because if it's not, you would want to make sure
3 you're not missing a different diagnosis that might
4 be a severe disease process, not necessarily
5 infective endocarditis.
6  Q.  Does Librium address the risk of delirium
7 tremens?
8      MR. MCFADDEN: Objection.
9  A.  Librium can help prevent delirium
10 tremens, yes.
11  Q.  Does Librium address the risk of
12 seizures?
13  A.  Librium can help prevent specifically
14 alcohol related seizures.
15  Q.  And does Librium address the risk of
16 death from alcohol withdrawal?
17  A.  Librium can reduce the risk of death from
18 alcohol withdrawal.
19  Q.  In fact, addressing those three risks,
20 serious risks of alcohol withdrawal, are the major
21 reason to prescribe Librium as part of an alcohol
22 withdrawal program, correct?
23  A.  Yes, I would say the prevention of
24 seizures, delirium tremens and death is a major

267

1 reason for prescribing Benzodiazepines, including
2 Librium, yes.
3  Q.  I just want to confirm a couple other
4 things that were in the DOJ report, if you still
5 have that pulled up.
6  A.  Sure.
7  Q.  So on page nine, the report reads in
8 part, "Housing individuals at risk for or
9 experiencing withdrawal in a dedicated unit or units
10 has several advantages, such as improved monitoring
11 and care (due to presence of staff with a focused
12 mission) efficiency of operations, (e.g. health care
13 staff can make rounds more quickly) and a lower risk
14 of diversion of treatment medications into the
15 general jail population." Do you see that, page
16 nine?
17  A.  Yes.
18  Q.  Do you agree with that statement?
19  A.  Yeah, to an extent, yes.
20  Q.  On page 30 there was some
21 recommendations. One of the recommendations, A24
22 reads, "Benzodiazepines are the preferred agent for
23 treating alcohol withdrawal." Do you agree with
24 that statement?

268

1  A.  Yes, I agree with that statement.
2  Q.  A26 says, "Patients with CIWA-Ar scores
3 of less than 10 and who are at minimal risk of
4 developing severe or complicated alcohol withdrawal
5 may be provided supportive care alone and
6 monitored." Do you agree with that statement?
7  A.  Yes, I would agree with that statement.
8  Q.  Under that it reads, "It is also
9 appropriate to use Benzodiazepines prophylactically
10 for alcohol withdrawal." Do you agree with that
11 statement?
12  A.  Yes, I agree with that statement.
13  Q.  Then on A33 it reads, "Benzodiazepines
14 used to treat alcohol withdrawal should be tapered
15 and discontinued following treatment." Do you agree
16 with that statement?
17  A.  Yes, I agree with that statement.
18  Q.  Have you ever treated anyone for alcohol
19 withdrawal in an ambulatory setting?
20  A.  I have.
21  Q.  And in that situation, what do you do to
22 monitor that patient?
23  A.  One, we would only do it in very specific
24 circumstances; someone who is very, very low risk,