# EXHIBIT D

**Page 1**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO:  20-30036-MGM

MAURA O'NEILL, as Administrator of
the Estate of Madelyn E. Linsenmeir,
                              Plaintiff,

vs.

CITY OF SPRINGFIELD, MOISES ZANAZANIAN,
REMINGTON McNABB, SHEILA RODRIGUEZ,
HAMPDEN COUNTY SHERIFF'S DEPARTMENT,
EILEEN BARRETT and MAUREEN COUTURE,
                              Defendants.

VIDEOCONFERENCE DEPOSITION OF:  SIMEON KIMMEL, M.D. M.A.
taken before Julia A. McLeod, Shorthand Reporter and
Notary Public, pursuant to the Federal Rules of Civil
Procedure via Zoom Meeting at 10:00 a.m., Friday,
April 5, 2024.

APPEARANCES:

(Please, see page two.)

Julia A. McLeod
PHILBIN & ASSOCIATES, INC.
75 Market Place
Springfield, MA 01103
(413)733-4078

**Page 2**

REMOTE APPEARANCES:

AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF
MASSACHUSETTS, One Center Plaza, Suite 850, Boston,
Massachusetts 02108 representing the Plaintiff,
Maura O'Neill, as Administrator of the Estate of
Madelyn E. Linsenmeir,
BY:  DANIEL L. McFADDEN, ESQUIRE
     dmcfadden@aclum.org

GOULSTON & STORRS, P.C., 400 Atlantic Avenue, Boston,
Massachusetts 02110 representing the Plaintiff,
Maura O'Neill, as Administrator of the Estate of
Madelyn E. Linsenmeir,
BY:  KIMAN KAUR, ESQUIRE
     kkaur@goulstonstorrs.com

LAW OFFICES OF EGAN, FLANAGAN & COHEN, P.C., 67 Market
Street, Springfield, Massachusetts 01103, representing
the Defendant Hampden County Sheriff's Department,
Eileen Barrett and Maureen Couture.
BY:  THOMAS E. DAY, ESQUIRE
     kdw@efclaw.com
     MICHAEL G. McDONOUGH, ESQUIRE
     mgm@efclaw.com

In attendance intermittently via iPhone:

     Maura O'Neil

          *****

**Page 3**

I N D E X

-----------------------------------------------------
WITNESS        DIRECT   CROSS  REDIRECT RECROSS
-----------------------------------------------------

Dr. Simeon Kimmel     5
     (Day)

-----------------------------------------------------
EXHIBITS:    DESCRIPTION            PAGE
-----------------------------------------------------

     (NONE)

          *****

**Page 4**

S T I P U L A T I O N S

   It is agreed by and between the parties that all

objections, except objections as to the form of the

question, are reserved to be raised at the time of trial

for the first time.

   It is further agreed by and between the parties

that all motions to strike unresponsive answers are also

reserved to be raised at the time of trial for the first

time.

   It is further agreed that the deponent will read

and sign the deposition under the pains and penalties of

perjury, notary waived, and that the sealing of the said

deposition will be waived.

   It is further agreed by and between the parties

that notification to all parties of the receipt of the

original deposition transcript is also hereby waived.

          *****

213

1      A.  Let me review, look back at my report.
2          She was asked if she had any cardiac issues, but
3   she was not asked if she had chest pain.
4      Q.  Okay.  What was her answer to the question of
5   whether she had cardiac issues?
6      A.  No.
7      Q.  Okay.  So let me just ask you:
8          Now having reviewed your report, having gone
9   back and reviewed your report, are you aware of any
10  evidence that Madelyn Linsenmeir ever reported chest
11  pain to a nurse while she was at the WCC?
12     A.  No.
13     Q.  On page ten -- I would ask you to turn to page
14  ten.  Under the heading October 4th, the second
15  paragraph reads --
16         Well, let me say this.  Feel free to read over
17  the second paragraph that starts with the medical record
18  notes.
19         Do you see that?
20     A.  Yes.
21     Q.  Okay.  So I'm going to ask you a few questions
22  about this.  I'm not going to take very long with it.
23  But, if at any point you want to stop and read the

