# EXHIBIT A

Volume 1, Pages 1-182

Exhibits: 1-3

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---

MAURA O'NEILL, as administrator of the Estate of Madelyn E. Linsenmeir,

Plaintiff,

vs. CA No. 3:20-cv-30036

CITY OF SPRINGFIELD, MOISES ZANAZANIAN, REMINGTON McNABB, SHEILA RODRIGUEZ, HAMPDEN COUNTY SHERIFF'S DEPARTMENT, and JOHN/JANE DOES NOS. 1-5,

Defendants.

---

REMOTE DEPOSITION OF SUSAN W. McCAMPBELL

Wednesday, March 27, 2024, 10:00 a.m.

Via Zoom Videoconference

----Reporter: Kathleen L. Good, CSR, RPR----
K. L. GOOD & ASSOCIATES
Post Office Box 367
Swampscott, Massachusetts 01907
Tel. 781-367-0815
Kathleen.Good@verizon.net

higher.

You know, my experience is that detainees and inmates generally are very poor consumers of healthcare. One of the reasons why they get in trouble with the justice system is often times medical/mental health care. They're not informed consumers.

Frequently, they don't even know how to access care. They don't understand the difference between a nurse practitioner or a PA or a doctor. So if they don't see a doctor, they demand to see a doctor.

There's a whole dynamic that goes on in a booking area that makes generalizations really difficult.

Q. Ms. McCampbell, staying on the same topic of circumstances, if somebody was experiencing chest pain, hypothetically, somebody is experiencing chest pain and they made a complaint of chest pain, and they're denied medical care in response to their complaint of chest pain, would that qualify as impeded or unimpeded access to medical care?

MR. VIGLIOTTI: Objection.



A. You know, these hypotheticals are very difficult to answer because there's a whole environment that goes around them in terms of if somebody is staggering into an emergency room of a hospital and clutching their chest and gasping for air, that's one version of chest pain.

Another person comes in and they sprained the muscle that goes across their chest, that's another -- I mean, hypotheticals are truly difficult for me to answer in any way that's informative to you, Mr. Halstead.

Q. (By Mr. Halstead) I want to show you a document that you listed as having been reviewed and I'll share my screen so you can see it.

(Screen shared.)

Do you recognize this document?

A. Yes, I do.

Q. Do you know who Haylee Champagne is?

A. I believe she was incarcerated with Ms. Linsenmeir.

Q. I want to draw your attention to Paragraph 4, specifically at the end of the third line, the sentence specifically where it



begins with "she told them "and then going, I guess, another couple of sentences and ending with "she asked multiple times to be taken to medical."

Do you see that section I'm talking about?

A. Yes, I do.

Q. So looking at that phrase, so I'm going to read it into the record. It says:

"She told them that she had pain in her chest. I remember her saying, again, my heart hurts and my chest feels tight, among other things. She asked multiple times to be taken to medical."

So hearing that excerpt, my question is:

If Madelyn had complained about chest pain to correctional officers and asked to see medical and they had refused to obtain medical attention for her, would that be consistent with the accepted standard?

A. Well, really is based on the credibility of the statement, Mr. Halstead, because this statement was made 1,700 days after



the event occurred.

So I sort of reject the premise that has any factual basis to be able to conclude anything for me.

Q. When you say it's based on credibility, what do you mean by that?

A. I mean that this is a detainee who is in a jail setting, and 1,717 days later, she signs a declaration with specific recollections of detail, and I find that hard to believe, frankly.

Q. So when you say you find that hard to believe, is it your opinion that it's not credible?

A. I believe that's what I wrote in my report.

Q. So just to make the record clear, is your answer to my question Yes?

A. My conclusion was that it was not plausible or realistic or credible.

Q. So assuming that this statement -- this would involve making an assumption but just bear with me.

Assuming that the statement is

truthful, would a refusal to provide care in that situation be consistent with the accepted standard?

A. It's too much of a leap for me, Mr. Halstead.

Q. Is your answer No?

MS. OLANOFF: Objection.

A. My review of this matter shows that Ms. Linsenmeir had multiple opportunities to provide her concerns to medical staff in the unit, in the housing unit, staff in the unit.

If she had provided her concerns to housing unit staff and medical staff and been refused, which would be a violation of policy at WCC, then I would say it doesn't meet an accepted level of care.

But there's too many ifs in this sentence regarding Ms. Champagne's statement to be able to use that as the basis for any conclusion 1,700 days after the event.

MR. HALSTEAD: So I have another document that I want to show you.

Mark the declaration of Haylee Champagne as Exhibit 2.



(Marked, Exhibit No. 2, Declaration of Haylee Champagne.)

(Screen share stopped.)

(Discussion off the record.)

MR. HALSTEAD: Next, I would like to mark as Exhibit 3, this document, Declaration of Alexandria Cox.

(Marked, Exhibit No. 3, Declaration of Alexandria Cox.)

