UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

|  |  |
|---|---|
| MAURA O'NEILL, AS ADMINISTRATOR OF THE ESTATE OF MADELYN E. LINSENMEIR,<br><br>PLAINTIFF<br><br>V.<br><br>HAMPDEN COUNTY SHERIFF'S DEPARTMENT AND MAUREEN COUTURE, DEFENDANTS | CIVIL ACTION NO. 3:20-CV-30036 |

**DEFENDANT'S , HAMPDEN COUNTY SHERIFF'S DEPARTMENT AND MAUREEN COUTURE, OPPOSITIONS TO PLAINTIFF'S MOTIONS IN LIMINE**

The Hampden County Sheriff's Department and Maureen Couture (the "HCSD Defendants") hereby respectfully oppose the Plaintiff's following Motions in Limine.

TABLE OF CONTENTS

I.    OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO LIMIT TESTIMONY OF
      PROFFERED EXPERT WITNESS SUSAN MCCAMPBELL ........................................ 3

II.   OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE CERTAIN
      TESTIMONY OF PROFFERED EXPERT DR. THOMAS LINCOLN ............................ 5

III.  OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE CERTAIN
      TESTIMONY OF PROFFERED EXPERT DR. MELISSA WEIMER ............................. 7

IV.   OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO PRECLUDE ARGUMENT OR
      EVIDENCE OF COMPARATIVE OR CONTRIBUTORY FAULT BY MADELYN
      LINSENMEIR OR HER FAMILY ............................................................... 9

V.    OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE EVIDENCE
      REGARDING MADELYN'S USE OF SUBSTANCES DURING PREGNANCY ............. 11

VI.   OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE EXTRANEOUS
      FAMILY HISTORY ................................................................................. 13

VII.  OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE TESTIMONY OF
      PREVIOUSLY UNDISCLOSED WITNESSES ............................................... 14

VIII. OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE INADMISSIBLE CRIMINAL
      CHARGES AND CONVICTIONS ............................................................... 33

I.     OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO LIMIT TESTIMONY OF PROFFERED EXPERT WITNESS SUSAN MCCAMPBELL

The HCSD's corrections expert, Ms. Susan McCampbell, relied upon her decades of extensive corrections experience in reaching her opinions, including deciding how much weight to give to particular pieces of evidence, such as the declarations of Plaintiff's witnesses, Hayley Champagne and Alexandria Cox. Ms. McCampbell's testimony as to how much weight she gave to these declarations (and why) is essential to the jury's understanding of Ms. McCampbell's expert opinion and how much weight to give to that. Plaintiff is attempting, through this Motion in Limine, to prevent Ms. McCampbell's from explaining the bases of her opinions, including the weight that she gave to certain evidence in forming her opinions and the reasons why she did or did not give a lot of weight to certain evidence.

Ms. McCampbell has offered several opinions related to the HCSD's corrections policies and the actions of its correctional staff, all based on her extensive expertise in the corrections field. Ms. McCampbell's opinions are based in part on her determination that the information contained in the Cox and Champagne *declarations* was not *plausible* because, among other reasons, the declarations contained allegations of conduct that were clearly rebutted by the video evidence available. As Ms. McCampbell explained at deposition and in her Expert Report, Ms. McCampbell arrived at her opinions through the application of her decades of experience, how and why she credited certain testimony is obviously an important facet of her opinions, and the opinions are helpful to the jury in that they provide a clear and exhaustively researched opinion as to why the relevant policies,

procedures, and practices of the HCSD – accused in this case of discrimination – are actually examples of sound correctional practice consistent with accepted standards of practice.

Ms. McCampbell testified that she relied on her experience in corrections to determine that the information provided in the declarations was not "*plausible*, realistic, or credible." Ex. A to Kaur Aff. in Supp. of Plaint.'s Mots. in Limine, McCampbell Dep., 97:19-20 (emphasis supplied). A juror without decades of experience in corrections might not understand why a particular claim is or is not plausible and testimony from a corrections expert will be helpful to the jury in explaining this technical area. For instance, a lay juror reviewing jail security footage likely will not understand how the footage relates to the claims in the declarations and, therefore, will not understand, without explanation, why Ms. McCampbell gave so little weight to this evidence in forming her opinions. The Advisory Committee Notes to Rule 702 of the Rules of Evidence, state, in pertinent part, that Rule 702 "expressly contemplates that an expert may be qualified on the basis of experience." *See also Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 156 (1999) (stating that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.")

When an expert relies on the statements or opinions of another, such reliance goes to the weight, not to the admissibility of the expert's opinion. *Ferrara & Dimercurio v. St. Paul Mercury*, 240 F.3d 1, 9 (1st Cir. 2001); *Forrestal v. Magendantz*, 848 F.2d 303, 306 (1st Cir. 1988). *See also Newell Puerto Rico, Ltd. v.*

*Rubbermaid Inc.*, 20 F.3d 15, 21 (1st Cir. 1994) ("When the factual underpinning of an expert opinion is weak, it is a matter affecting the weight and credibility of the testimony -- a question to be resolved by the jury."). It follows then, that if an expert *rejects* the statements or opinions of another, this too goes to the weight, and not admissibility of that opinion.

"[V]igorous cross-examination, presentation of contrary evidence, and careful instructions on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Campos v. Safety-Kleen Sys.*, 98 F. Supp. 3d 372, 378 (D.P.R. 2015)(*citing Daubert*, 509 U.S. at 596).

"When the 'adequacy of the foundation for the expert testimony is at issue, the law favors vigorous cross-examination over exclusion.'" *Zuckerman v. Coastal Camps, Inc.*, 716 F. Supp. 2d 23, 28 (D. Me. 2010) (quoting *Carmichael v. Verso Paper, LLC*, 679 F. Supp. 2d 109, 119 (D. Me. 2010)). "If the factual underpinnings of [the expert's] opinions [are] in fact weak, that [is] a matter affecting the weight and credibility of their testimony." *Payton v. Abbott Labs.*, 780 F.2d 147, 156 (1st Cir. 1985). Furthermore, Ms. Champagne and (if this Court permits her to testify) Ms. Cox will be called by Plaintiff to testify and will have a full opportunity to explain to the jury why their testimony should be believed.

This Motion is an attempt to prevent Ms. McCampbell from fully testifying as to the bases of her opinions and it should be denied.