214

1   entire paragraph, of course feel free to do so.
2          But is it fair to say that in this paragraph you
3   are criticizing nurse Julie Belle-Isle?
4          MR. McFADDEN:  Objection.
5          THE WITNESS:  No.  I'm not criticizing her.
6   I'm noting what she documented as the likely diagnoses.
7      Q.  Okay.  And so it would be wrong to interpret
8   this paragraph in any way as criticizing the care that
9   Julie Belle-Isle provided to Madelyn Linsenmeir in any
10  way.  Is that fair?
11         MR. McFADDEN:  Objection.
12         THE WITNESS:  I think Ms. Belle-Isle
13  responded to the emergency and provided emergency
14  support.  And I see what she noted in her medical
15  documentation, and noted that things other than -- that
16  two of the three leading diagnoses were related to
17  substance use principally.
18     Q.  Right.  But you are not --
19     A.  The emergency care she provided -- I think the
20  emergency care she provided was appropriate.
21     Q.  Okay.  Is it your medical opinion that there was
22  a problem with Julie Belle-Isle ruling out overdose with
23  a patient that is semiconscious and has a documented --

215

1   had reported both opioid and alcohol use?
2          MR. McFADDEN:  Tom, are you asking about
3   the whole paragraph or that first sentence?
4      Q.  I'm asking about your opinion, Doctor, whether
5   it be in that paragraph or anywhere else in your report.
6          Is it your opinion that there was something
7   wrong with Julie Belle-Isle ruling out overdose as a
8   possible -- as a differential diagnosis in the case that
9   she was presented?
10     A.  So Julie Belle-Isle, Ms. Belle-Isle, initiated
11  an emergency response protocol appropriately, and then
12  later documented what her differential diagnosis was.
13         And the drug overdose, while it's reasonable for
14  that to be on a differential diagnosis, is -- typically
15  when people have a drug overdose, they have slowed
16  respiratory rate, not rapid respiratory rate.  And that
17  made me think that Ms. Belle-Isle was, in her thinking
18  about the case, not on how she actually physically
19  responded and initiated emergency protocol, but in
20  thinking about the case was thinking about her in the
21  context of someone who had a substance use disorder and
22  was being treated for withdrawal.
23     Q.  Okay.  So when somebody -- have you ever worked

216

1   in a correctional environment?
2      A.  I have shadowed clinicians in correctional
3   environments.
4      Q.  And when was that?
5      A.  The treating physician.  When I was working with
6   Doctor Jody Rich in Rhode Island.  And during my
7   residency I did a correctional health rotation, and
8   shadowed some physicians who were providing care in the
9   correctional setting.
10     Q.  Okay.  And when was the last time you were in
11  the correctional environment shadowing somebody else?
12         MR. McFADDEN:  Objection.
13         THE WITNESS:  During my residency.
14     Q.  And you write the fact that Ms. Belle-Isle
15  investigated a potential OD, notwithstanding vital
16  statistics that were directly contrary to an OD,
17  suggests that Ms. Belle-Isle anchored her investigation
18  on Ms. Linsenmeir's substance use without considering or
19  investigating alternative causes of her symptoms.
20         Do you see that?
21     A.  I do see that.
22     Q.  Did you write that?
23     A.  Yes.