(Screen shared.)

Q. Do you see the document on the screen, Ms. McCampbell?

A. Yes.

Q. Do you recognize this document?

A. Yes.

Q. Do you know who Alexandria Cox is?

A. She was incarcerated with Ms. Linsenmeir.

Q. So next I would like to direct your attention to Paragraph 5. I would like to read this excerpt into the record.

"I and other prisoners tried to speak up for Madelyn and asked the WCC staff members to get her medical attention because it



seemed like she became too weak and sick to speak up for herself."

Do you see that?

A. Yes.

Q. So based on that excerpt, Ms. McCampbell, my question to you is:

If correctional officers received requests for medical attention from other prisoners on Madelyn's behalf and they refused, would that be consistent with the accepted standard?

A. Well, the same comment I had regarding Ms. Champagne's declaration is what I have regarding Ms. Cox's declaration, which is that 1,700 days later, I find it incredible, uncredible to believe that she has this kind of recollection. And she uses phrases like "very lethargic," which doesn't sound like language I very often heard in a jail setting.

Also, let me point out too, I should have mentioned this, when you look at the video, you can see that Ms. Champagne came in and out of her cell multiple times during the course that Ms. Linsenmeir was her cellmate, and never did



Ms. Champagne come out and speak to the corrections officers. She would come out; she would get her meal; she would sit down. There was no urgency, there was no interaction that I was able to see in those hours of video.

So that's the other thing that resulted in my conclusion about Ms. Champagne's declaration.

Ms. Cox's declaration, I think, to me, suffers the same thing. This is a lot of detail to remember 1,700 days after an event.

So to answer your question, you know, hypothetical, the staff working in a jail, if they were alerted by an inmate, to a sick inmate, and they failed to take action, that would be a concern.

But I'm not thinking that, in my opinion, that Ms. Champagne's and Ms. Cox's declarations provide the basis for making that conclusion about Ms. Linsenmeir.

Q. Is the basis for your conclusion that in that instance, that this situation didn't or wasn't sufficient for a correctional officer to provide medical care, is that basis

rooted in your conclusion that this statement of Alexandria Cox isn't credible?

A. The basis for my conclusion about the credibility of both of these statements are the time that has passed between the event and them writing these. The language that's used does not sound like thousands of inmates' grievances and letters that I've read over the years.

Also, looking at the evidence, the video evidence, that shows that at least Ms. Champagne had access to staff and showed no urgency or need to speak to them in the hours I looked at and I don't know where Ms. Cox was housed but, you know, I didn't see any urgency, I didn't see detainees rushing up to staff, you know, saying, you must come right now, there's a sick person. I didn't see any of that.

So when you add that with the 1,700 days that passes between the event and these two declarations, it just raises my concern about the credibility of them.

Q. So going back to the report -- you have the report in front of you, correct, Ms. McCampbell?



A. What page are you on there?

(Screen share stopped.)

Q. Going back to Page 12, specifically Paragraph 3, the booking section.

A. Okay.

Q. So for this procedure, what is the basis for your opinion that it's consistent with accepted practices?

A. Which sentence are you looking at?

Q. So I guess this is the fifth line down, at the end of that sentence, beginning with, it says:

"This is accepted practice in jails."

A. Okay. I see it. Okay.

What's the question?

Q. What is the basis for your opinion that this policy is consistent with accepted practice?

A. Because I don't know any other way that a booking operation would go. This is how you do it. You bring the detainee in, put them in front of an officer. You do questions. You talk with them. Some people don't even do that, so I think



the WCC did well with this in terms of its interaction.

Q. How did you go about forming that specific opinion?

A. Based on years of supervising booking. I mean, if you look at the policy, you look at what has to happen, and WCC does, in my view, a good job of bringing people in and individually screening them.

Thankfully for them, they don't have a lot of volume in the women that are coming in, so they have an opportunity to engage them more, talk with them.

Q. Did anybody assist you in formulating this specific opinion?

A. No.

Q. Is there a specific authority used to establish accepted practices as it relates to booking?

A. That's what my other response is. There's a variety of documents talking about what booking procedures should be. A lot of them relate to identification of the incoming arrestee. A lot of them relate to health and



mental health screening and screening for other conditions that might be violence and other conditions.

I mean, I don't think you want my lecture on jail operations 101 again. There's just plenty of documentation out there. There's not a single place that you go to learn this.

Q. So I know there is no one specific authority, but what are some of the accepted authorities on the accepted standard when it comes to booking?

A. The general standards, you can look at the Commission on Accreditation for Corrections, you can look at those standards; you can look at the PREA standards in terms of sexual safety. Those are just two of them.

There's 37 states that have state standards, so there's 37 more you can look at too. So there's a variety.

Clearly, the medical staff would have an interest in doing screening for medical. The security staff for the violence-related issues. There's not one place that you go to.

Q. Did you consult the Commission on