## II.    OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE CERTAIN TESTIMONY OF PROFFERED EXPERT DR. THOMAS LINCOLN

Plaintiff seeks to exclude Dr. Lincoln's testimony insofar as it purports to summarize Madelyn Linsenmeir's medical records. As a practical matter, there can be no doubt that Ms. Linsenmeir's medical records will be in evidence at the trial of this matter. Once in evidence, any witness may refer to them. Dr. Lincoln's prospective testimony explaining or summarizing these medical records is likewise appropriate where the expert witnesses' "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. Rule 702(a).

Dr. Lincoln need not be offering any particular opinion regarding the medical records or Ms. Linsenmeir's care or treatment at the WCC. As the Advisory Committee Notes to Rule 702 contemplate:

> Most of the literature assumes that experts testify only in the form of opinions. The assumption is logically unfounded. **The rule accordingly recognizes that an expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts**. Since much of the criticism of expert testimony has centered upon the hypothetical question, it seems wise to recognize that opinions are not indispensable and to **encourage the use of expert testimony in non-opinion form when counsel believes the trier can itself draw the requisite inference**. (emphasis added).

Furthermore, as the HCSD's Medical Director, board-certified in Addiction Medicine, Dr. Lincoln is also a pivotal fact witness in this case, as Plaintiff takes the position that the HCSD's healthcare policies, procedures, protocols, and practices were discriminatory against inmates suffering from substance use disorder. To restrict this pivotal witness from testifying freely as to the care and

treatment provided to Ms. Linsenmeir at the WCC would deny the HCSD a fair trial on the ADA claim.

Plaintiff also seeks to exclude portions of Dr. Lincoln's opinion testimony on the grounds that it does not have an adequate foundation. Dr. Lincoln testified that he had reviewed training materials related to the training of the medical technicians at the WCC who dispense Librium to inmates withdrawing from opiates and alcohol. While Dr. Lincoln testified that he was uncertain what he had reviewed, Dr. Lincoln notably did not testify "nothing." Rather, his memory was exhausted. Day Aff., Exh. A, 67:8-9. However, even a bad memory does not require the exclusion of his opinions, because this goes to the weight, not the admissibility of an opinion. "When the 'adequacy of the foundation for the expert testimony is at issue, the law favors vigorous cross-examination over exclusion." *Zuckerman v. Coastal Camps, Inc.*, 716 F. Supp. 2d 23, 28 (D. Me. 2010) (quoting *Carmichael v. Verso Paper, LLC*, 679 F. Supp. 2d 109, 119 (D. Me. 2010)). "If the factual underpinnings of [the expert's] opinions [are] in fact weak, that [is] a matter affecting the weight and credibility of their testimony." *Payton v. Abbott Labs.*, 780 F.2d 147, 156 (1st Cir. 1985). This Motion should be denied.

## III.  OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE CERTAIN TESTIMONY OF PROFFERED EXPERT DR. MELISSA WEIMER

Dr. Weimer offers her opinion that "the WCC had a proactive and medically appropriate alcohol withdrawal management protocol in October 2018." This opinion is based upon her training and experience and her review of all of the materials produced in discovery related to Madelyn Linsenmeir's care and

treatment at the WCC. Dr. Weimer appropriately details the bases for her opinion,

which includes Dr. Lincoln's statements that "the medical technicians who dispense

medications to patients in the housing units are trained to identify the symptoms of

over-sedation from Librium and not dispense additional Librium in this situation."

Day Aff., Exh. B, 6.

When an expert relies on the statements or opinions of another, such reliance

goes to the weight, not to the admissibility of the expert's opinion. *Ferrara &*

*Dimercurio v. St. Paul Mercury*, 240 F.3d 1, 9 (1st Cir. 2001); *Forrestal v.*

*Magendantz*, 848 F.2d 303, 306 (1st Cir. 1988). *See also Newell Puerto Rico, Ltd. v.*

*Rubbermaid Inc.*, 20 F.3d 15, 21 (1st Cir. 1994) ("When the factual underpinning of

an expert opinion is weak, it is a matter affecting the weight and credibility of the

testimony -- a question to be resolved by the jury."). It follows then, that if an expert

*rejects* the statements or opinions of another, this too goes to the weight, and not

admissibility of that opinion.

The plaintiff claims that Dr. Lincoln had no basis to make such a statement.

This however, does not render Dr. Weimer's opinion inadmissible. "When the

'adequacy of the foundation for the expert testimony is at issue, the law favors

vigorous cross-examination over exclusion.'" *Zuckerman v. Coastal Camps, Inc.*, 716

F. Supp. 2d 23, 28 (D. Me. 2010) (quoting *Carmichael v. Verso Paper, LLC*, 679 F.

Supp. 2d 109, 119 (D. Me. 2010)). "If the factual underpinnings of

[the expert's] opinions [are] in fact weak, that [is] a matter affecting the weight and

credibility of their testimony." *Payton v. Abbott Labs.*, 780 F.2d 147, 156 (1st Cir.

1985). The Motion should be denied.

## IV.  OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO PRECLUDE ARGUMENT OR EVIDENCE OF COMPARATIVE OR CONTRIBUTORY FAULT BY MADELYN LINSENMEIR OR HER FAMILY

The Plaintiff is simply wrong that the Defendants have not pleaded

contributory or comparative negligence to any of Plaintiff's claims and have waived

their right to do so. As stated clearly in the Defendant's Answer to Plaintiff's First

Amended Complaint, the Defendants assert the affirmative defenses of both "[t]o

the extent plaintiff's claims **can be read as a claim sounding in negligence**."

ECF No. 148, ¶¶29-33 (emphasis supplied).

Both civil rights claims under §1983 and claims under the Americans with

Disabilities Act have been considered analogous to personal injury causes of action

sounding in tort. *See Doty v. Sewall*, 784 F.2d 1, 11 (1st Cir. 1986) *quoting Graffals

Gonzalez v. Garcia Santiago*, 550 F.2d 687, 688 (1st Cir. 1977) ("Traditionally, civil

rights actions have been considered to state a cause of action lying in tort . . .");

*Fincher v. Town of Brookline*, 26 F.4th 479, 485 (1st Cir. 2022) *quoting Poy v.

Boutselis*, 352 F.3d 479, 483 (1st Cir. 2003) and *Gilbert v. City of Cambridge*, 932

F.2d 51, 57 (1st Cir. 1991) ("Section 1983 'borrows the appropriate state law

governing limitations unless contrary to federal law.' 'The limitation period

applicable to a [§ ] 1983 claim is to be found in the general personal injury statute of

the jurisdiction in which the claim arises.') *Downs v. Massachusetts Bay Transp.