217

1    Q.  Okay.  And what is the basis -- what is the
2  factual basis for your conjecture as to what
3  Ms. Belle-Isle anchored her investigation in and what
4  she did not consider?
5            MR. McFADDEN:  Objection.
6            THE WITNESS:  When one writes a medical
7  note and includes a differential diagnosis, that
8  information is meant to convey one is thinking about the
9  clinical case.
10           And she writes these three things as her
11 immediate things that she is thinking should be ruled
12 out.
13   Q.  Okay.  And considering Ms. Linsenmeir's reported
14 history, was it appropriate for Ms. Belle-Isle to rule
15 out opioid withdrawal?
16   A.  Yes.
17   Q.  When considering Ms. Linsenmeir's clinical
18 presentation, was it appropriate for Ms. Belle-Isle to
19 rule out internal bleeding?
20   A.  Yes.
21   Q.  And considering Ms. Linsenmeir's history,
22 reported history, with substance use and the fact that
23 she was in a correctional environment, was it

218

1  appropriate for Ms. Belle-Isle to rule out that she --
2  and in light of her clinical presentation, was it
3  appropriate for Ms. Belle-Isle to rule out drug
4  overdose?
5    **A.  I think it's appropriate for that to be on the**
6  **list of things that she was thinking about.**
7    Q.  And if it's on the list, it would only be on the
8  list to rule it out or not rule it out.  Correct?
9            MR. McFADDEN:  Objection.
10           THE WITNESS:  It's on the list because it
11 was on her differential diagnosis.
12   Q.  And you don't have any problem with that.
13 Correct?
14   **A.  I think there are alternative diagnoses that are**
15 **more likely.**
16   Q.  Okay.  But do you have a problem with -- well,
17 first of all, you are not giving an opinion as to
18 Ms. Belle-Isle's treatment of Madelyn Linsenmeir.
19 Correct?
20   **A.  That's correct.**
21           MR. McFADDEN:  Objection.
22   Q.  But that's correct?
23   **A.  I'm giving opinions of the -- well, my opinion**

219

1  **is that her response, her emergency medical response,**
2  **including providing oxygen and initiating additional**
3  **support was appropriate.**
4            **In terms of the treatment that she provided and**
5  **calling for help and, you know, calling for EMS, that**
6  **was appropriate.**
7            **I'm commenting on the fact that drug overdose is**
8  **the third thing on her list when the clinical picture is**
9  **not consistent with a drug overdose because one doesn't**
10 **have a respiratory rate of fifty when one is having a**
11 **drug overdose, and makes me think that she was thinking**
12 **about Madelyn as someone who is receiving treatment for**
13 **her substance use or for her withdrawal, but not**
14 **considering alternative things that might be leading to**
15 **her symptoms.**
16   Q.  Okay.  But you don't have enough professional
17 experience to have an informed opinion as to how serious
18 drug overdose is as a risk in a correctional
19 environment.  Correct?
20           MR. McFADDEN:  Objection.
21           THE WITNESS:  Drug overdose is a big risk
22 in lots of places.  I have a lot of experience
23 responding to drug overdoses.  And I work very closely

220

1  with people who train and respond to drug overdoses.  So
2  I'm basing my opinion on my experience responding to
3  drug overdoses and what I know about the emergency
4  protocols related to drug overdose.
5    Q.  Okay.  And what you do, if you determine that
6  somebody is in a drug overdose, the overdose and drugs
7  or opioids, at least is you institute harm reduction
8  procedures.  Correct?
9            MR. McFADDEN:  Objection.
10           THE WITNESS:  The most important thing to
11 do when someone experiences an overdose is preserve
12 oxygen supply to the brain.
13   Q.  And that would be a harm reduction procedure.
14 Correct?
15   **A.  That would be medical treatment.**
16   Q.  And how would you do that?
17   **A.  How would you provide oxygen to the brain?**
18   Q.  Yes.
19   **A.  There are several ways to try to improve**
20 **oxygenation.  If you have access to supplemental oxygen**
21 **and someone is breathing, breathing some, you provide**
22 **supplemental oxygen.**
23           **The community standard is now to also start CPR,**