Auth.*, 13 F. Supp. 2d 130, 136 (D. Mass. 1998) ("Neither Title II [of the ADA] nor

the Rehabilitation Act establish a limitations period, and accordingly it is appropriate to adopt the limitation period of the most analogous state statute. Many courts have characterized claims brought under the ADA as personal injury claims. *E.g., Hickey v. Irving Indep. Sch. Dist.*, 976 F.2d 980 (5th Cir. 1992); *Doukas v. Metropolitan Life Ins. Co.*, 882 F. Supp. 1197 (D.N.H. 1995). The MBTA proposes borrowing Massachusetts' three-year statute of limitations for personal injuries. … This limitation period seems appropriate and is applicable here.") *See also Devbrow v. Kalu*, 705 F.3d 765, 768 (2013) ("The tort claim most closely analogous to a deliberate-indifference claim premised on a medical error is medical malpractice.")

Plaintiff's civil rights and ADA claims both sound in negligence and Defendants have certainly asserted the affirmative defense of comparative or contributory fault. In arguing that, nonetheless, that comparative and contributory fault do not apply to damages awarded under Sec. 1983 or the ADA, Plaintiff cites only to out-of-jurisdiction, trial court level cases, which are not mandatory authority. Also, in citing to these cases, Plaintiff provides no argument or explanation as to why the affirmative defense of comparative/contributory fault should not apply to these claims, so the cases are not even persuasive authority. Indeed, if the Plaintiff and the Plaintiff's decedent, Ms. Linsenmeir, passed up numerous opportunities to raise the Plaintiff's medical problems with Defendants and failed to do so, a reasonable jury could find that the Plaintiff and Ms. Linsenmeir were partially responsible for any delay in providing medical care to

Ms. Linsenmeir, and under the logic of the doctrine of comparative/contributory fault, any award to Plaintiff should be proportionately reduced.

V.    **OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE EVIDENCE REGARDING MADELYN'S USE OF SUBSTANCES DURING PREGNANCY**

Madelyn Linsenmeir's lifetime struggle with opiate use disorder is relevant to the causation and damages prongs underlying the Plaintiff's claims against the HCSD defendants. The Plaintiff argues that the HCSD defendants' actions, inactions and policies led to the death of Ms. Linsenmeir; and that had they acted in accordance with their legal obligations, Ms. Linsenmeir would have received treatment in sufficient time to save her life. The plaintiff's two medical experts offer this very opinion in each of their reports: "…had she received regular monitoring, her underlying pathology of infective endocarditis could have been identified in time to save her life." Day Aff., Exh. C, 12. "…due to delays in bringing her in for assessment and treatment, her endocarditis and severe septic shock were very advanced and she was not able to be saved. It is very likely that Ms. Linsenmeir's death was caused by her late presentation to the hospital while in custody." Day Aff., Exh. D, 1.

Defendants' expert Dr. McGee will opine that not only was Madeline's endocarditis so advanced by the time she first entered that WCC that she had little if any chance of survival even if she had immediately been taken to an acute care setting, but that she would not have been a candidate for the cardiovascular surgery necessary to save her life. Defendants' expert Dr. Weimer will further opine that Ms. Linsenmeir would be unlikely to survive beyond one year even if she did survive

the surgery. Both experts' opinions are largely based on Ms. Linsenmeir's long history with opioid and alcohol abuse.

Ms. Linsenmeir's use of substances during her pregnancy are evidence that she was unlikely to heed the medical advice that would follow cardiovascular surgery nor was she likely to refrain from returning to abuse substances, both of which would be required in order to facilitate any chance of her long-term survival. Day Aff., Exh. D, 7. Day Aff., Exh. B, 8-11.

Madeline's long history with substance abuse- and her disregard of medical advice- is wholly relevant to the question of causation and damages and a jury must therefore hear it.

The plaintiff claims that this evidence should be excluded under Fed. R. Evid. Rule 403. However, "the exclusion of evidence is not the general rule; to the contrary, the "trial court's discretion to exclude relevant evidence under Rule 403 should be exercised with recognition that exclusion is **extraordinary and to be invoked sparingly**." Rule 403.2.1 (emphasis in original); See also *Harrington v. Hiller*, 883 F.2d 411, 414 (5th Cir. 1989) ("probative evidence should be 'sparingly' excluded"); *United States v. Grant*, 256 F.3d 1146, 1155 (11th Cir. 2001) ("Rule 403 is extraordinary remedy whose 'major function . . . is limited to excluding matter of scant or cumulative probative [*6]  force . . .'"); *United States v. Dodds*, 347 F.3d 893, 897 (11th Cir. 2003) ("trial court's discretion to exclude relevant evidence under Rule 403 should be exercised with recognition that exclusion is

extraordinary and to be invoked sparingly, with trial court striking the balance in favor of admission in most cases").

"In performing the 403 balancing, the court should 'give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value.'" *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1274 (10th Cir. 2000) (citation omitted).

## VI. OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE EXTRANEOUS FAMILY HISTORY

The Court should deny this irresponsible and offensive Motion. Plaintiff charges that "[d]uring discovery, defense counsel attempted to elicit potentially embarrassing or unsavory information concerning the personal histories of various members of Madelyn's family – not Madelyn herself – regarding substance use in the past by other family members, participation in treatment programs, and alleged infidelity." Plaintiff's Motions in Limine, 10. In support of this spurious and offensive mischaracterization of defense counsel's behavior at the many depositions in this case, Plaintiff provides not a single citation or quote, much less the context in which any questions were asked. Any suggestion that HCSD defense counsel was anything other than unfailingly polite to Ms. Linsenmeir's family during depositions is utterly false. Day Aff., ¶39. Had defense counsel used the discovery process to attempt to embarrass grieving family members, Plaintiff's counsel would certainly have raised it with this Court immediately. This Court should deny this motion as unsupported and not worthy of the Court's consideration.