221

1  which can create some ventilation for patients, and then
2  also to give Naloxone.
3  　　Q.  And that was one of the things that you
4  mentioned earlier in the deposition as harm reduction,
5  Naloxone.  Right?
6  　　MR. McFADDEN:  Objection.
7  　　THE WITNESS:  Naloxone distribution as a
8  practice is a strategy to reduce the harms of -- to
9  reduce the risk of fatal overdose.
10  　　In an individual setting with a patient in
11  front of you, this is delivering lifesaving treatment
12  potentially.
13  　　Q.  Okay.  So is it fair to say that you could not
14  provide an opinion as to Ms. Belle-Isle's treatment of
15  Ms. Linsenmeir because you are not familiar with nursing
16  standards?  Correct?
17  　　MR. McFADDEN:  Objection.
18  　　THE WITNESS:  I'm familiar with emergency
19  response standards.  And I think Ms. Belle-Isle, she
20  prioritized oxygenation.  She called for help.  I think
21  that her treatment was appropriate.
22  　　Q.  Okay.  Did you read -- I think you listed on
23  your list the deposition of Officer Phipps?

222

1  　　A.  Yes.
2  　　Q.  And Officer Phipps was the only person in the
3  stairwell with Madelyn Linsenmeir on October 2nd.
4  Correct?
5  　　A.  That's correct.
6  　　Q.  And Officer Phipps did not testify than
7  Madelyn Linsenmeir was experiencing shortness of breath
8  on October 2nd while she was in the stairwell.  Correct?
9  　　A.  I don't remember.
10  　　Q.  Okay.  You state in your opinion -- this is on
11  page eight under October 2nd, subsection E.
12  　　You say:  Ms. Phipps testified that she would
13  have conveyed information about Ms. Linsenmeir's fall
14  and difficulty climbing stairs when she was brought to
15  the infirmary.
16  　　Do you see that?
17  　　A.  I do see that.
18  　　Q.  Okay.  How long was Ms. Phipps in the Medical
19  Department with Ms. Couture on that day?
20  　　A.  I think there's a door entering into medical.
21  And then she is seen kind of poking her head in off to
22  the side, just outside of where the medical facility is.
23  And then she walks in with Madelyn.  And then I believe

223

1  she leaves.  So maybe a minute.
2  　　Q.  And when she pokes her head off to the side,
3  where is she poking her head?
4  　　A.  I think she -- I think she says that that may be
5  where she conveys -- she would have conveyed the
6  information about the stairwell.
7  　　Q.  Okay.  And is that the basis of your
8  understanding on which you base your opinion with regard
9  to what Ms. Couture may have known?
10  　　MR. McFADDEN:  Objection.
11  　　THE WITNESS:  That's one piece of
12  information.
13  　　Q.  Are there any other pieces of information?
14  　　A.  Well, Ms. Couture had a conversation with
15  Ms. Linsenmeir.
16  　　Ms. Couture had seen Ms. Linsenmeir the day
17  before, or maybe it was two days before.
18  　　Q.  Did you watch that video of the two of them
19  interacting two days before?
20  　　A.  I believe I did.  But I didn't watch it in
21  preparation for this deposition though.
22  　　Q.  Okay.  So from what you remember of that video,
23  was there any indication that Madelyn -- as to what

224

1  Madelyn and Maureen Couture were talking about on
2  September 30th on that video?
3  　　MR. McFADDEN:  Objection.  Tom, I'm sorry.
4  You are referring solely to the video, not any other
5  information?
6  　　MR. DAY:  I'm referring solely to the
7  video.
8  　　THE WITNESS:  I don't remember.
9  　　Q.  Okay.  And are you aware of any other
10  information that would indicate anything that Madelyn
11  and Ms. Couture discussed on September 3oth?
12  　　A.  On September 30?
13  　　Q.  Yes.
14  　　A.  There's a medical note on September 30th.
15  　　Q.  So other than Ms. Couture's medical note and
16  what you see on that video, is there any other
17  indication of what Madelyn and Ms. Couture discussed on
18  September 30th?
19  　　A.  There is deposition information, as well.
20  　　Q.  Okay.  Whose deposition?
21  　　A.  Ms. Couture and Ms. Wisnaskas.
22  　　Q.  Okay.  Other than that, is there anything else,
23  any other information that you can base your knowledge