## VII.  OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE TESTIMONY OF PREVIOUSLY UNDISCLOSED WITNESSES

As a threshold matter, virtually all of the challenged witnesses were disclosed in the Plaintiff's Initial Disclosure, as the Plaintiff acknowledges in her Motion. Plaint.'s Mot. in Limine, 12 and Exh. K. The Plaintiff never raised an objection to this disclosure, sought a discovery conference, or filed a motion to compel. Day Aff., ¶40. The reason for this, we expect, is that, through the discovery process, starting with the Initial Disclosures and continuing through an exhaustive production process, including documents, videos and audio recordings, and then through more than 60 depositions, the majority of which were conducted by the Plaintiff, the Plaintiff was thoroughly apprised of the identities of these 22 individuals and their relevance to the case. Day Aff., ¶41. Throughout the discovery process, Plaintiff's counsel team repeatedly contacted the Defendants seeking additional documentation or information. Plaintiff's counsel team did this formally through interrogatories that demonstrated Plaintiff had conducted an extremely close review of the produced documents. Day Aff., ¶42. Plaintiff's counsel much more frequently did this informally, through countless requests for additional information or documents. *Id*. Defendants cooperatively complied with all of Plaintiff's extremely thorough discovery requests and demands throughout the long history of this case. *Id*.

It should be noted that the HCSD Defendants produced thousands of pages of documents, videos, and audio recordings in a highly-organized fashion. Day Aff., ¶43. For instance, HCSD staff or inmates can be identified in videos and then

14

named through reference to the Shift Rosters or the Inmate Rosters. *Id.* If the identity of a particular individual was not able to be discerned, the Plaintiff could serve interrogatories, or ask other witnesses at depositions, or simply pick up the phone and call Defendant's counsel to ask. *Id.* Plaintiff's counsel did all of this and received cooperation from Defendants' counsel at every turn. *Id.*

It should also be noted that this case does not include an unmanageable amount of material. Madelyn Linsenmeir was at the WCC for just less than four days, from around 11:00 a.m. on September 30, 2018 to around 10:00 a.m. on October 4, 2018. Day Aff., ¶44. Ms. Linsenmeir spent most of October 1, 2018 out at court. *Id.* Therefore, there was a limited number of inmates housed in the same unit as Ms. Linsenmeir and a limited number of staff who came in contact with her. *Id.* All of their names are on organized and easily discernable inmate rosters and shift rosters, identifying such things as the particular unit or shift. *Id.*

In short, the Defendants clearly identified, in their Initial Disclosures, that each person identified in the documents that the Defendants produced through discovery (identified by categories of documents in the Initial Disclosures) was an individual likely to have discoverable information that the Defendant may use to support its claims or defenses. If this had been inadequate, the Plaintiff would surely have objected and demanded additional detail, which she did not.

There was no need for the Defendants to supplement their Initial Disclosures after this discovery process was in full swing because the identities of the additional witnesses identified in their Proposed Witness List were disclosed through this

15

discovery process, usually in multiple different ways, such as repeated identification in documents and mention in depositions. The Federal Rules of Civil Procedure 26(e), "exempts a party from the supplementation requirement where the additional or corrective information has…otherwise been made known to the other parties during the discovery process or in writing." (internal quotations omitted) *Pina v. Children's Place*, 740 F.3d 785, 793 (2014), quoting Fed. R. Civ. P. 26(e)(1). *See United States ex rel. Long v. Janssen Biotech, Inc.*, 2022 U.S. Dist. LEXIS 162782 (D. Mass Sept. 9, 2022) ("Courts routinely decline to require a party to supplement their initial disclosures where information was provided through other means, such as a document production or through deposition.") All of the witnesses that Plaintiff claims were undisclosed were identified through document production and/or deposition.

At no point in this litigation did the Plaintiff object to the Defendants' Initial Disclosure or the language used therein. The Plaintiff never requested additional clarification from the Defendants on the identifies of witnesses that can be either seen in videos or are referenced in the documentation. The Plaintiff did request additional clarification during discovery, through Interrogatories, as to the identifies staff that used the Jail Management System ("JMS") to modify or enter data into Ms. Linsenmeir's chart. These Interrogatories were specific, referenced a wide range of discovery material and demonstrated that the Plaintiff was reviewing the records very closely and in great detail. Throughout the exhaustive discovery process, Defendants cooperated consistently and diligently with Plaintiff's countless

requests for additional information, even while producing numerous HCSD witnesses, who also freely provided information to Plaintiff as to identities of witnesses and their roles.

Of the twenty-two (22) witnesses that Plaintiff claims were undisclosed, four were identified during depositions the Plaintiff noticed, one was identified by the Plaintiff's witness Alexandria Cox, who was disclosed more than two months after discovery closed, as the potential declarant of comments of direct animus, eleven are clearly identified in the documentation Defendants produced during discovery, four are also named in Answers to Interrogatories, and three are named in documents produced by the Plaintiff. Additionally, Plaintiff's claim that Dr. Brogdon Tiru is not referenced in any of the documents is false.

The Court should not preclude the testimony of these twenty-two (22) witnesses because they were clearly disclosed to the Plaintiff through the Initial Disclosure and subsequently and Plaintiff never sought a Rule 7.1 conference, filed a motion to compel, or otherwise complained that the disclosure was inadequate. The expected testimony of these witnesses is not cumulative or of minimal import. Especially since the Plaintiff's production of the Declarations of inmates Hayley Champagne and Alexandria Cox after the close of discovery, the testimony of many of these witnesses has become central to the case.

    **i.**    **The Court should not preclude the testimony of the twenty-two (22) witnesses identified in Plaintiff's Motion because all are referenced either in deposition, the documentation produced during discovery, or both.**

The Defendants were not required to supplement their Initial Disclosure to disclose additional witnesses whose identities were revealed during discovery. *See Echavarria v. Roach*, 2022 U.S. Dist. LEXIS 84042 (D. Mass May 10, 2022) ("given that Plaintiff learned of [the witness] in depositions that he noticed during discovery, he cannot claim surprise."). *See also S. Shore Hellenic Church, Inc. v. Artech Church Interiors, Inc.*, 183 F. Supp. 3d 197, 221 (D. Mass. 2016) (finding duty under 26(e)(1)(A) satisfied where information was disclosed during depositions). All of the alleged undisclosed witnesses are clearly identified in documentation, including video, and/or are specifically identified in depositions.

Additionally, any of the alleged undisclosed witnesses are entitled to testify to rebut any statements made by the Plaintiff's witnesses that the undisclosed witnesses allegedly made any discriminatory comments, which is direct evidence of discriminatory animus, or refused to help Ms. Linsenmeir obtain medical treatment.

### a. The identities of Kerry Ann Robinson, William Courchesne, Elizabeth Meaux, Kimberly Glaszcz and Arianna Lugo were clearly disclosed during deposition and in several pages of documents produced by the Defendants during discovery.

The Defendants were not required to supplement their Initial Disclosure to disclose Kerry Ann Robinson, William Courchesne, Elizabeth Meaux, Kimberly Glaszcz or Arianna Lugo because they were identified in depositions, on documentation produced by the Defendants, and in the videos.

In the deposition of Lauren Moore on October 21, 2022, Moore was asked by Plaintiff's counsel to watch a video, identified as Exhibit 133, and identify two

people who are seen in the video. The two people were identified as Med-Tech

Kimberly Glaszcz and Correctional Officer William (Bill) Courchesne. Day Aff., Exh.

E, 49:13-19; 50:16-17. Glaszcz is also identified by full name in the six Health

Services Shift Logs produced by the Defendants during discovery. Day Aff., Exh. F.

Additionally, Glaszcz can be seen in the video entitled "1B Cell 1 until she leaves for

court on 10 1 18" that Plaintiff has included as a proposed exhibit in her Proposed

Exhibit List. *See* Exh. G. Galszcz's name appears on the "Patient Dispense List" ten

times showing where and when Ms. Glaszcz dispensed what medications to Ms.

Linsenmeir. Day Aff., ¶45, Exh. II.

Officer William Courchesne is clearly listed on seven shift logs by full name,

he was the Correctional Officer in 1B on September 30 and October 1, 2018, and he

was the Correctional Officer in 1A on October 4, 2018. Day Aff., Exh. H.

Additionally, Officer Courchesne is listed as "12-8 Staff" on several documents and

shift logs produced by the Defendants. Day Aff. Exh. I. Most importantly, Officer

Courchesne is identified in Defendants' Answers to Plaintiff's First Set of

Interrogatories regarding his entries into JMS as a person who modified or entered

information into Ms. Linsenmeir's file. Day Aff., Exh. J. Courchesne is also

identified in the video titled "second and third and day shift until ambulance" that

Plaintiff has identified in her Proposed Exhibit List. Day Aff. Exh. G.

Elizabeth Meaux was identified as the Nursing Supervisor for the WCC in

five depositions, numerous pages of shift logs and several correspondences that the

Defendants produced during discovery. Meaux was identified and discussed in the

depositions of Alexandra Russ, Keisha Williams, Samantha Ferriter, Rachel Reale and Lauren Moore. In the deposition of Alexandra Russ, she identified Meaux as her supervisor. Day Aff., Exh. K, 21:9-17. In the deposition of Samantha Ferriter, she identified Meaux as evening shift supervisor. Day Aff., Exh. L, 24:18-22. In the deposition of Rachel Reale, she identifies Meaux as one of the two medical supervisor that would receive grievances. Day Aff., Exh. M, 44:16-22; 50:19-21. In the deposition of Lauren Moore, she identifies Meaux as her nursing supervisor. Day Aff. Exh. E, 15:11-18. In the deposition of Keisha Williams, Williams identifies Meaux and provides an overview as to what Meaux's role was in conducting a mortality review in 2018. Day Aff., Exh. N, 142:20-144:23.

Additionally, Meaux is listed by full name and "Supervis Nurse" in twelve different Health Services Shift Logs, clearly showing that she was the nursing supervisor on duty for the second shift (evening shift) on September 28 and from October 1, 2018 through October 4, 2018. Day Aff., Exh. O. Meaux is also included on several email correspondences related to the WCC, produced by the Defendants through discovery. Day Aff. Exh. P. It is undisputable that Meaux was disclosed through discovery and the Defendants did not need to supplement their Initial Disclosure to identify Meaux.

Additionally, Kerry-Ann Robinson was identified during discovery by the Plaintiff's late-identified witness Alexandria Cox. Alexandria Cox was first identified as a witness in this case over two months after discovery had closed when the Plaintiff provided the Defendants with Cox's signed Declaration dated June 27,

2023. Day Aff., ¶20. Cox had never been previously identified in this case nor was she listed on Plaintiff's Initial Disclosure or her Supplemental Disclosure. Day Aff. ¶21. In Cox's deposition taken in May 2024, Cox identifies a female Correctional Officer with the last name "Robinson" who *could* have made the remarks that would qualify as direct discriminatory animus such as "You did it to yourself." Day Aff., Exh. Q, 34:16-25:7. Kerry-Ann Robinson was the correctional officer on duty in Ms. Linsenmeir's pod at the time.

Until Cox's deposition, the Defendants were unaware of the full relevance of Correctional Officer Robinson to this case. The Plaintiff were clearly in communication with Cox prior to the end of discovery and could have identified Cox as a witness in this case before discovery closed, but she failed to do so. It was not until after Cox's deposition, taken over a year after discovery ended, that the Defendants were aware of the allegations against Ms. Robinson.

However, even before Cox identified Robinson as a potential key witness in this case, Robinson was identified in the Defendants' Answers to Plaintiff's First Set of Interrogatories. Day Aff., Exh. J. The Defendants list Kerry-Ann Robinson as a Correctional Officer that modified or entered information into Ms. Linsenmeir's file in JMS. Day Aff., Exh. J. Robinson can also be seen in the video entitled "second and third and day shift until ambulance" that Plaintiff has listed in her Proposed Exhibit List. Day Aff., Exh. G. Robinson can be seen on that video as one of the correctional officers on duty in the cellblock where Ms. Linsenmeir, Sandi Dailey and Ricky (Lynn) Rivera are located at the time. Thus, the Plaintiff knew that

21

Robinson was a potential witness in this case from the shift logs, Answers to Interrogatories and videos, and likely knew long before the Defendants that she was a key witness in this case considering Cox's testimony.

Lastly, Arianna Lugo is identified in the deposition of Keisha Williams, taken on January 23, 2023, as a Med-Tech and Health Services staff member who was unable to administer medication to Ms. Linsenmeir on October 3, 2018, because Ms. Linsenmeir was a "No show." Day Aff., Exh. N, 180:14-181:8. Arianna Lugo's name also appears eleven times on the one page "Patient Dispense List" that Defendants produced through discovery, showing the dates and times that Ms. Lugo dispensed each medication to Ms. Linsenmeir. Day Aff., ¶45, Exh. II. Therefore, Plaintiff could see Ms. Lugo on a video interacting with Ms. Linsenmeir, then go to the Patient Dispense List and identify her by first and last name and even identify what drugs she was dispensing. From this deposition and the documentation, Plaintiff was aware of Ms. Lugo's identity, her role at the WCC, her specific interactions with Ms. Linsenmeir, and the potential that she would be called as a witness in this case.

    **b. Two of the witnesses that Plaintiff identified as undisclosed can be identified in Defendants' Answers to Plaintiff's First Set of Interrogatories as well as in numerous pages of documentation produced by the Defendants during discovery.**

The Plaintiff has identified Robert Donovan and Meagan Moorhouse as two witnesses that were not previously disclosed to the Plaintiff and should be precluded from testifying. Both Corporal Donovan and Officer Moorehouse were clearly identified in the Defendants' Answer to Plaintiff's First Set of Interrogatories as two people who modified or entered data into Ms. Linsenmeir's

file. Day Aff., Exh. J. From the specificity of the Plaintiff's First Set of Interrogatories Propounded on the Defendants, it is clear that Plaintiff reviewed the documentation closely and in great detail. In the Interrogatories, Plaintiff requested clarification of the identities of staff members who may be involved in or witnesses in Ms. Linsenmeir's case based on their modification or entering of data into Ms. Linsenmeir's JMS file while she was in their custody. The Plaintiff cannot now claim that they were unaware that these two, in addition to Courchesne and Robinson as discussed above who were also mentioned in these Answers, were not disclosed to them.

Additionally, Robert Donovan is identified as a correctional officer in seven pages of shift logs. Day Aff., Exh. R. Additionally, Donovan is listed on fifteen shift logs and staffing sheets that were circulated through correspondences as coverage for 1A/1B on September 30, 2018, as 8-4 Staff, and as 1B Floater and 1B coverage for meal breaks on October 4, 2018. Day Aff., Exh. S. Moreover, Plaintiff has identified the video entitled "1B cell 1 until she leaves for court on 10 1 18" in her Proposed Exhibit List. Day Aff., Exh. G. In that video, Donovan is one of the officers on duty and he engages in conversations with Hayley Champagne, a key witness for the Plaintiff. For an extended period of time after arriving in the unit, Ms. Linsenmeir leans at the officer's desk in close proximity to Officer Donovan. Officer Thompson is seen on duty in the video with one other Correctional Officer, his partner on the Shift, Officer Marcus Thompson. Both are clearly identified as the Unit 1B pod officers for that shift on the Shift Roster. After reviewing discovery,

23

including the documentation and the videos, and considering the claims against the HCSO, the Plaintiff was aware that Donovan is an important witness in this case, his relevance to this case, and the information he would have.

Meagan Moorhouse is identified in eight shift logs and eight staffing sheets circulated through email correspondences in addition to in the Defendants' Answers to Plaintiffs First Set of Interrogatories. Moorhouse is listed as a Correctional Officer on duty in 1A on September 29, 2018, October 2, 2018, October 3, 2018, and 1B October 4, 2018. Day Aff., Exh. T. Additionally, Moorhouse is listed as 12-8 Staff and 1B unit officer on October 4, 2018 on several shift logs and staffing sheets that were circulated through email. Day Aff., Exh. U. Moorhouse is also the officer in 1A on October 1, 2018 when Ms. Linsenmeir is in the unit. Plaintiff has proposed to admit the video entitled "1A gets supper than to bed for night 10 1 18" on her Proposed Exhibit List. Day Aff., Exh. G. In that video, Moorhouse is one of the officers on duty and she even engages in contact with cell 11, the cell in which Linsenmeir and Voudren were in at that time. Ms. Moorhouse is easily identified from the Shift Rosters described above.

### c. Eleven of the Defendants' witnesses can be found in several documents that they produced during discovery.

Plaintiff's claim that several witnesses appear on "just one or two pages of shift rosters or similar administrative documents" is misguided. All of the witnesses appear in the documentation that was provided to the Plaintiffs during discovery, including the videos. Many of the witnesses appear extensively in the documentation and are easily identifiable as correctional officers or health services

24

staff. The identified staff were present in Ms. Linsenmeir's cellblock, as evidenced by the shift logs and medical records, and are key witnesses to combating statements that will likely be made about staff by the Plaintiff's witnesses.

Juanita Gibbs is clearly listed as a Correctional Officer on seven shift logs and eleven documents produced as email correspondence. Additionally, Gibbs was the Correctional Officer inside the unit that Ms. Linsenmeir, Ms. Champagne, Ms. Dailey and Ms. Cox were in at the relevant time and seemingly fit the identity of the alleged Correctional Officer making statements of direct discriminatory animus to the inmates. Cox alleges that a female officer would not help Linsenmeir on the date that Gibbs is identified by the Shift Logs and the video as being at the Correctional Officer Station with Officer Robinson. Day Aff., Exh. Q, 71:12-73:20. Officer Gibbs can be seen as one of the correctional officers on duty in the video "second and third and day shift until ambulance" that has been identified on Plaintiff's Proposed Exhibit List. Day Aff., Exh. G. Officer Gibbs is a necessary witness to combat any allegations that she made statements which would be examples of direct discriminatory animus. Moreover, Officer Gibbs was an officer on duty during the alleged tray debacle that Cox testified about in her deposition, which would be in the same video proposed by the Plaintiff.

Patricia Tabb is a Correctional Officer who is found in six shift logs, and eight other entries in email correspondences. Officer Tabb was on duty with "Programs-Health Services" on September 29, 2018 and October 2, 2018 from 2:00 p.m. until 10:00 p.m. Day Aff., Exh. V. She is also listed on shift logs as an officer who

swapped shifts on October 3 and October 4, 2018. Day Aff., Exh. W. Additionally, Officer Tabb is listed as "4-12 Staff" on several staffing sheets and on identified on shift logs that were circulated by email. Day Aff., Exh. X. Officer Tabb can also be identified on the video as one of the officers in Ms. Linsenmeir's cellblock.

Terrence Xavier is a Correctional Officer who is found in six shift logs and nine other documents produced by the Defendants during discovery. Officer Xavier was on duty on September 29, September 30, and October 4, 2018 in 1B. Day Aff., Exh. Y. Additionally, Officer Xavier is listed as "4-12 staff" and on Housing Shift Reports as having taken count on October 4, 2018 in 1B. Day Aff., Exh. Z. Officer Xavier can be seen in the video entitled "1B cell until she leaves for court on 10 1 18" as the officer working with Damian Iennaco that Plaintiff has identified in her Proposed Witness List. Day Aff., Exh. G.

Marcus Thompson is a Correctional Officer that is listed on at least one shift log and on numerous staffing lists. Thompson was on duty on September 30, 2018 in 1B when Ms. Linsenmeir was in the unit. Day Aff., Exh. AA. Thompson is also listed on several other documents the Defendants produced in discovery. Day Aff., Exh. BB. Additionally, Thompson is an officer on duty in the video entitled "1B cell 1 until she leaves for court on 10 1 18" that Plaintiff has identified as an exhibit on her Proposed Exhibit List. Day Aff., Exh. G. Mr. Thompson is seen on the video having extensive contact with Plaintiff's witness, Hayley Champagne.

Ashley Alvarado is clearly listed as an RN on several of the Health Services Shift Logs. Day Aff., Exh. CC. Moreover, Alvarado worked from "3p-11p" on October

1, 2018. Day Aff., Exh. CC, 403, 621. Jennifer Auger is also listed as a worker on the Health Services Shift Logs. Day Aff., Exh. DD. Auger worked on October 1, 2018 from "5p-8:30p." Day Aff., Exh. DD, 404. Auger can be seen in the video entitled "1B cell 1 until she leaves for court on 10 1 18" as identified by the Plaintiff in her Proposed Exhibit List. Day Aff., Exh. G. Maribel Mojica is listed as an MA in three Health Services Shift Logs who worked "3p-11p" on September 28, 2018, "9a-12p" on September 30, 2018 and "3p-11p" on October 1 to October 5, 2018, which directly correlates with Ms. Linsenmeir's incarceration. Day Aff., Exh. DD, 400, 408, 618. Sara Smedberg is listed as an RN in six of the Heath Services Shift Logs who worked "5:15p-11p" on October 1, 2018. Day Aff., Exh. O. Auger's name appears on the "Patient Dispense List" twice showing where and when Ms. Glaszcz dispensed what medications to Ms. Linsenmeir. Day Aff., ¶45, Exh. II.

There are actually only two witnesses, Damian Iennaco and Arianna Lugo, who appear on just one or two pages of shift rosters. However, as explained above,

Noelani Washington is identified as a RN on the Heath Services Shift Logs who worked "3p-11p" on September 29 and September 30, 2018, and was included on the email correspondence circulating the obituary of M. Linsenmeir. Day Aff., Exh. EE. Additionally, Washington can be seen in the video entitled "1B cell 1 until she leaves for court on 10 1 18" that Plaintiff has included in her Proposed Exhibit List. Day Aff., Exh. G. Carmen Edwards is listed on the Health Services Shift Logs as a staff member who worked "5p-9p" from October 1, 2018 to October 5, 2018. Day Aff., Exh. FF.

There are actually only two witnesses, Damian Iennaco and Arianna Lugo, who appear on just one or two pages of shift rosters. However, as explained above,

Arianna Lugo was clearly identified by name as a Med-Tech during Keisha Williams' deposition. Day Aff., Exh. N, 180:14-181:8. Lugo is also seen distributing medication to Ms. Linsenmeir in the video entitled "1A gets supper then to bed for night 10 1 18" that has been identified in Plaintiff's Proposed Witness list. Day Aff., Exh. G. Damian Iennaco is clearly listed on the shift roster for September 30, 2018 as "1A/1B FLTR" which includes the cellblock where Ms. Linsenmeir was located at the time. Day Aff., Exh. Y, 71. Additionally, on the video entitled "1B cell 1 until she leaves for court on 10 1 18" Officer Iennaco is one of the correctional officers on duty from 4:00PM until the end of the video, and identified as such on the produced documentation.

> **d. Michael Joselin was clearly identified by Daniel Soto, an internal affairs Investigator, in the witness interviews conducted by the investigation staff at the HCSD after Ms. Linsenmeir's death.**

In every video, or almost every video, of the interviews that were completed by the investigation staff at the HCSD after Ms. Linsenmeir's death, Daniel Soto identifies Michael Joselin's as being present or Joselin asks the questions himself.. Joselin was present at, at the minimum, the interviews of Meagan Moorhouse, Ann Cutler, Shana Pedroso, Lynn Minella, Alliza Cleary, Kaneshia Dorsey, Lindsey Bouthiller, Mary Llyod and Donna Hagopian. It is clear from the videos, which were produced by the Defendants during discovery, that Michael Joselin was an internal affairs investigator, like Daniel Soto, and these videos identify him as such.

### e.  Three of these witnesses Plaintiff claims are undisclosed are clearly identified in the documentation the Plaintiff's produced during discovery.

The Court should not preclude the testimony of Neal Colburn and Stephen Draghetti, the EMTs who transported Ms. Linsenmeir from the WCC to the hospital, or Dr. Brogdon Tiru, her Baystate Medical Center Provider, because they are clearly identified in the documentation Plaintiff's produced during discovery. Mr. Colburn and Mr. Draghetti are also clearly visible and easily identifiable on a key video in this case, which depicts when Ms. Linsenmeir was transported from the WCC to the hospital on October 4, 2018. Both the Alert Ambulance Service, Inc. records and the Baystate Medical records have been identified as proposed exhibits on Plaintiff's Proposed Exhibit List. Day Aff., Exh. G. The two crew members for Alert Ambulance Service Inc. are listed as Steven P. Draghetti and Neal Colburn. Day Aff., Exh. GG. Dr. Brogdon Tiru is identified and disclosed numerous times in the nine hundred and sixty-nine (969) pages of medical records that the Plaintiff produced during discovery. Moreover, Dr. Tiru is clearly listed as Ms. Linsenmeir's admitting and attending physician. Day Aff., Exh. HH. Dr. Tiru, EMT Neal Colburn and EMT Stephen Draghetti were clearly identified by the documentation she produced, and the Plaintiff cannot now claim that she was unaware that they could be called as witnesses in this case.

### ii.  The Court should not preclude the testimony of the twenty-two (22) witnesses identified in Plaintiff's Motion because the factors do not weigh in favor of preclusion, and the impact of these witnesses is not minimal.

When a party does fail to supplement or disclose an identity, that party "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). However, even if the Court decides that such disclosures were insufficient, "preclusion is not automatic and a failure to disclose may be excused if a court determines that a different remedy is more appropriate under the circumstances." *Allscripts Healthcare, LLC v. Dr/Decision Res., LLC*, 2021 U.S. Dist. LEXIS 268994 (internal quotations omitted) (D. Mass. July 1, 2021), quoting *Genereux v. Raytheon Co.*, 754 F.3d 51, 59 (1st Cir. 2014). The Court weighs several factors to determine whether preclusion is justified pursuant to Federal Rule of Civil Procedure 37. These factors include, "the sanctioned party's justification for the late disclosure; the opponent party's ability to overcome its adverse effects (i.e., harmlessness); the history of the litigation; the late disclosure's impact on the district court's docket; and the sanctioned party's need for the precluded evidence." *Harriman v. Hancock Cnty.*, 627 F.3d 22, 30 (1st Cir. 2010) (citing *Esposito v. Home Depot U.S.A., Inc.*, 590 F.3d 72, 76 (1st Cir. 2009).

The Defendants did not supplement their Initial Disclosure because all witnesses named in the paperwork produced through discovery <u>were</u> disclosed and Plaintiff never raised any objection regarding this disclosure. As explained above, even if these witnesses had not been disclosed in the Initial Disclosure, witnesses whose identities are disclosed through discovery need not be supplemented. Moreover, Plaintiff never asked for clarification on any witnesses besides those

30

disclosed in the Answers to Interrogatories in spite of an absolutely exhaustive discovery process conducted by the Plaintiff. Moreover, the Plaintiff's First Set of Interrogatories are highly specific and demonstrate that the Plaintiff examined all the documentation that the Defendants produced during discovery with very closely and in great detail. The First Set of Interrogatories even reference the specific HCSD Batestamp numbers that the Plaintiff is inquiring about. Interrogatory No. 1 references those who modified or entered information from HCSD 3509 to 3538. Day Aff., Exh J. Interrogatory No. 3 asks about 3520. Day Aff., Exh J.  Finally, Interrogatory No. 4 asks about HCSD 111 through HCSD 256. Day Aff., Exh J. Based on the foregoing reasons, the Defendants were justified in their reliance that the identities of these witnesses were uncovered through discovery and the Plaintiff would have, and could have, inquired further, but did not do so.

The fact that the Defendants did not supplement the Initial Disclosure with a Supplemental Initial Disclosure to specifically name witnesses who were already identified in the previous disclosure and specifically named in the documents referenced in that previous disclosure and produced through discovery caused no harm to the Plaintiff. As stated in great detail above, the Plaintiff became aware of the identities of the witnesses that she now claims are undisclosed through discovery. Plaintiff was not harmed by the lack of a Supplemental Initial Disclosure because these witnesses were specifically named through the supplemental discovery process, including successive productions of documents and videos, and depositions. *See Echavarria v. Roach*, 2022 U.S. Dist. LEXIS 84042 (D. Mass May

10, 2022) ("given that Plaintiff learned of [the witness] in depositions that he noticed during discovery, he cannot claim surprise."). Additionally, all of these witnesses were easily identifiable in the documentation that the Plaintiff's First Set of Interrogatories inquires into. In fact, most, if not all, of the witnesses' identities can be found in the very first Exhibit produced during discovery, which contained the Shift Rosters. This factor clearly weighs in favor of no preclusion.

This litigation has been extensive. There were over sixty (60) depositions noticed in this litigation since the case was filed in March 2020. There have been numerous continuations, both of discovery and other deadlines, including a continuation of the trial, originally scheduled for May 2024, at Plaintiff's request. This litigation has been extensive and time-consuming for both parties.

The Defendants disagree with Plaintiff's claims that all of these factors weigh in favor of preclusion, that the Defendants' need for the aforementioned witnesses is minimal or that the testimony that they would provide would be cumulative or marginally relevant at best. Plaintiff seeks to keep out twenty-two (22) witnesses that are in the best position to rebut statements that <u>will</u> be made by the inmate witnesses that were incarcerated in 2018 with Ms. Linsenmeir against correctional and health staff. These former inmates will testify regarding statements and/or comments allegedly made by correctional staff and/or the health services staff that, if believed, are direct evidence of discriminatory animus and intentional discrimination. (Ironically, one of these two witnesses, Alexandria Cox, was never disclosed by the Plaintiff in either her Initial Disclosure or Supplemental Initial

32

Disclosure.) To say that the Defendants would be prejudiced by the preclusion of these witnesses, who worked in Ms. Linsenmeir's unit from September 29, 2018 to October 4, 2018 and are the only witnesses in a position to rebut such statements made by Plaintiff's witnesses, would be an understatement. This would deny the Defendants a fair trial. Plaintiff will not be unfairly prejudiced by the inclusion of any of these challenged witnesses because, as explained in great detail above, all of these witnesses were disclosed through discovery. If the Court disagrees as to any witness, the Court should permit the depositions of that witness.

For the foregoing reasons, the Plaintiff's Motion in Limine to Exclude Testimony of Previously Undisclosed Witnesses should be DENIED.

## VIII. OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE INADMISSIBLE CRIMINAL CHARGES AND CONVICTIONS

The Defendants do not oppose this motion to the extent that it intends to preclude inadmissible criminal charges or convictions. To the extent that Defendants intend to use past criminal charges or convictions that are admissible pursuant to Federal Rule of Evidence 609, the Defendants will disclose such charges or convictions in advance of any impeachment on such grounds.

Respectfully submitted,

HAMPDEN COUNTY SHERIFF'S
DEPARTMENT AND MAUREEN
COUTURE

By their attorney,
ANDREA CAMPBELL
ATTORNEY GENERAL

33

By: */s/ Thomas E. Day*
Thomas E. Day, BBO #655409
Special Assistant Attorney General
Lauren F. Olanoff, BBO #669371
Michael G. McDonough, BBO #682128
Marissa Fabbo, BBO #715127
EGAN, FLANAGAN AND COHEN, P.C.
67 Market Street, P.O. Box 9035
Springfield, MA 01102-9035
(413) 737-0260
Email: ted@efclaw.com; lfo@efclaw.com
mgm@efclaw.com;mf@efclaw.com

Dated February 14, 2025

<u>Certificate of Service</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies of this document will be mailed, first-class mail, postage prepaid, to any unregistered participants on February 14, 2025.

*/s/ Thomas E. Day*
Thomas E. Day

34